```
1          IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                    PLANO DIVISION

3   UNITED STATES OF AMERICA      )(   DOCKET 4:19-CR-277

4                                  )(   JULY 31, 2020

5   v.                            )(   9:48 A.M.

6   CHRISTIAN CORTEZ-SANCHEZ      )(   PLANO

7   ---------------------------------------------------------

8         REPORTER'S TRANSCRIPTION OF DETENTION HEARING

9      BEFORE THE HONORABLE KIMBERLY C. PRIEST JOHNSON

10              UNITED STATES MAGISTRATE JUDGE

11  ---------------------------------------------------------

12

13  APPEARANCES:

14  FOR THE GOVERNMENT:    Mr. Ernest Gonzalez

15

16
    FOR THE DEFENDANT:     Mr. Jim Burnham
17

18

19
    THE REPORTER:          MS. SHAWNA GAUNTT-HICKS, CSR, CCR
20                         DEPUTY COURT REPORTER
                           UNITED STATES DISTRICT COURT
21                         EASTERN DISTRICT OF TEXAS
                           (903) 276-1090
22                         SHAWNACCR@OUTLOOK.COM

23

24

25   PROCEEDINGS RECORDED USING DIGITAL AUDIO; TRANSCRIPT PRODUCED
              VIA COMPUTER-AIDED TRANSCRIPTION.
```

1                         I N D E X

2

3                                                  PAGE

   GOVERNMENT'S WITNESS:
4

   MARCUS WEST
5  DIRECT EXAMINATION BY MR. GONZALEZ..................   5
   CROSS-EXAMINATION BY MR. BURNHAM....................  21
6

7  DEFENSE'S WITNESSES:

8  COOLET SANCHEZ
   DIRECT EXAMINATION BY MR. BURNHAM...................  44
9

   ITZEL CORTEZ
10 DIRECT EXAMINATION BY MR. BURNHAM...................  50

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      P R O C E E D I N G S

2

3        (Proceedings commence at 9:48 a.m.)

4        (Defendant present with counsel.)

5

6           THE COURT:  Christian Cortez Sanchez.

7           MR. GONZALEZ:  Your Honor, Ernest Gonzalez for the

8  Government.  The Government is ready to proceed.

9           Good morning.

10           THE COURT:  Good morning.

11           MR. BURNHAM:  Jim Burnham for Mr. Cortez.

12           And, Judge, I would just like to -- I filed a notice

13  of appearance, but my appearance is just limited for the

14  initial hearing in this detention hearing.

15           THE COURT:  Okay.

16           MR. BURNHAM:  And then I'm going to see --

17           THE COURT:  And then is he going to retain addition

18  counsel, or will he be --

19           MR. BURNHAM:  He may retain me.  We're working that

20  out right now.

21           THE COURT:  Okay.

22           MR. BURNHAM:  I just got the call Fri- -- well, I

23  really was just hired Monday.  So on this case, we didn't have

24  time to work out the logistics --

25           THE COURT:  Okay.
```

| | |
|---|---|
| 1 | MR. BURNHAM:  -- of representation, but -- |
| 2 | THE COURT:  All right.  Well, can you notify the |
| 3 | Court just so I know if I need to bring him back to appoint |
| 4 | counsel -- |
| 5 | MR. BURNHAM:  Yes, ma'am. |
| 6 | THE COURT:  -- whether or not he's able to retain |
| 7 | counsel or not? |
| 8 | MR. BURNHAM:  Absolutely. |
| 9 | THE COURT:  All right.  Thank you. |
| 10 | Mr. Sanchez, please raise your right hand to be |
| 11 | sworn. |
| 12 | (Whereupon, the defendant was sworn.) |
| 13 | THE DEFENDANT:  Yes, Your Honor. |
| 14 | THE CLERK:  Thank you. |
| 15 | THE COURT:  We're here today, sir, for your detention |
| 16 | hearing. |
| 17 | Are both counsel ready to proceed? |
| 18 | MR. GONZALEZ:  Yes, Your Honor. |
| 19 | MR. BURNHAM:  Yes, Your Honor. |
| 20 | THE COURT:  All right.  Before we begin, have both |
| 21 | counsel received a copy of the pretrial services report? |
| 22 | MR. GONZALEZ:  Yes, Your Honor. |
| 23 | MR. BURNHAM:  Yes, Your Honor. |
| 24 | THE COURT:  Are there any modifications that you |
| 25 | would like to make to that report? |

1          MR. GONZALEZ:  No, Your Honor.

2          MR. BURNHAM:  No, Your Honor.

3          THE COURT:  All right.  At this time the Government

4     may call its first witness.

5          MR. GONZALEZ:  The Government calls Special Agent

6     Marcus West.

7          (Whereupon, the witness was sworn.)

8          THE WITNESS:  I do.

9          THE CLERK:  Have a seat, please.

10         Will you please state your name and spell it for the

11    record.

12         THE WITNESS:  My name's Marcus West.  First name,

13    M-A-R-C-U-S; last name, W-E-S-T.

14                       DIRECT EXAMINATION

15    BY MR. GONZALEZ:

16    Q.   And, sir, how are you employed?

17    A.   I'm a special agent with the Drug Enforcement

18    Administration.

19    Q.   And is that in Dallas, Texas?

20    A.   Yes, sir.

21    Q.   And pursuant to your duties with the DEA, are you familiar

22    with an individual by the name of Christian Cortez Sanchez?

23    A.   Yes, sir, I am.

24    Q.   Do you see that individual in the courtroom today?

25    A.   I do.  I see him.  I do.

1  Q.  Will you point to where you see him and point to an

2  article of clothing he is wearing.

3  A.  He is sitting right here (indicating), straight ahead by

4  the microphone in the light gray and the dark gray striped

5  jumpsuit.

6          MR. GONZALEZ:  Your Honor, may the record reflect

7  that the witness has identified the defendant?

8          THE COURT:  It will so reflect.

9  Q.  (BY MR. GONZALEZ)  Sir, based on your investigation, did

10  you conduct an investigation involving the defendant?

11  A.  Yes.

12  Q.  Can you summarize that investigation as to when it started

13  and how you were able to determine the defendant's involvement

14  in that organization?

15  A.  Yes, sir.  In August of 2019 I testified -- well, I've

16  testified in this court about a drug trafficking organization

17  that's head and led by Raphael Gallegos, drug trafficking

18  organization.  There is a picture of him on this -- on this

19  slide here.  He is connected with the CLO cartel.  We started

20  that investigation in August of 2019.  He actually lived in

21  Plano, Texas, and supplied customers throughout the United

22  States, including the Dallas/Fort Worth area -- Plano,

23  McKinney, Lewisville -- kilos of cocaine, methamphetamine,

24  heroin, Xanax, fentanyl pills, OxyContin pills, and marijuana.

25  Q.  And based on your investigation, was the defendant one of

1    the recipients of the drugs that were being distributed here

2    locally by this organization?

3    A.   Yes.

4    Q.   Would the drugs come in from Mexico, arrive here in the

5    local area, and then be distributed to customers such as the

6    defendant?

7    A.   Yes.

8    Q.   Okay.  What do you know about the defendant's involvement?

9    And if you have to use the PowerPoint, please do.

10   A.   Yes, sir.  Here I have a picture of Christian Cortez.  He

11   popped up on our radar during a surveillance.  We observed him

12   meet with suppliers of the Raphael Gallegos drug trafficking

13   organization.  He worked with other individuals in the Plano,

14   Texas, area.  And they used residences, what we call trap

15   houses, where they would rent these homes and they would

16   distribute street-level quantities like multi ounces, half

17   ounces of heroin and cocaine and Xanax and promethazine with

18   codeine, marijuana out of these homes to customers in -- in

19   Plano, Texas.

20          And we were able to corroborate that information

21   through a traffic stop utilizing Plano Police Department patrol

22   officers stopping a lot of the customers leaving Mr. Cortez's

23   house, specifically one located on 20- -- 2900 Dale Drive in

24   Plano, Texas, where we conducted three or four traffic stops of

25   customers that would go into this house for three or four

1  minutes, come out.  We would traffic stop and we were able to

2  seize heroin and cocaine, Percocet from those customers that

3  visited Mr. Cortez's house.

4          Also, Mr. Cortez popped up in a lot of Plano Police

5  Department narcotic complaint tip lines where people would

6  anonymously call up and identify Mr. Cortez as being a danger

7  to the community because he's dealing OxyContin, fentanyl, and

8  drugs and that he was always armed with handguns.  So as the

9  Plano Police Department is moving along, they are building up

10  these tips and -- and, with DEA, we target Mr. Cortez.

11  Q.   And just -- just briefly, just so that we get the grasp of

12  what the chain of distribution is.  Raphael Gallegos, Jr., is

13  in Mexico sending them different types of drugs to the U.S.?

14  A.   Yes.

15  Q.   They arrive here in Dallas, Texas, area including Plano

16  and then they are distributed?

17  A.   Yes.

18  Q.   During this investigation, did you seize any ledgers or

19  any documents indicating the quantity or -- or the scale of the

20  drugs that were being sent from Mexico to the United States,

21  specifically the Dallas area for distribution?

22  A.   Yes.

23  Q.   Was it hundreds of kilos of the varying types of drugs?

24  A.   I would get up to thousands of kilos.

25  Q.   Okay.  And did you seize any ledgers indicating that

1  activity?

2  A.   Yes.

3  Q.   And did you seize ledgers indicating that there were

4  individuals in Plano that were distributing drugs?

5  A.   Yes.

6  Q.   And from the individuals that were documented in the

7  ledgers as individuals distributing in Plano, was the defendant

8  receiving drugs from some of those individuals that were found

9  inside the ledgers?

10  A.   Yes.

11  Q.   And, again, what quantities were being distributed to

12  those distributors operating in Plano?

13  A.   Hundreds of kilos of heroin, methamphetamine, cocaine,

14  marijuana; pills -- lots of pills:  Xanax and OxyContin,

15  fentanyl.

16  Q.   And you testified about a residence where vehicles were

17  stopped when they were leaving and cocaine and heroin and other

18  drugs were seized from the individuals that had just left that

19  location.

20         What was the address of that location again?

21  A.   It was right here -- 2900 Dale Drive, Plano, Texas.

22  Q.   Had surveillance been conducted and seen the defendant

23  there on multiple occasions?

24  A.   Yes.

25  Q.   Okay.  Go ahead.

A.   So at 2900 we start off investigating Mr. Cortez, DEA,

along with the Plano Police Department, looking for Mr. Cortez.

As you can see there, I have an arrow pointing both directions.

2900 is where the -- the pin drop is at -- the house, which was

a trap house where traffic stops were conducted of a lot of

customers leaving that location.  Also, we would see Mr. Cortez

in the house and he would stay the night there.  He'd live

there.  He actually put on his probation paperwork with Collin

County probation that his address was 2900 Dale Drive.  So

that's where he listed his address with his probation officer.

So as you can see to the left there, we have an

elementary school.  We would set up in the elementary school

and watch the customers go into Mr. Cortez's residence.  And

that is Meadows Elementary School in Plano ISD.  And, you know,

children were going to school.  Children were playing on

playgrounds, and he was distributing drugs right down the

street from the school in this -- in this picture.

So we picked up this search warrant at that residence

during this investigation in November of 2019.

Q.   What did you find there?

A.   At that residence we found approximately an ounce of -- of

cocaine and promethazine with codeine; Xanax pills; U.S.

currency, $3,000; drug paraphernalia; and paperwork, again,

with Christian Cortez's name on it that he was on probation in

Collin County.

1   Q.   And was the defendant arrested?

2   A.   He was.

3   Q.   Okay.  And was he then, subsequent to that arrest, back in

4   November of 2019, released on bond?

5   A.   He was.

6   Q.   Okay.  What happened next in your investigation?

7   A.   So next in the investigation, we noticed that he was

8   staying with his sister at a -- I believe it's 2901 Countess

9   Drive in Plano, Texas.  And so when we saw him staying there at

10  that residence and we -- and we decided to go and conduct trash

11  pulls at the residence -- pulling the trash when they would set

12  it out.  We'd look into their trash.  And we seized multiple

13  tin foil wrappers with burnt residue on it.  And we associated

14  that with somebody smoking maybe crushed pills, like Percocet

15  or OxyContin.  So we saw those discarded in the trash, that

16  someone in the house was smoking opiates from that tinfoil that

17  was seized as evidence.  And -- and continued our

18  investigation.

19  Q.   And whose house was that again?

20  A.   That was, I believe, I want to say it's -- it's Coolet

21  Sanchez, the sister of -- of --

22  Q.   The defendant?

23  A.   Yes.

24  Q.   And the defendant -- defendant was seen coming and going

25  from that residence sporadically?

1    A.    Yes.

2    Q.    Okay.  And those items were seized during the trash run?

3    A.    Yes, they were.  So we continued our investigation and he

4    moves out of that residence, and he moves to this residence

5    here that's displayed on the screen, 4217 Merriman Drive in

6    Plano, Texas.  Nice little residence there.  He moves there.

7    We conduct surveillance.  We see him wake up in the morning,

8    leave the house.  We see him sleep there.  We conduct

9    surveillance continuously for about two weeks leading up to

10   July 24th of 2020, and that's where he's staying at.  And we

11   see him there.  We speak to witnesses or neighbors in the area,

12   and they put him in that house there at 4217 Merriman Drive for

13   approximately a two-week time period.

14   Q.    Was there complaints from the -- the neighbors or other --

15   other people in that area about that activity going on at that

16   residence?

17   A.    Yes.  There were a lot of complaints about the foot

18   traffic and, from what they said, drug activity, because high

19   volume of traffic:  people going in and quickly coming out,

20   people going in and quickly coming out.  So a lot of complaints

21   were generated with the Plano Police Department regarding

22   narcotic activity at this residence.

23   Q.    And was Plano PD fully aware of the defendant and had been

24   investigating the complaints against the defendant since he had

25   been previously identified?

1    A.    Yes.

2    Q.    Okay.

3    A.    So next I kind of did an overhead view of Google Map

4    again.  It seems to be a common thing with his trap houses.  He

5    locates them near a school.  That's Plano East High School.

6    You can see the pin that's dropped there is the house where he

7    was arrested and where the drug stash was at and the guns.

8    Just right there is a parking lot of the Plano East High

9    School.  And it's a big campus, but kids do cut through the

10   neighborhood.  They do walk home from school there in front of

11   his house.  And so, again, that's another common pattern I see

12   with Mr. Cortez, that he locates his trap houses next to these

13   public schools.

14         Okay.  So here, we actually have video of the search

15   warrant day of July 24th of 2020.  We were able to upload this

16   video, and you can see on this day that we had some -- some

17   drama with Mr. Cortez.  What you see here is overhead footage.

18   For officers' safety, they have some video drone footage, and

19   it shows the SWAT team entering the house.  And we'll get that

20   to play here in a second.

21         But if you -- if you notice the house right across

22   from the trampoline, that's the house that we need to focus in

23   on. It's the house right across from the trampoline.  The

24   backyard there.  And you'll see the Plano SWAT members entered

25   the front of the house.  They're all marked with police gear.

1   They have lights on, red and blues.  And they are announcing

2   their presence at the house.

3           MR. GONZALEZ:  Let me see if I can fast-forward.  One

4   second.

5           MR. BURNHAM:  I'm sorry, sir.  I didn't get the

6   address of that house.

7           THE WITNESS:  I believe it's 4217 Merriman.

8           MR. BURNHAM:  Oh, okay.

9           THE WITNESS:  M-E-R-R-I-A-M [sic], I believe.

10          MR. BURNHAM:  Thank you.

11          THE WITNESS:  Let me make sure I'm right.

12          MR. BURNHAM:  Have you finished?

13          MR. GONZALEZ:  I'm sorry.  I can't fast-forward.

14          THE WITNESS:  What -- what -- what if you took

15  that -- that cord out of the back of it and did that one that's

16  not connected to the monitors, fast-forward it, and then plug

17  it back in.

18          (Pause in proceedings.)

19  Q.  (BY MR. GONZALEZ)  Anyway, so at that particular house,

20  can you just summarize what --

21  A.  Okay.  If you could go back to that -- if you -- we'll

22  just use that as an illustration, and then I'll just go through

23  it real quick.  So the officers approached the house.  They go

24  to the backyard.  They encounter Mr. Christian Cortez on the

25  back patio of the house across from the trampoline on the other

1   side of the fence.  Mr. Cortez is -- he is given loud,

2   repetitive verbal commands:  "Police department.  Don't move.

3   Hands up."  He resisted those commands.  They had mikes on him.

4   They were showing -- illuminating him.  And, again, they were

5   shouting loud verbal commands.

6           At that time the primary SWAT team was going into the

7   front of the house and clearing the house.  And Christian --

8   Mr. Cortez decides to run out the back, and he took off

9   sprinting across the backyard.  If you're looking at the

10  screen, he went to the right, and then he ran up the side of

11  the yard to the fence.  He tried to jump the fence, the officer

12  was able to grab him before he jumped the fence and they pulled

13  him to the ground.  And at that time two officers grabbed him

14  and laid on him on the ground, and they attempted to arrest

15  him. And he resisted arrest.  At that time he wouldn't pull his

16  hand from underneath his body, and they kept shouting louder

17  verbal commands:  "Give me your hands.  Give me your hands."

18  So they struggled with him for a while there.  Several minutes

19  of trying to arrest him there.  At that time the SWAT team was

20  trying to -- was clearing the house.

21  Q.  Were there any other individuals in the house?  Did any of

22  the individuals in the house also try to elude arrest or

23  compliance with the police officers?

24  A.  Yes.  So at the time Christian ran up the side yard, a

25  female ran out the door and jumped the fence to the -- to the

1  side of -- of -- of Mr. Cortez's house.  She ran through that

2  yard.  She jumped another fence and ran, and then she ran down

3  the street, and they were able to apprehend her in the -- in

4  the street.

5  Q.   Okay.  And was a search conducted at that residence?

6  A.   Yes, sir, it was.

7  Q.   What was found?

8  A.   At the residence approximately five firearms, large

9  volu- -- large quantities of ammunition for those firearms;

10  cocaine, approximately a half kilo of cocaine; approximately a

11  quarter kilo of black tar heroin; hundreds of OxyContin pills,

12  Xanax pills; promethazine with codeine liquid; and, also, they

13  searched Mr. Cortez's vehicle that was in the driveway.  And in

14  that driveway, in the trunk of his car, he had two empty kilo

15  wrappers in the trunk of his car -- a car that we observed him

16  on surveillance, a car that we watched him get in that morning

17  and rearrange -- so those were seized as evidence too.  And --

18  and they seized approximately 50,000 -- approximately $50,000

19  in cash from Mr. Cortez.  A large portion of that was in his

20  pockets.

21  Q.   Okay.

22  A.   So as you can see here is a video of the SWAT team pulling

23  up to the front of the house.  They're going to the front.  And

24  you can see a perimeter, SWAT members going into the backyard.

25  You can see their flashlights in the backyard.  They are kind

1    of getting in the backyard there. It happens really quick.

2           They take their positions in the back of the house,

3    and you peek into the flashlight in the back of the house.

4    It's about right in here in a second.  They make contact with

5    Christian Cortez, who comes to the door.  Right there.  And he

6    goes back into the house.  They are shining lights on him.  And

7    they were giving commands right here.  And here in a second

8    you'll see he will run out the back. You look for -- right now.

9    And there he goes.  And that's him running.  He tries to go

10   over and they capture him right there.

11          And then if you see -- a female is running over one

12   fences, now two fences -- really quick -- and then she gives

13   up.

14   Q.   And these were the items that were found in the residence?

15   A.   Yes, sir.

16   Q.   Okay.

17   A.   And packaging from Christian's vehicle, which is

18   important, and they found the kilo packaging in his -- in his

19   car empty.  I continued to look into his crossing into Mexico.

20   And we see that from 2016 to 2018 he's -- he has traveled to

21   Mexico, Cancun, Cabo San Lucas, and then there's one in Laredo

22   where he crosses the bridge from United -- from the United

23   States into Mexico, and then he comes back into the United

24   States from under the Laredo Bridge.  So we saw that, and

25   Christian did tell me that he did have family members.  I

1  believe his mom and dad live down there in Mexico.

2  Q.   So if he said he -- he only traveled to Mexico in 2017,

3  that would be inaccurate; right?

4  A.   That's not correct.

5  Q.   Okay.  And in regards to drug use, did you have an

6  opportunity to speak to the defendant after his arrest?

7  A.   Yes, I did.

8  Q.   And did you inquire about his drug use?

9  A.   I did.

10  Q.   And what drug use did he tell you he -- what types of

11  drugs did he tell you he used?

12  A.   He said that he smoked marijuana and that he used cocaine

13  recreationally.  I asked him about being addicted to opiates.

14  And he said he was not addicted to opiates, heroin, or any type

15  of pills, just cocaine and marijuana.

16  Q.   So if he told probation that he was only -- that he had

17  used marijuana a year prior to that, that would also be an

18  accurate statement?

19  A.   Yes.

20  Q.   And had you received information that he was using drugs

21  from any confidential sources?

22  A.   We did.

23  Q.   What type of information did you receive and what did they

24  say?

25  A.   So after we did the trash pulls at the Countess address we

1    were kind of inquiring about "Okay.  Is he an addict?"  So we

2    asked sources, and the sources were able to say, yes, he does

3    smoke Percocets.  That's his drug of choice.  He smokes

4    Percocets.  He uses tinfoil to smoke it with a pipe, and he

5    smokes it probably five times a day.  A lot, he smokes a lot of

6    Percocet pills.

7    Q.   That would be consistent with what you found at the

8    sister's house; correct?

9    A.   Yes.

10   Q.   And in regards to the possession of firearms, you

11   mentioned that the Plano PD had indicated that he was a drug

12   dealer and he was commonly in possession of firearms; is that

13   correct?

14   A.   That is correct.

15   Q.   And in the search of that particular residence that we saw

16   there, were firearms seized?

17   A.   That is correct.

18   Q.   Okay.  All right.

19          Now, based on your investigation, have you determined

20   his criminal history?

21   A.   Yes, I have.

22   Q.   And what do you know it to be?

23   A.   So I know he was involved in burglary, a lot of deferred

24   adjudications.  I did see that he was on probation or on bond

25   for a drug charge, I believe, because we saw the paperwork at

1   the house when we did a search warrant at the house back in

2   November of 2019.  So I think deferred adjudication and on

3   probation.

4   Q.   So that was the first -- that was the first offense where

5   he was out on bond.  You saw the paperwork during the search of

6   the first residence; right?

7   A.   That's correct.

8   Q.   And then he was arrested and released on bond again.

9   A.   Yes.

10  Q.   And then he's found at this second residence when you do

11  your search and you rearrest him.

12  A.   Yes.

13  Q.   Okay.  Now, based on your training and experience and your

14  investigation and then the facts as you are aware of -- of this

15  defendant, have you formed an opinion as to whether he would be

16  a continuing risk of flight or threat to the community?

17  A.   Yes.

18  Q.   And what is your opinion?

19  A.   My opinion that he is -- well, first, I believe he is a --

20  he is a danger to the community based on the drugs he is

21  distributing:  the OxyContin, the Percocet.  A lot of his

22  clientele seem to be high schoolers and college age students --

23  kids based on our surveillance going in and out of the house.

24          So we're talking about opiates, high addiction

25  with -- with the opiates.  And, also, the firearms that he uses

1  to protect the drugs.  He had a large sum of cash on him,

2  50,000; a large -- two cocaine kilos.  That's $50,000 worth of

3  cocaine that he had along with all the other drugs, the

4  firearms, the distribution to the kids in the neighborhood,

5  being located so close to the schools, and also his connections

6  to Mexico.  You know, his mom and dad down there, and we see

7  the crossing, going over to Mexico.  That he -- he could be

8  able to go down there and live with his mom and dad and avoid,

9  you know, prosecution in this case.

10  Q.   What about the fact that he was on some sort of

11  supervision when he was arrested the first time and was found

12  with drugs and firearms?

13  A.   Yes, sir, I believe that too, being on probation.

14  Q.   And the same the second time that he was arrested when he

15  was out on bond and still on probation for the first offense

16  where he was again found to be in possession of drugs and

17  firearms?

18  A.   Yes, sir.

19          MR. GONZALEZ:  That's all I have.

20          THE COURT:  Thank you.

21          Cross-examination.

22                    **CROSS-EXAMINATION**

23  BY MR. BURNHAM:

24  Q.   Mr. West --

25  A.   Yes, sir.

1   Q.   -- or it's Officer West, I guess.

2   A.   Agent.

3   Q.   Pardon me.

4   A.   It's all right.

5   Q.   I have just a few questions for you.  Now, this 2900 Dale

6   Drive that you referred to, the first house, who owned that

7   house?

8   A.   It was another individual that owned the house that --

9   there was another individual who actually owned the house that

10  lived there also.

11  Q.   Okay.  So you're not trying to tell the Court that -- that

12  Mr. Cortez owned the house or even leased the house?

13  A.   Well, I'm not going to tell the Court that -- that he

14  didn't own the house because that -- that is not correct.  But

15  I want to tell the Court that he was staying at that house.

16  Q.   Oh, he was staying at the house.  You don't have any

17  evidence that he was leasing the house from somebody?

18  A.   No.  So the evidence I do have is that there was another

19  individual that owned the house. The house owner lived there,

20  but Mr. Cortez was also a roommate of -- of that individual --

21  Q.   Okay.

22  A.   -- the owner of the house.

23  Q.   Who is the owner of the house?

24  A.   You know, it escapes me right now.  I don't have the name

25  of it, but he was also -- he's in our reporting system of being

```
 1    contacted that day.  And I also believe he was arrested that

 2    day when Mr. Cortez was arrested on November 14th, 2019.

 3    Q.   Was Mr. -- Mr. Cortez ever arrested at this house?

 4    A.   He was arrested after he left the house.  So he --

 5    Q.   After he left the house?

 6    A.   -- he left the house and he was detained and stopped.

 7    Q.   And -- and that's -- that's -- what day was that when he

 8    was detained after he left --

 9    A.   I believe it was November 14th --

10    Q.   -- the Dale home?

11    A.   November 14th, 2019.

12    Q.   All right.  And that's the case that is pending in Collin

13    County?

14    A.   Yes.

15    Q.   Okay.  That's the case that he's been indicted on and he's

16    out on bond on that case; is that correct?

17    A.   That's correct.

18    Q.   And he hasn't fled on that -- when was he indicted?  Back

19    in November?

20    A.   Indicted on what case?

21    Q.   On the case involving the Dale house.

22    A.   I don't know the exact date when he was indicted in that

23    case.

24    Q.   But it was last year?

25    A.   I believe so.
```

1   Q.   Okay.  So he hadn't fled to Mexico, has he, since then --
2   since he got indicted on that case?
3   A.   No.
4   Q.   Okay.  And when he left from that house, did you have a
5   surveillance on that house?
6   A.   Yes.
7   Q.   And how long was the surveillance?
8   A.   Several hours.
9   Q.   Several hours?  Okay.
10  A.   Several hours.
11  Q.   Okay.  So you just saw -- the only surveillance you saw
12  was him coming out of the house?
13  A.   No.  A surveillance shows him going in and out of the
14  house.  Okay.  So -- if you want to say surveillance, are you
15  talking about through the day or through the course of the
16  investigation at Dale Street?
17  Q.   Well, how long did you have the house under surveillance?
18  A.   Several -- probably about a month.
19  Q.   About a month.  Well, how many times did you have him
20  going to the house and coming back?
21  A.   Multiple, multiple times.  Staying there, living there.
22  Q.   Okay.  How do you know he was living there?
23  A.   Well, I mean, if you go and park your car and you go
24  inside and you stay there overnight, and then the next morning
25  or next afternoon, brunch time, he's leaving, he's staying the

1   night over there.

2   Q.   Okay.  And so how many nights did you determine that he

3   stayed there -- stayed the night there?  How many times?

4   A.   I don't have a number, but I would say multiple times.

5   Q.   Okay.  What does multiple mean?

6   A.   Several.  I mean --

7   Q.   Two or three?

8   A.   -- I know that I'm not going to put a number on it.  I'm

9   not going to put a number on it.

10  Q.   Okay.

11  A.   I don't have a number.  I'm not just going to just throw

12  out a number.

13  Q.   Okay.  Okay.  But you say multiple.  It could be two or

14  three?

15  A.   It could be -- it could be 10, 11.

16  Q.   Okay.

17  A.   It could be several different combinations of numbers, but

18  I don't --

19  Q.   It could be 2 or 3 or 10 or 11?

20  A.   No.  It could be 15, 16.

21  Q.   Okay.  Well, are you going to go up higher or lower?

22  A.   Well, it could be --

23  Q.   You don't know what it is.

24  A.   -- seven, eight.

25  Q.   You don't know what it is?

1  A.  Well, right now, if I could go back and look at my

2  reports, I probably could.  But right now I'm not going to

3  throw out a number for you.

4  Q.  Okay.  And did he own the house?

5  A.  I'm not going to say he owned the house, but he listed the

6  house as his residence in his bond paperwork for his probation

7  officer.  That's it.  He didn't list his mom's address or his

8  sister's address.  He listed the 2900.  It said residential

9  address, 2900 Dale Drive.

10  Q.  That's what he listed on -- what paperwork was that?

11  A.  The paperwork where he bonded out of jail. His bond

12  paperwork.

13  Q.  On this case?  When he got arrested?

14  A.  When he got arrested on November 14th, yes.

15  Q.  And when you arrested him, did he -- what did he have

16  on -- in his possession?

17  A.  He had nothing on his possession.

18  Q.  Did he have any drugs in the car?

19  A.  No.

20  Q.  Did he have any guns in the car?

21  A.  No, sir.

22  Q.  Did he have any cash in the car?

23  A.  He had a little bit of cash.

24  Q.  A little bit of cash.  Okay.  So -- so all the stuff that

25  you found was in the house; is that right?

1   A.   That's correct.

2   Q.   Did you-all -- after he left the house, did you-all run a

3   search warrant on the house?

4   A.   Yes.

5   Q.   All right.  Did you arrest anybody in the house?

6   A.   Yes, we did.

7   Q.   And who did you arrest?

8   A.   The homeowner.

9   Q.   And who is the homeowner?

10  A.   Like I said, I don't -- I don't have his name.

11  Q.   All right.  He's -- he's the one that had the controlled

12  substances and stuff; is that correct?

13  A.   No, sir.  It's both Mr. Cortez, your client, and the

14  homeowner.  They were both charged in that case.

15  Q.   Both charged in that case.  But -- okay.  But you didn't

16  arrest Mr. Cortez --

17  A.   Yeah, we did.

18  Q.   -- in possession of any controlled substances or any

19  firearms?

20  A.   Yeah, we did.

21  Q.   Huh?

22  A.   He was arrested for that.

23  Q.   I know he was arrested for it, but they weren't in his

24  possession.

25  A.   Okay.  So you're -- he was arrested for that, but, no, he

```
 1   was not -- well, he was in possession.  That's his house.  So,
 2   yeah, I mean, those are his drugs.
 3   Q.   But you just said the other guy owned the house.
 4   A.   You can still be in possession of drugs in a house if you
 5   are a roommate.
 6   Q.   Okay.  Okay.  Well -- okay.  And I'm just trying to make
 7   the distinction that, when he was arrested, he didn't have any
 8   of that stuff on him.
 9   A.   That's true, but, I mean, that's his -- okay -- yeah.  All
10   right.
11   Q.   You're making the leap that, since he stayed there a
12   couple of nights, he possessed these things.
13   A.   I'm not making that leap.  I didn't say a couple of
14   nights.  I said I can't put a number on it.
15   Q.   Okay.  Okay.  I got you.
16   A.   Okay.  All right.
17   Q.   And did you find any ledgers with his name on it?
18   A.   No, sir.
19   Q.   Huh?
20   A.   No, sir.
21   Q.   No ledgers with Mr. Cortez's name on it?
22   A.   So no.  No.
23   Q.   I mean, it's "yes" or "no."  Okay?
24   A.   No.
25   Q.   Okay.  Now, I guess the next thing we need to go down to
```

1    is this Merriman house.  Okay?

2    A.   Yes, sir.

3    Q.   4217 Merriman.

4    A.   Yes, sir.

5    Q.   And does Mr. Cortez own that house?

6    A.   No, he does not.

7    Q.   And a guy by the name of Nasib does, doesn't he?

8    A.   Yes, sir.

9    Q.   N-A-S-I-B.

10   A.   Umm --

11   Q.   Something like that, I think.

12   A.   Yes, sir.

13   Q.   He's the owner of the house.

14   A.   Yes, sir.

15   Q.   And my client -- there's no evidence my client was leasing

16   the house from him; right?

17   A.   I -- I don't believe as far as, like, contractual, like --

18   no.  No.

19   Q.   And a matter of fact, did you have this house under

20   surveillance?

21   A.   Yes.

22   Q.   And do you have any evidence my client was living there --

23   A.   Yes.

24   Q.   -- or -- how many nights do you have him staying the

25   night?

1    A.   Two weeks.

2    Q.   Two weeks.  You have him staying the night two weeks in a

3    row --

4    A.   Yes, sir.

5    Q.   -- or broken up?

6    A.   Two weeks in a row.

7    Q.   Two weeks in a row.  And what weeks were those?

8    A.   Two weeks prior to Ju- -- so July 24th was the

9    execution -- execution of the search warrant.  So two weeks

10   prior to that.

11   Q.   Okay.

12   A.   So 14 days before that July 24th.

13   Q.   Okay.  And so when you issued the search warrant on July

14   24th -- right? --

15   A.   Yes, sir.

16   Q.   -- where did you find -- did you find some guns?

17   A.   Yes, sir.

18   Q.   Where were the guns?

19   A.   Laundry room, kitchen.  They were spread out all through

20   the house.

21   Q.   Okay.  Okay.  And -- and where did you find the cocaine?

22   A.   So the cocaine and the heroin and all the drugs were

23   stashed in a laundry room on top of the cabinet above the

24   washer/dryer.  So you actually had to get a chair, put it there

25   or climb up on the washer/dryer, and look on top of the

1   cupboards; and it was all up in that area.

2   Q.   All right.  So it was all hidden?

3   A.   Yes, sir.

4   Q.   Okay.  So he -- hypothetically, I mean, neither one of us

5   was there.  So, hypothetically, he could have been staying

6   there and not know it was up there hidden in the cabinet;

7   correct?

8   A.   Not based on what we know about Mr. Cortez.

9   Q.   Well, I know.  I mean, you don't want to believe that.

10  But, I mean, it's a possibility.

11  A.   No.  We have a lot of facts supporting his drug-dealing

12  and his distribution.

13  Q.   Okay.  Okay.  I understand.

14         But did you search Mr. Cortez's car after -- after

15  the arrest, when he's trying to jump over the fence?

16  A.   Yes.

17  Q.   And what did you find in his car?

18  A.   So in the trunk we found two empty kilo wrappers of

19  cocaine.

20  Q.   Two kilo wrappers.  But was there any controlled

21  substances -- any -- any controlled substances in the trunk?

22  A.   Yes.

23  Q.   How much?

24  A.   Well, the two empty kilo wrappers has residue on it of

25  cocaine.

```
 1    Q.   Is that what you call traces?
 2    A.   There you go.
 3    Q.   Traces.  It's traces.
 4              Was there any guns in the trunk?
 5    A.   No.
 6    Q.   Okay.  Any guns in any of the car -- in the car anywhere?
 7    A.   No.
 8    Q.   No.  No.  Other than the trace in the trunk, there was
 9    nothing in the car.
10    A.   That's correct.
11    Q.   And how many wrappers did you find?
12    A.   Two.
13    Q.   Two?  Okay.
14              Have you -- have you ever arrested or seen in your
15    surveillance Mr. Cortez with a firearm?
16    A.   So he was arrested on July 24th with those firearms.  But
17    as far as surveillance before that, no.
18    Q.   Okay.  Okay.  But I'm just saying -- I'm talking about in
19    his possession where he has them in his car or on his person.
20    A.   On his person, no.
21    Q.   Okay.  And did you arrest Nasib that night?  The man that
22    owned the house.
23    A.   No.
24    Q.   You didn't arrest him?
25    A.   I don't believe so, no.
```

```
 1   Q.   He owned the house?

 2   A.   That's true.

 3   Q.   And is there some reason you didn't arrest him?

 4   A.   Well, you have to understand he's an IT guy that has been

 5   out of town.  So Mr. Cortez has basically taken over his house.

 6   He was out of the country for several months.

 7   Q.   Okay.  Go ahead.

 8   A.   And he was finally able to come back.  But -- so

 9   Mr. Cortez has turned that house into a party house.

10   Q.   Okay.  Okay.

11   A.   But no.  He wasn't arrested.

12   Q.   But is Mr. Nasib -- is that the right name?  Nasib,

13   N-A-S-I-B?

14   A.   If you say so.  I mean, I don't -- I don't know the exact

15   spelling of it.

16   Q.   Okay.  Okay.  I don't either.  Is he a confidential

17   informant?

18            MR. GONZALEZ:   Your Honor, I'm going to object.  Not

19   relevant.

20            THE COURT:   Sustained.

21   Q.   (BY MR. BURNHAM)  Okay.  The -- how many other people were

22   in the house besides -- we saw the girl running.  She got

23   arrested; right?

24   A.   Yeah.  I believe so, yes.

25   Q.   What was her name?
```

```
1    A.   I don't recall.

2    Q.   Was there anybody else in the house?

3    A.   There were, like, I believe, eight other individuals in

4    the house.  Yes.

5    Q.   Were they all arrested?

6    A.   A lot of them were, yes.  For different type of offenses.

7    Q.   All right.  How many were arrested for the stuff in the

8    cupboard and the gun?

9    A.   They were not arrested for that.

10   Q.   Mr. Cortez only got the --

11   A.   That's correct.

12   Q.   -- got the black bean, so to speak, on that?

13   A.   Was arrested for that, yes.

14   Q.   Okay.  Okay.  He's the only one taking responsib- -- he's

15   the only one getting the responsibility for it.

16   A.   Yes.

17   Q.   Okay.  The -- have you -- have there been any hand-to-hand

18   buys from Mr. Cortez?

19   A.   There is a controlled purchase from him.  Yes.

20   Q.   And when was that, sir?

21   A.   In 2019.

22   Q.   In 2019?

23   A.   Yes, sir.

24   Q.   Is that the case he's indicted for in Collin County?

25   A.   No, sir.
```

1    Q.   Okay.  The Collin County case is the Dale case; right?

2    A.   Yes.

3    Q.   The one he's indicted for, the Collin case.

4    A.   Yes, sir.

5    Q.   So they are taking care of that case.  So this controlled

6    buy was in -- when? -- in 2019?

7    A.   I don't recall the exact date, but it was a controlled --

8    Q.   Do you know what month?  I'm sorry.  I didn't mean to

9    interrupt you.

10   A.   I can't give you a month.  I can't give you a month.  But

11   it was a controlled purchase from him.

12   Q.   You what?

13   A.   I can't give you a month, but there was a controlled

14   purchase from him.

15   Q.   And -- and was it an officer or an informant that had the

16   purchase from him?

17            MR. GONZALEZ:  Your Honor, I'm going to object.  Not

18   relevant.

19            MR. BURNHAM:  Well, Judge, I think it's --

20            MR. GONZALEZ:  Well, it's trying to determine if it's

21   a confidential informant, and he's trying to expose that

22   confidential informant.

23            MR. BURNHAM:  Well, I'm not going to ask him who the

24   confidential informant was.  I just asked him whether it was a

25   police officer or a confidential informant.  I'm not going to

1  ask who it is.

2          MR. GONZALEZ:  But his defendant will know who he

3  sold that to and --

4          THE COURT:  But --

5          MR. GONZALEZ:  -- and that would expose who --

6          THE COURT:  I'm going to sustain the objection.

7          MR. BURNHAM:  Okay.

8  Q.   (BY MR. BURNHAM)  Was this a -- well, can I ask was it

9  a -- was it a peace officer that did the hand-to-hand buy from

10  him -- purchase?

11  A.   But if I answer that, it would just kind of try --

12  Q.   Okay.  You feel like that may -- okay.  We'll go on.

13          And how many did you have like this?

14  A.   One.

15  Q.   Just one.  One hand-to-hand --

16  A.   Yes.

17  Q.   -- buy?  Okay.  And that was -- and what was that for?

18  A.   Cocaine.

19  Q.   Cocaine.  And how much cocaine?

20  A.   An ounce.

21  Q.   Ounce of cocaine.  What was the purchase price?

22  A.   $1,000.

23  Q.   $1,000?  Okay.

24          And -- and y'all didn't -- what did you have?  A buy

25  bust?  You didn't decide to bust him then?

1    A.    No.

2    Q.    You let him go out on the street, so to speak, and

3    continue to sell cocaine?

4    A.    Well, I'm -- we were trying to further our investigation.

5    Q.    Okay.

6    A.    Again, we're trying -- trying to figure out what's going

7    on, putting things together, you know.

8    Q.    Okay.  And, you know -- do you have any idea what part of

9    2019 this was?

10   A.    I don't recall, man.

11   Q.    Do you know where it was?

12   A.    Plano, Texas.

13   Q.    Plano, Texas.  Where in Plano, Texas?

14   A.    A house.

15   Q.    House?  Okay.

16   A.    Yeah.

17   Q.    And do you know where the house was?  Was it Dale or

18   Merriman?

19   A.    Again, if I give -- I mean, I want to protect the source

20   and the situation.

21   Q.    Okay.  Okay.  Okay, sir.  I don't want to get into that,

22   then.

23          You said he had connections in Mexico.  Are you --

24   are you aware that his parents, mother and father, both left

25   him and his sisters in about 2014 and went to Mexico and really

1    had no contact with them?

2    A.   I didn't know that.

3    Q.   And his sister -- his sister -- one of his sisters has

4    kind of been his mother and raised him and his other sister.

5             Are you aware of that?

6    A.   No.

7    Q.   Okay.  Did you see the pre-sentence investigation report

8    today?  I think some of that's in there.

9    A.   I didn't see that part.  No.  I didn't read that.

10   Q.   Okay.  And so you said he's got contacts in Mexico.  But

11   he's an American citizen, is he not?

12   A.   He is.

13   Q.   Okay.  And I have his passport here if you need it.  Okay?

14   A.   I don't need it.

15   Q.   Okay.  And going to Cabo, you know, a lot of people go to

16   Cabo to vacation, trips, and went down there; right?

17   A.   I disagree with that.

18   Q.   Well --

19   A.   I mean -- I mean, I partially agree with it; but in this

20   case a lot of these guys go to Cabo San Lucas and Cancun, and

21   they do more than just party down there.  They are doing

22   business.

23   Q.   Okay.

24   A.   But, I mean, there's other places that he went to in

25   Mexico.

1    Q.   Yeah.  Yeah.

2    A.   Not just Cabo San Lucas.  He went other places.

3    Q.   Well, that was his main deal, though.

4    A.   I'm sorry.

5    Q.   Never mind.  Let me see if I have any other questions for

6    you.

7    A.   Okay.

8    Q.   And when he -- when you had this controlled buy, the one

9    controlled buy, did he -- did he have a weapon on him?

10   A.   There was no weapon present.

11   Q.   Okay.  Thank you, sir.

12        When you went into the house on Merriman this last

13   time, when he was arrested -- okay? -- on this case, why he's

14   sitting here today -- when you went in the house, was there any

15   cocaine in open view on the tables there in the house?

16   A.   No.  We didn't see any.

17   Q.   Any -- any controlled substance in open view, like you --

18   you walk in your living room, there's cocaine on the, you

19   know -- there's tables -- dining room tables and kitchen

20   tables.  Was there anything in open view like that with the

21   cocaine, heroin, and all this other stuff you talked about?

22   A.   No.

23   Q.   No.  It was all hidden up in a cabinet?

24   A.   Yes, sir.

25   Q.   Okay.  Is this Mr. Nasib -- does he have a criminal

1    record?

2    A.   I -- I don't believe so.

3    Q.   Okay.  Did -- did he set Mr. -- did he set Mr. Cortez up?

4    A.   You want to go back into that -- asking me if he's an

5    informant?

6    Q.   No.  I'm just asking you if he set him up.

7    A.   No, he didn't.

8    Q.   Huh?

9    A.   No.

10   Q.   He didn't get him to come over there --

11   A.   No.

12   Q.   -- and then you all come over there, and he gets to stay

13   and they take him?

14   A.   No.

15   Q.   You know what I mean?  You seen how that worked -- deal

16   works; right?

17   A.   No.  But, yeah --

18   Q.   He just --

19   A.   -- he's not involved like that.  No.

20   Q.   No?  Okay.

21            It looks like that, doesn't it?

22   A.   I guess so, if you want to say that.  I mean, he's not the

23   informant.

24   Q.   One other question.  Mr. Nasib, is he -- he's been away

25   from the house very long?  He's been away from the house?

1    A.   He's been out of the country.

2    Q.   For how long?

3    A.   Probably up to a month.

4    Q.   So he -- this was -- this was on March -- July 24th;

5    right?

6    A.   That's correct.

7    Q.   And he hadn't been there for a month?

8    A.   Approximately a month.  Yeah, he hadn't been there.

9    Q.   Are you positive of that?

10   A.   I believe that's the statement, yeah.  I mean, he hasn't

11   been there.  He's been out of the country.

12   Q.   Have you verified that?

13   A.   We're still working on it.  But, yeah, he said he was out

14   of the country.

15   Q.   Can you say positively he was out of the country for a

16   month, under oath?

17   A.   I can't say that right now.

18   Q.   Okay.

19   A.   I want -- I want to check his documents and stuff.

20   Q.   Okay.  So you're not -- you're not really saying, "Judge,

21   positively, Nasib wasn't there for a month"?

22   A.   What do you mean?  At the house?

23   Q.   At the house.

24   A.   I can't -- I can't say.  That's just what his statements

25   were.  He's been out of the country.

```
 1    Q.   Well -- well, if he's believable.  So you're just taking

 2    his word for it?

 3    A.   Yes.

 4    Q.   Okay.  So if he lied to you, you hadn't verified he was

 5    out of the country, like flights going out and flight coming

 6    back, anything like that?

 7    A.   I'll get into that.  I'll -- I'll look into it.  I'll

 8    investigate.

 9    Q.   You're working on it?

10    A.   Yes.

11    Q.   Okay.  So we're not sure about that yet.

12    A.   Not a hundred percent sure.  But yes.

13    Q.   Okay.  Let's go -- that's good.  And when -- when he

14    so-called resisted arrest, he didn't strike the officers or

15    anything, did he?

16    A.   No.  He didn't punch the officers.

17    Q.   Huh?

18    A.   No, he did not punch the officers.

19    Q.   Okay.  So he just kind of maybe -- I don't know what you

20    mean by "resist arrest," but we didn't have any -- there wasn't

21    any altercation, was there?

22    A.   He didn't, you know, strike the officers.

23    Q.   Okay.

24    A.   No.

25    Q.   And is there -- is there a body cam showing this resisting
```

```
1    arrest?
2    A.   Yes, sir.
3    Q.   Okay.  So, I mean, what do you classify resisting arrest?
4    A.   Well, when --
5    Q.   The fact he's running?
6    A.   So when he ran, he was caught --
7    Q.   Uh-huh.
8    A.   He put his hands under his body, and they were trying to
9    pull his arms to put behind his back, and he wouldn't allow
10   them to do that.
11   Q.   Okay.
12   A.   Okay.  So when they were shouting loud, verbal commands --
13   "Hey, we're police officers.  You're under arrest.  Give us
14   your hands so we can handcuff you" -- all right? -- he wouldn't
15   do it.  So, to me, that is resisting arrest.  They sat there
16   for several minutes doing that.  Argu- --
17   Q.   Did he finally do that?  Put his hands behind his back.
18   A.   Well, yeah, they had to threaten harm to him of like
19   striking him, and he finally put his arms around his back.
20   Q.   Did they threaten to shoot him or something?
21   A.   No.
22   Q.   What did they --
23   A.   They didn't say that.  They didn't say that.
24   Q.   Did he voluntarily put his hands behind his back?
25   A.   No.  They had to physically put his hands behind his back.
```

```
 1    Q.   Okay.  We're finished.  Okay.
 2              MR. BURNHAM:  That's all of the questions I have for
 3    this witness, Your Honor.
 4              THE COURT:  All right.  Thank you.
 5              Redirect?
 6              MR. GONZALEZ:  No, Your Honor.  No further questions.
 7    No further witnesses.
 8              THE COURT:  Thank you, sir.  You may step down.
 9              MR. BURNHAM:  One second, Your Honor.
10              THE COURT:  Uh-huh.
11              MR. BURNHAM:  Judge, I've got two short witnesses.
12              THE COURT:  Okay.
13              MR. BURNHAM:  The witness has not been sworn, Your
14    Honor.
15              THE COURT:  All right.  If you will come up to the
16    witness box.
17              Mr. Burnham, I just want to remind you, we've got
18    about ten minutes left.
19              MR. BURNHAM:  I'll be real short.
20              THE COURT:  Okay.
21              MR. BURNHAM:   Thank you.
22              (Whereupon, the witness was sworn.)
23              THE CLERK:  Have a seat, please.  Please state your
24    name and spell it for the record.
25              THE WITNESS:  Hi.  My name's Coolet Cortez.  Spell --
```

DIRECT EXAMINATION

1

2     BY MR. BURNHAM:

3     Q.   Would you state your name for Your Honor.

4     A.   Coolet Cortez.  C-O --

5     Q.   Ms. Cortez, I'm going to try to be brief -- real brief

6     with you here.

7                THE COURT:  Wait, Mr. Burnham.  Let her spell it.

8                MR. BURNHAM:  Okay.  Okay.  I'm sorry.

9                THE WITNESS:  C-O-O-L-E-T.

10    Q.   (BY MR. BURNHAM)  Okay.  And how old are you, ma'am?

11    A.   I am 28 years old.

12    Q.   And where do you live?

13    A.   I live on 2901 Countess Drive, Plano, Texas 75074.

14    Q.   Are you employed, ma'am?

15    A.   Yes, sir.

16    Q.   Where do you work?

17    A.   I work for Robert M. Sharp, MD.

18    Q.   And what do you do there, ma'am?

19    A.   I am a medical assistant.

20    Q.   Okay.  And how long have you worked for him?

21    A.   For seven years.

22    Q.   Okay.  And are you a mother too?

23    A.   Yes, sir.

24    Q.   How many children do you have?

25    A.   I have two boys and I am currently pregnant.

```
 1   Q.   Okay.  And so you are trying to have your children before
 2   you are 30; is that right?
 3   A.   Correct.
 4   Q.   Okay.  And you're on track for that.
 5   A.   Yes, sir.
 6   Q.   And you live -- you live with the father of your children;
 7   is that correct?
 8   A.   Yes, sir.
 9   Q.   You are -- are practically -- you're not married but
10   you're practically married.
11   A.   Correct.
12   Q.   Plan to get married; right?
13   A.   Yes, sir.
14   Q.   And -- now, did your mother and father leave you and your
15   brother and your sister back at about 20- -- was it 2010?
16   A.   Yes, sir.
17   Q.   And -- and they went to Mexico.
18   A.   Yes, sir.
19   Q.   Okay.  And have you seen your parents since then?
20   A.   No, sir.
21   Q.   Have you been down to Mexico to see them?
22   A.   No, sir.
23   Q.   Do you know if your brother's been down there to see them?
24   A.   No, sir.
25   Q.   He's not?
```

```
 1   A.   No.
 2   Q.   So you all don't have no connection with them?
 3   A.   Correct.
 4   Q.   They just left you all.
 5             And who raised -- who kind of became the mother of
 6   the family?
 7   A.   I did.
 8   Q.   So you were the oldest.  And so you have a sister named
 9   Itzel -- right? -- Itzel and Christian -- and you kind of
10   raised these two people; is that correct?
11   A.   Yes, sir.
12   Q.   Your brother and your sister.  And along with your uncle?
13   A.   Yes, sir.
14   Q.   You kind of shared custody with him.
15   A.   Yes, sir.
16   Q.   And did your brother graduate from high school?
17   A.   Yes, sir.
18   Q.   And where did he graduate from?
19   A.   Plano East Senior High.
20   Q.   Okay.  And the judge would like to know do you think --
21   have you ever seen your brother with a gun?
22   A.   No, sir.
23   Q.   Have you ever seen him with any drugs?
24   A.   No, sir.
25   Q.   And do you think he's a threat to the community in any
```

Case 4:19-cr-00277-ALM-CAN   Document 665   Filed 11/03/20   Page 48 of 61 PageID #:  4343

48

```
1   way?
2   A.   No, sir.
3   Q.   And do you think that he would flee to Mexico?
4   A.   No, sir.
5   Q.   Why do you say that?
6   A.   Because I just know that he will not leave.
7   Q.   Okay.  He's an American, and this is where he wants to
8   live; right?
9   A.   Correct.
10  Q.   And he's never been down to see his parents?
11  A.   No, sir.
12  Q.   And -- and they haven't come up here to see y'all either?
13  A.   No.
14  Q.   Now, is he -- how long has he been living with you,
15  Ms. Cortez?
16  A.   From when our parents left in 2010 all the way to 2018.
17  Q.   So -- so he lived with you until 2018?
18  A.   Correct.
19  Q.   And you took care of him --
20  A.   Yes, sir.
21  Q.   And where does he work?
22  A.   AST Flooring.
23  Q.   Okay.  ASC -- AST Flooring.
24  A.   Correct.
25  Q.   And does he do -- also do yard work?
```

1    A.   Correct.

2    Q.   And have you ever seen him violent towards you or your

3    sister?

4    A.   No, sir.

5    Q.   Have you ever seen him violent towards any female?

6    A.   No, sir.

7    Q.   Okay.  So he hadn't had any problems with family violence,

8    so to speak?

9    A.   No, sir.

10   Q.   And you're asking the judge to release him so he

11   can -- out on bond; is that correct?

12   A.   Yes, sir.

13   Q.   And you'll be there to support him like you have since he

14   was a young --

15   A.   Yes, sir.

16   Q.   -- child.

17   A.   A hundred percent.

18   Q.   How old was he when your parents left?

19   A.   Fourteen.

20   Q.   Fourteen.  So you've been kind of a momma figure; so --

21   A.   Correct.

22   Q.   -- you'll be there to support him if the judge sees fit to

23   release him?

24   A.   Yes, sir.

25   Q.   That's all we have, ma'am.

```
 1              THE COURT:  Thank you.

 2              Cross-examination?

 3              MR. GONZALEZ:  No questions, Your Honor.

 4              THE COURT:  All right.

 5              Thank you, ma'am.  You may step down.

 6              THE COURT:  Ma'am, if you'll come up to the witness

 7    stand, please.

 8              MR. BURNHAM:  How much time do we have left, Judge?

 9              THE COURT:  All total with closing and statements,

10    everything, seven minutes.

11              MR. BURNHAM:  Okay.

12              (Whereupon, the witness was sworn.)

13              THE CLERK:  Have a seat, please.  State your name and

14    spell it for the record.

15              THE WITNESS:  I'm Itzel Cortez.  I-T-Z-E-L --

16    I-T-Z-E-L, C-O-R-T-E-Z.

17                          DIRECT EXAMINATION

18    BY MR. BURNHAM:

19    Q.   Now, would you speak up louder so Mr. Gonzalez and

20    I can hear you -- everybody in the courtroom can hear you,

21    because you've got a soft voice.  Okay?

22    A.   Yes, sir.

23    Q.   See, that wasn't too loud.

24    A.   Yes, sir.

25    Q.   Okay.  There you go.
```

```
1              And how old are you, Ms. Cortez?
2    A.   Twenty-six.
3    Q.   And was that your sister Coolet that just left the
4    courtroom?
5    A.   Yes, sir.
6    Q.   And is this your brother over here?
7    A.   Yes, sir.
8    Q.   Now, where do you work, ma'am?
9    A.   I work at A & D health care.
10   Q.   I didn't hear that.
11   A.   I work at A & D health care.
12   Q.   And how long have you worked there?
13   A.   Eight years.
14   Q.   And how many employees does that company have?
15   A.   300-plus.
16   Q.   All right.  And what is your position?
17   A.   I am a financial director.
18   Q.   All right.  So you've got a good job there; is that
19   correct?
20   A.   Yes, sir.
21   Q.   All right.  You're here today to support your brother; is
22   that correct?
23   A.   Yes, sir.
24   Q.   And you want the judge to know that you -- you've never
25   been arrested and charged with any offenses, have you?
```

```
 1    A.   No, sir.
 2    Q.   And your sister hasn't either that just left the
 3    courtroom?
 4    A.   No, sir.
 5    Q.   Okay.  And do you have any children?
 6    A.   No, sir.
 7    Q.   Okay.  Now, where do you live at this time?
 8    A.   I work -- I mean I live in Plano, Debbie Drive.
 9    Q.   Debbie Drive in Plano, Texas?
10    A.   Yes, sir.
11    Q.   And let me ask you this right quick.
12            Have you ever seen your brother with a firearm?
13    A.   No, sir.
14    Q.   Have you ever seen him with cocaine, heroin, or any other
15    drugs?
16    A.   No, sir.
17    Q.   All right.  And where is he living at this time -- before
18    he got arrested?
19    A.   With me.
20    Q.   All right.  Before he got arrested?
21    A.   Yes, sir.
22    Q.   And -- and do you own the house on Debbie Drive?  Are you
23    buying it?
24    A.   Yes, sir.  I own --
25    Q.   So -- I mean, so you haven't paid it off, but you've got a
```

1   mortgage; right?

2   A.   Correct.

3   Q.   He was living with you; is that correct?

4   A.   Yes, sir.

5   Q.   Now, he's got a girlfriend; is that right?

6   A.   Yes, sir.

7   Q.   And sometimes he goes and spends some time with her?

8   A.   Yes, sir.

9   Q.   So he's not -- you're not saying he's there every night,

10  but --

11  A.   Yes, sir.

12  Q.   -- you know that, basically, he has his things there.

13  A.   Correct.

14  Q.   Have you ever found cocaine or drugs in your house?

15  A.   No, sir.

16  Q.   You wouldn't allow that anyhow, would you?

17  A.   No, sir.

18  Q.   And have you ever seen him use drugs? do drugs?

19  A.   No, sir.

20  Q.   Now, the judge is going to decide whether or not he's a

21  danger to the community.

22          You -- you know his girlfriend?

23  A.   Do I know her?

24  Q.   Yes, ma'am.

25  A.   Yes, sir.

```
1    Q.   What's her name?

2    A.   Katherine (phonetic).

3    Q.   All right.  How long has he been dating her?

4    A.   Maybe, like --

5    Q.   Approximate.

6    A.   -- eight years --

7    Q.   All right.

8    A.   -- maybe ten.  I'm not too sure.

9    Q.   Has she ever complained to family about violence, that

10   he's assaulting her or --

11   A.   Oh no.  Never --

12   Q.   Huh?

13   A.   Never, sir.

14   Q.   You know if he's abusive to women?

15   A.   No, sir.

16   Q.   Okay.  And you -- do you -- do you think that he would

17   flee if the judge gave him bond and released him today -- you

18   think the judge -- you think he would flee to Mexico?

19   A.   No, sir.

20   Q.   Flee to go down there to be with your parents?

21   A.   No, sir.

22   Q.   Now, why is that?

23   A.   He doesn't like Mexico.  He's not never been into it.  He

24   wouldn't do it.

25   Q.   All right.  And have your parents -- have you seen -- when
```

1    is the last time you saw your parents?

2    A.   It's been quite a long time.  Since maybe, like, 2010.

3    Q.   Okay.  Your parents left you and your sister and your

4    brother; right?

5    A.   Correct.

6    Q.   Both of them.  And they haven't come back to visit, have

7    they?

8    A.   No, sir.

9    Q.   Okay.  So really -- basically, they're gone.

10   A.   Correct, sir.

11   Q.   And no contact with them?

12   A.   No, sir.

13   Q.   You don't send them money or anything like that, do you?

14   A.   No, sir.

15   Q.   And they don't send you money?

16   A.   No, sir.

17   Q.   Okay.  And so he'd -- he'd have no reason to go down there

18   and be with them?

19   A.   Correct, sir.

20   Q.   I mean, you all were kind of upset with them, really,

21   aren't you?

22   A.   Yes.

23   Q.   They just got up and left you.  And he was 14 and how old

24   were you?

25   A.   I was 15 or 16.

1    Q.   And Coolet kind of raised you and Christian; is that

2    correct?

3    A.   Yeah.  She's been our mother since then.

4    Q.   Your brother's name is Christian Cortez?

5    A.   Correct.

6    Q.   And are you asking the judge to release him, that he would

7    not flee to Mexico?  He hadn't fled on any Collin County cases,

8    has he?

9    A.   No, sir.

10   Q.   Okay.  Any reason to believe he would now?

11   A.   No, sir.

12   Q.   That's all we have.  Thank you --

13   A.   Thank you.

14   Q.   -- Ms. Cortez.

15            MR. GONZALEZ:  No questions, Your Honor.

16            THE COURT:  All right.  Thank you.  You may step

17   down.

18            THE WITNESS:  Thank you.

19            THE COURT:  If counsel wishes to make any closing

20   remarks, I'll hear them at this time.

21            MR. GONZALEZ:  Your Honor, with regards to the

22   Government, we would obviously invoke the presumption that we

23   don't believe the witnesses provided to the Court have rebutted

24   the presumption.  What is clear to the Court is that this

25   defendant has been on other types of conditions set by other

1    courts and has not been in compliance with those conditions.

2          As the Court has heard, he is a well-known drug

3    distributor in the Plano, Texas, area.  As the Court has seen,

4    at the time of his arrest, he attempted to flee and resisted

5    arrest, did not comply with the orders of the law enforcement

6    officers.

7          Substantial drugs have been found at two locations

8    where the defendant has been living or staying, residing

9    temporarily or, in some cases, as the agent testified, had been

10   seen at that house for two weeks prior to the search and a

11   large number of drugs and $50,000 was seized from the

12   defendant.

13         So we would argue that the presumption test has not

14   been rebutted and there are no conditions or set of conditions

15   that the Court could set that would guarantee that he would not

16   be a risk to the community.

17         THE COURT:  Thank you.

18         MR. BURNHAM:  May it please, Your Honor?  I'll just

19   be brief.

20         I think we have rebutted the presumption, or I hope

21   we have.  And the Collin County case, he's on bond for that

22   case.  And they didn't see fit to detain him, and they have not

23   moved to revoke his probation.  And they filed a motion; we'll

24   get straight on that.  And I think from his sisters' testimony,

25   you get a different picture of this man.  And in some of the

1    testimony that Agent West testified to, you know, he wasn't

2    caught in possession of these drugs.

3            I mean, you know, I was a prosecutor for 16 years,

4    and that's an old trick, you know.  He leaves and he gets

5    arrested, and the guy in the house, that owns the house where

6    all the drugs are, he doesn't get arrested.  I mean, that's

7    kind of a --

8            MR. GONZALEZ:  Your Honor, there's no tricks here.

9    What's obvious is that there is constructive possession.

10   Obviously, there is a theory of construction possession that

11   defense counsel doesn't seem to understand, that simply because

12   a person is not caught with the drug on his person doesn't mean

13   that he's not in possession of it.  So there's no tricks

14   involved here.  There is a theory of constructive possession

15   where somebody can be held accountable for drugs that are not

16   personally on his -- on his person.

17           MR. BURNHAM:  Well, I understand if I come over and

18   visit somebody tonight and I left later and I get arrested for

19   drugs they've got in their house and they don't arrest them,

20   well, that's a little fishy.  I mean, I'm just saying, it looks

21   a little -- you know what I mean?  And so that's what happened

22   here.

23           And the so-called resisting arrest, he's never been

24   caught with a firearm.  There's no evidence of physical abuse

25   or violence with women.  And you can see his sisters were

1    actually witnesses, and he's had, obviously, a tough childhood

2    when your parents leave you when you're 14.  And I think there

3    is sufficient evidence that this man -- and there is no

4    question he's going to return to court.  I think no question.

5    I mean, his ties are here.  His sisters are here and his family

6    is here.

7            And you talk about got family ties, he's got deep

8    ties.  He's living with his sister right now.  The lady that

9    left here is a financial director of a company of 300

10   employees, and I ask the Court to -- and I, you know, some of

11   these -- well you've seen the evidence.  You've just got to

12   piece it together.  It's pretty loose here.  And in this last

13   case, where he was arrested -- he's got the Collin County case;

14   they are working on that.

15           But this case here on this Merriman Drive, this is

16   weird -- weird situation.  Nobody -- nobody in that house was

17   arres- -- charged with those drugs but this man.  And then

18   they're hidden.  Now, if they were out on the table or

19   something, came in -- whoa, whoa, whoa, you know.  But they

20   just all of the sudden just happen to pick him.

21           And so I ask the Court to please consider that I

22   think we have rebutted the presumptions, and he's not a threat

23   to anybody and -- and he will return to court.  And thank you

24   for your patience.

25           THE COURT:  Thank you.  Well, I'll say, Mr. Burnham,

1    the one thing that I agree with you about is the difficult

2    childhood part.  I don't disagree with you on that.  And I also

3    don't disagree with his two sisters seem like they've got their

4    life together.  But I -- I don't think that they would be

5    proper custodians in this case.  As for Coolet, she's got two

6    children and -- and another one on the way.  And I -- I --

7    don't, because of that, think that it would be a proper living

8    situation as a custodian.  And, you know, the other sister,

9    she's 26 years old.  That's where he was living when the

10   activity was going on, including violations of state -- state

11   probation.  So -- or being on bond.

12          And so I don't find that the presumption has been

13   rebutted based on the evidence, aga- -- that's been presented

14   against Mr. Cortez as well as the findings in the pretrial

15   services report, the prior violations of bond in the prior

16   revocations and, frankly, the fact that he was on bond when he

17   committed this offense.

18          So based on those reasons, the Court will grant the

19   Government's motion to detain.

20          Anything further from counsel?

21          MR. GONZALEZ:  Not from the Government.

22          MR. BURNHAM:  No, Your Honor.

23          THE COURT:  We'll stand adjourned.

24          MR. BURNHAM:  I hope we got your time correct.

25          (End of proceedings.)

1              C E R T I F I C A T E

2

3         I, court-approved transcriber, hereby certify on this

4    date, August 27, 2020, that the foregoing is a correct

5    transcript from the official electronic sound recording of

6    proceedings in the above-entitled matter.

7

8      /s/ Shawna Gauntt-Hicks

9    SHAWNA GAUNTT-HICKS, CSR, CCR
     STATE OF TEXAS NO. 9353
10   EXPIRATION DATE: 12/31/2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25