```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      SHERMAN DIVISION

 3    USA                      )(   DOCKET 4:19-CR-277-54

 4    v.                       )(   OCTOBER 5, 2020

 5                             )(   9:48 A.M.

 6    ROCKY OLIVAREZ, JR.      )(   SHERMAN

 7    ----------------------------------------------------------

 8          REPORTER'S TRANSCRIPTION OF DETENTION HEARING

 9         BEFORE THE HONORABLE CHRISTINE A. NOWAK

10             UNITED STATES MAGISTRATE JUDGE

11    ----------------------------------------------------------

12

13    APPEARANCES:

14    FOR THE GOVERNMENT:    Mr. Ernest Gonzalez

15

16
      FOR THE DEFENDANT:     Ms. Linda Guadarrama
17

18
      THE COURT REPORTER:    MS. SHAWNA GAUNTT-HICKS, CSR, CCR
19                           DEPUTY COURT REPORTER
                             UNITED STATES DISTRICT COURT
20                           EASTERN DISTRICT OF TEXAS
                             (903) 276-1090
21                           SHAWNACCR@OUTLOOK.COM

22

23

24

25    PROCEEDINGS RECORDED USING DIGITAL AUDIO; TRANSCRIPT PRODUCED
                VIA COMPUTER-AIDED TRANSCRIPTION.
```

1                        I N D E X

2

3                                                      <u>PAGE</u>

<u>GOVERNMENT'S WITNESS:</u>

4

**AGENT MARCUS WEST**

5    DIRECT EXAMINATION BY MR. GONZALEZ.................    9
     CROSS-EXAMINATION MS. GUADARRAMA....................   28

6

7

<u>DEFENSE'S WITNESS:</u>

8

**ERICA VERDIGUEL**

9    DIRECT EXAMINATION BY MS. GUADARRAMA...............   35
     CROSS-EXAMINATION BY MR. GONZALEZ..................   39

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2

3      (Proceedings commence at 9:48 a.m.)

4      (Defendant present with counsel.)

5

6          THE COURT:  Ms. Guadarrama, have you have a

7  sufficient opportunity to talk with your client?

8          MS. GUADARRAMA:  Yes, Your Honor.

9          THE COURT:  Can I just confirm?  Are we having a full

10 hearing in your client's case?

11         MS. GUADARRAMA:  Yes, Your Honor.  I have one

12 witness.

13         THE COURT:  You have one witness?  All right.

14         And, Mr. Gonzalez, how many witnesses does the

15 Government have?

16         MR. GONZALEZ:  Just the one.

17         THE COURT:  Just the one?  Okay.

18         All right.  Ms. Guadarrama, if you will go ahead and

19 come forward.  I am going to call your case next.  All right?

20         Mr. Olivarez, can you please come forward.

21         All right.  At this time, the Court calls

22 4:19-CR-277, the United States of America versus Rocky

23 Olivarez, Jr.

24         If I can have an appearance on behalf of the

25 Government, please.

1          MR. GONZALEZ:  Your Honor, Ernest Gonzalez for the

2  Government.  The Government is ready to proceed.

3          THE COURT:  All right.  Thank you.

4          If I could have an appearance on behalf of

5  Mr. Olivarez.

6          MS. GUADARRAMA:  Linda Guadarrama for Mr. Olivarez.

7  And the defense is ready to proceed, Your Honor.

8          THE COURT:  Thank you.

9          Mr. Olivarez, can you please state your name for my

10  record.

11          THE DEFENDANT:  Rocky Olivarez, Jr.

12          THE COURT:  Thank you.  And, sir, I just want to

13  confirm.  You do speak and understand English.  So you don't

14  need an interrupter to understand our proceedings here today;

15  is that correct?

16          THE DEFENDANT:  Yes, ma'am.

17          THE COURT:  We are scheduled here today to proceed on

18  the Government's motion for detention.  I'll ask the Government

19  to confirm that it pursues in its request to detain

20  Mr. Olivarez.

21          MR. GONZALEZ:  That's correct, Your Honor.

22          THE COURT:  And, Ms. Guadarrama, I'll just confirm as

23  well that you and your client continue to desire a full

24  detention hearing.

25          MS. GUADARRAMA:  That's correct, Your Honor.

1          THE COURT:  Okay.  You've each advised me that you

2     have one witness to present today.  Before we turn to that, I'm

3     just going to confirm that each of the parties have had an

4     opportunity to review the pretrial services report in this case

5     and its recommendation for detention.

6          Mr. Gonzalez.

7          MR. GONZALEZ:  Yes, Your Honor.

8          THE COURT:  Ms. Guadarrama.

9          MS. GUADARRAMA:  Yes, Your Honor.

10          THE COURT:  Okay.  And other than evidence that

11     you'll be presenting during the course of this hearing today,

12     are there any errors in that report that you want to draw to

13     the Court's attention at this time, Mr. Gonzalez?

14          MR. GONZALEZ:  No, Your Honor.

15          THE COURT:  Ms. Guadarrama.

16          MS. GUADARRAMA:  Just one supplemental thing.  Would

17     you like for me to point now?

18          THE COURT:  Please.

19          MS. GUADARRAMA:  There is a statement on here that

20     Mr. Olivarez was on probation during the time of this alleged

21     offense.  But it fails to mention that his probation was

22     successfully discharged.  It wasn't any kind of revocation or

23     anything like that.

24          THE COURT:  Are you talking about the April 5, 2017?

25          MS. GUADARRAMA:  The 2016 case.  They were both

1 successfully discharged.

2      THE COURT: And I'm so sorry, Ms. Guadarrama. I'm

3 looking here at the report. And let me make sure I'm looking

4 at the right report.

5      Yes. Mr. Olivarez, I don't see a 2016. I see an

6 April 5, 2017, at age 49 out of Dallas County Sheriff's office.

7      MS. GUADARRAMA: Right before that.

8      THE COURT: The 2015?

9      MS. GUADARRAMA: The DWI. The period of 2016.

10      THE COURT: You're saying that 18 months' probation

11 in that particular term of probation was successfully

12 discharged?

13      MS. GUADARRAMA: Both of them were successful. There

14 were no revocations.

15      THE COURT: Okay. Thank you for clarifying that.

16 I'll just ask Mr. Gonzalez is this a presumption case?

17      MR. GONZALEZ: It is, Your Honor.

18      THE COURT: Ms. Guadarrama, do you concur?

19      MS. GUADARRAMA: Yes, Your Honor.

20      THE COURT: And have you had an opportunity to talk

21 with your client about what it means if this is a presumption

22 case?

23      MS. GUADARRAMA: No, Your Honor.

24      THE COURT: Okay. If you'll take a step back from

25 that microphone and make sure that he understands what it

1  means, that this is a presumption case before we go forward.

2  　　　　　MS. GUADARRAMA:  Okay.  Yes, Your Honor.

3  　　　　　THE COURT:  Thank you.

4  　　　　　(Discussion off the record.)

5  　　　　　THE COURT:  All right.  Ms. Guadarrama, have you had

6  an opportunity to talk with your client now about what it means

7  that this is a presumption case?

8  　　　　　MS. GUADARRAMA:  Yes, Your Honor.  I think we are

9  going to decide that it's not a presumption case and we would

10 like to hear from the DEA agent.

11 　　　　　THE COURT:  Okay.  So you're challenging that this is

12 a presumption case?

13 　　　　　MS. GUADARRAMA:  Yes, Your Honor.

14 　　　　　THE COURT:  Okay.  If I might ask, Mr. Gonzalez.  Can

15 you specify the statutory basis under which you are arguing

16 that this is a presumption case?

17 　　　　　MR. GONZALEZ:  Your Honor, just based upon what the

18 defendant's already been charged with.  I believe he's charged

19 in Count 2 and Count 3 on -- both of those counts allege

20 violations which carry a potential sentence of greater than ten

21 years.  Thereby, one, it's a narcotics charge and, secondly,

22 there is a punishment of more than ten years -- a potential

23 punishment of more than ten years that would make it a

24 presumption case.

25 　　　　　THE COURT:  All right.

1    And, Ms. Guadarrama, in light of the fact that this

2 is a narcotics charge that carries that range of penalties and

3 consequences, can you advise why you believe this is not a

4 presumption case?

5    MS. GUADARRAMA:  No, Your Honor.  Not at this time.

6    THE COURT:  Okay.  And I just want to make sure I am

7 understanding.  You are not able to articulate at this time why

8 you believe it's not a presumption case --

9    MS. GUADARRAMA:  That is correct.

10    THE COURT:  -- but you are continuing to argue it as

11 not --

12    MS. GUADARRAMA:  Yes, Your Honor.  I just don't have

13 enough information right now.

14    THE COURT:  Okay.  So I will give you an opportunity

15 after the hearing, should you desire to submit briefing on

16 whether -- why you believe it's not a presumption.

17    In light of the fact that the Government's argued

18 that it is a presumption and on its face it is a narcotics

19 charge, I'm just still going to ask you to confirm that you

20 have explained to your client what a presumption case is.

21    MS. GUADARRAMA:  Yes, Your Honor.

22    THE COURT:  Okay.  And in your opinion, does he

23 understand what a presumption case, in the context of detention

24 --

25    MS. GUADARRAMA:  Yes, Your Honor.

1    THE COURT:  -- is?  All right.

2        In light of that, they -- Mr. Olivarez, if I can ask

3    you and Ms. Guadarrama to take a seat.

4        And the Government may call its first witness.

5        MR. GONZALEZ:  Your Honor, the Government calls

6    Special Agent Marcus West.

7        (Whereupon, the witness was sworn.)

8        THE COURT:  Agent, if you could please state your

9    name for the record and please spell it.

10       THE WITNESS:  Yes.  My name's Marcus West.  First

11   name, M-A-R-C-U-S; last name, W-E-S-T.

12       THE COURT:  Thank you.

13       And with that, you may proceed, Mr. Gonzalez.

14                   **DIRECT EXAMINATION**

15   **BY MR. GONZALEZ:**

16   Q.  Agent West, how are you employed?

17   A.  I am a special agent with the Drug Enforcement

18   Administration.

19   Q.  And where are you presently stationed?

20   A.  Dallas, Texas.

21   Q.  And pursuant to your duties with DEA, are you

22   familiar with an individual by the name of Rocky Olivarez, Jr.?

23   A.  I am.

24   Q.  Do you see that individual in the courtroom today?

25   A.  I do.

1  Q.   Would you point to where he's seated and state an article

2  of clothing that he's wearing?

3  A.   Okay.  Sitting here (indicating) with the pinstripe

4  jumpsuit on, light gray/dark gray, and a baby blue mask.

5          MR. GONZALEZ:  Your Honor, may the record reflect

6  that the witness has identified the defendant, Rocky Olivarez,

7  Jr.?

8          THE COURT:  Let's do this.  Because I have three

9  gentlemen sitting in the courtroom right now in those articles

10 of clothing and baby blue masks, can you give me some further

11 defining features just so the record later is clear?

12         THE WITNESS:  Okay.  He's got a little white patch of

13 hair on the front part of his head and has a -- maybe a little

14 bit of a shadow of a beard coming out.

15         MR. GONZALEZ:  Let me do this.  You're talking about

16 this area; correct?

17         THE WITNESS:  Yes.

18         MR. GONZALEZ:  If this person is number 1 and this

19 person is number 2, which person would he be?

20         THE WITNESS:  Person Number 2.

21         THE COURT:  All right.

22         And with that, the record shall reflect that Agent

23 West has properly identified the defendant.

24         MR. GONZALEZ:  All right.

25 Q.   (BY MR. GONZALEZ)  Now, Agent West, can you summarize your

1  investigation that led to the identification of the defendant

2  as well as his indictment and arrest?

3  A.   Yes, sir.  We started investigating a cocaine, marijuana,

4  heroin, methamphetamine, Xanax, and some fentanyl drug

5  trafficking organization based out of Durango, Mexico.   And

6  the leader of that organization was a subject here locally as

7  Rafael Gallegos (phonetic) and his dad was Rafael

8  Galindo (phonetic) Gallegos.  Both of them now fugitives in

9  Durango, Mexico.

10          We started investigating that group.  We were able to

11  make controlled purchases of cocaine, controlled purchases of

12  methamphetamine, multiple seizures of firearms that were being

13  trafficked and sent or exported to Mexico to support the

14  Sinaloa Cartel.

15          So as I testified to earlier, Mr. Duolingo Gallegos

16  and Mr. Gallegos are both members of the Sinaloa Cartel.  And,

17  again, they're down in Durango, Mexico.  Those firearms were

18  being exported to Durango, Mexico, to support the cartel and

19  their battle against other rival drug trafficking members

20  and/or subjects.  And, also to the military police.  That being

21  said, we were able to make multiple seizures in this case and

22  targeted that group here in the Dallas, Texas, area,

23  specifically Rafael Gallegos lived in Plano, Texas.

24  Q.   And about when did your investigation begin?

25  A.   So our -- my actual investigation when I started looking

1   at this group started in 2019.  But the seizure of multiple

2   drug ledgers led us back to as early as 2017 with this group.

3   Q.  And based on your investigation, were you able to

4   determine the mode of operation?  How was this organization

5   distributing its drugs?  How was this organization getting its

6   drugs that were then being distributed?

7   A.  So the primary smuggling method that this

8   organization used was trailers.  So they had trap compartments

9   built into these trailers, in the floor of the trailers.  And

10  they would smuggle the drugs through the United States in those

11  trailers.  And if you're familiar with kind of like a shuttle

12  service like Super Shuttle or other like shuttle service that

13  transport people and luggage, there is a services that goes

14  from Mexico to the United States.  And weekly this service

15  would pull this trailer filled with luggage, filled with people

16  inside a van, and that -- and those trailers were filled with

17  cocaine and heroin.

18          So on the flip side of that, the trailers, when they

19  went down south to Mexico, they would load those false

20  compartments or cover loads with, like, water heaters, washers

21  and dryers, TVs.  They would load it with millions of dollars

22  of proceeds that would go down to Mexico.  That would continue

23  back and forth on a weekly basis to Dallas, Texas, and, also,

24  to Chicago, Illinois.

25  Q.  And your records indicated or the ledgers indicated that

1  this was going on all the way back to 2017?

2  A.   Yes, sir.  That is correct.

3  Q.   And what quantities of drugs were they importing or

4  bringing into the United States in those trailers?

5  A.   So on the cocaine/heroin side to the Dallas, Texas, area,

6  it was 40 kilos of cocaine and heroin up to the Dallas, Texas,

7  side.  How do we know that?  We made seizures on June 18th.  We

8  seized a trailer that was offloaded and a stash house was

9  loaded with cocaine and heroin was approximately 40 kilograms.

10  And then also on that same trailer was a water heater that

11  contained almost a million dollars in U.S. currency.  So we

12  were able to actually see what was on that trailer or was being

13  smuggled.  We happened to hit it at the right time, you know,

14  the money and the drugs were together on June 18th in that

15  trailer.

16          So we're talking kilograms, to answer your

17  question -- kilograms of cocaine and heroin.  They also did

18  dabble in distributing methamphetamine in the kilos also.  And

19  thousands and thousands of fentanyl pills and Xanax pills were

20  also a part of their drug distribution here in the United

21  States.

22  Q.   How frequently were those loads coming into the United

23  States for distribution?

24  A.   Those loads were coming in -- those trailers, on a weekly

25  basis.  We know that through electronic surveillance, physical

1 surveillance of reliable and credible testimony from
2 cooperating defendants and sources, and so you put that all
3 together, and we were able to come up with a pattern of a
4 weekly basis to Dallas and Chicago.  One trailer to Dallas and
5 one trailer to Chicago would go.  And then one would come back
6 to Dallas where the money was aggregated and it was sent down
7 to Durango, Mexico, to Mr. Duolingo Gallegos.
8 Q.   And the money that was aggregated you said was in the
9 millions; correct?
10 A.   In the millions.  And we know that from seizures that
11 we've made.  We've made multiple money seizures, one
12 specifically coming down from Chicago where we seized 103,000
13 in U.S. currency.  And, again, on that particular date, June
14 18th, 2020, we seized on that date U.S. currency of
15 approximately almost four million in cash, on that date from
16 different locations.  But specifically from that trailer and a
17 water heater there was almost a million dollars in U.S.
18 currency that was going down to Mexico.
19 Q.   Now, you talked about the leadership of the
20 organization and that they're now hiding or are
21 fugitives in Durango, Mexico; is that correct?
22 A.   That's correct.
23 Q.   And how do you know that?
24 A.   So I know that through multiple sources and also through
25 sources that are in Mexico.  They're telling us, "Hey, these

1   people are showing up down here." And so I was able to do a

2   telephone brief of multiple sources to determine that, oh,

3   yeah, that's the guy that's been indicted in this case. And

4   they are all U.S. citizens -- a majority of them are U.S.

5   citizens, not all of them. But a majority of the people that

6   have fled down there are U.S. citizens, and they're visiting

7   one common spot, which is Mr. Duolingo Gallegos's ranch in

8   Durango, Mexico, and a lot of them are held up there just kind

9   of, I guess, vacationing -- I mean hiding out from law

10  enforcement. And there's probably, I would say, approximately

11  eight to ten of them down in Mexico that are doing that.

12  Q.   And as the leaders of the organization, do you have any

13  information that they've instructed any of the members of the

14  organization to flee or that they could go to Mexico if they

15  chose to and that they would be received there and that they

16  could hide out there if necessary?

17  A.   Yes. There are defendants in this case that we have

18  interviewed that are in custody right now that have been

19  contacted by Mr. Gallegos, the son of Mr. Duolingo Gallegos,

20  and solicited or recruited to go down there to -- that they

21  would cover their expenses to go down there and to avoid law

22  enforcement detection. But those defendants are -- rejected

23  those offers, and, you know, we were able to arrest them and

24  get that information out of them. But a few of the defendants

25  in this case have been solicited to go to Mexico to avoid DEA's

1    arrest.

2    Q.    Now, you said this organization is connected or associated

3    with the Sinaloa Cartel.  Is that cartel a violent cartel?

4    A.    It is a very violent cartel.

5    Q.    And is it well resourced?

6    A.        Very well resourced.

7    Q.    Has sufficient manpower or resources to hide

8    somebody or conceal somebody in Mexico if necessary?

9    A.    Yes, they do.

10   Q.    And now, you also talked about firearms being

11   involved in this organization and the exportation of firearms

12   from the United States to Mexico.  Tell us about that.

13   A.    So in this investigation, in November of 2019, DEA

14   executed a search warrant at a storage shed.  We did learn that

15   they were gathering a cache of weapons or firearms to build up

16   to send to Mexico.  With that information, we learned that the

17   firearms were going to Mexico potentially to harm somebody.  We

18   reacted, and we executed a search warrant at a storage shed

19   where we seized eight to nine firearms.  That was just a small

20   amount of firearms.  They were building these firearms up.  So

21   as I testified to earlier, we did seize drug ledgers in this

22   investigation, and one of those ledgers was not a drug ledger.

23   It was actually a firearms ledgers, where they were keeping a

24   running total of firearms that they were purchasing from

25   different members of this organization to send to Mexico:

1  Glock handguns, ammunition, targets, ear and eye protection,

2  sniper rifles, AK-47s. And specifically speaking to a

3  cooperating defendant in this case, two of the firearms

4  purchased for the organization was purchased by Mr. Olivarez.

5  Q.  Okay. We'll talk about Mr. Olivarez here in a little bit.

6  A.  Yes, sir.

7  Q.  Generally speaking, those ledgers -- let's talk about

8  those ledgers. You talked about the indication of firearms

9  being purchased and annotated in the ledgers. What about the

10 drugs? What is the amount of drugs this organization has been

11 involved with? What do the ledgers show?

12 A.  So in the drug ledgers, they were analyzed by FBI in

13 Quantico, Virginia, for a period of 201- -- so it goes back --

14 approximately back a year and a half in 2019 to 2018. And then

15 those drug ledgers, again, it's just a snapshot. We're only

16 able to see approximately 13 drug ledgers in this investigation

17 from a cooperating defendant. So in a 1.5-year period, FBI was

18 able to determine that this drug trafficking organization in

19 the Dallas, Texas, area collected $5.7 million in cash. And in

20 kilos, there were hundreds and hundreds of kilo of cocaine,

21 methamphetamine, heroin, and Xanax and fentanyl distributed

22 just in the Dallas, Texas, area alone. So, again, that is just

23 a snapshot for a year and a half.

24        Why is it a snapshot? Because the cooperating

25 defendant destroyed numerous drug ledgers, and what I mean by

1   that is shredding them or burning them so that someone like me

2   would not find them and use that against them.  But we were

3   lucky.  In November we were able to get 16 of them and do the

4   analysis of those drug ledgers.

5   Q.   But that same cooperating defendant or individual, did he

6   indicate if this organization had been operational more than a

7   year and a half prior?

8   A.   That is correct.  They -- or so our timeline starts in

9   2017.

10  Q.   And have you been able to corroborate a lot of the

11  information provided by that cooperating defendant as well as

12  other sources that you have in this investigation?

13  A.   I have.

14  Q.   Do you believe the information that they provided you,

15  that had been truthful and credible?

16  A.   I believe that it's been truthful and credible.

17  Q.   Now, specifically looking at Mr. Olivarez, what did they

18  tell you, either the cooperating defendants or cooperating

19  sources about the involvement of the defendant in this

20  organization?

21  A.   Yes, sir.  So as we're investigating, as we're

22  interviewing the cooperating defendant and looking at the drug

23  ledgers and taking copies of those drug ledgers and taking

24  copies of those drug ledgers to the cooperating defendant and

25  showing the cooperating defendant, you know, again it's just

1  names in drug ledgers.  I don't know the names.  I mean, like

2  there are names like Pinicola and Rocky and Salo.  So you see

3  all these names in there, but those are just names to me.  What

4  helps for those names to have faces is that the cooperating

5  defendant is able to say, "That's this person here, Rocky

6  Olivarez.  And I've dealt with him this many times.  And those

7  entries in there are cocaine or that entry in there is

8  methamphetamine."

9          And so although Mr. Olivarez, he is listed in there

10  as Rocky, R-O-C-K-Y, and sometimes they write it R-O-C-K-I in

11  the drug ledgers.  But we have in there about $58,000 worth of

12  transactions that occurred with the drug trafficking

13  organization.  So a photo has been displayed to the cooperating

14  defendant and we get an identification there.  Not just one

15  photo of just Rocky with Rocky.  It's a photo of like maybe 40

16  photos that are lined up and they go through them, and they are

17  able to see this is Rocky right here.  They are able to

18  identify their house, and then we continue our investigation of

19  Mr. Olivarez being a member of this drug trafficking

20  organization.

21  Q.   And, again, you were able to corroborate his

22  information.  Did the cooperating defendant or cooperating

23  sources identify individuals in the ledgers and then those

24  individuals were arrested and then, they themselves, admitted

25  that they were involved to that level and that degree as

1  indicated in the ledgers?

2  A.  So yes.  To answer your question, yes.  But

3  because of COVID, we haven't been able to pick up a lot of

4  them.  But a majority of them we have picked up that had been

5  listed in the ledgers.  For example, Sergio is in the ledger of

6  saying like, "Yeah, that's me and I was a customer of this

7  organization."  Yeah, so as you go down, no one has refuted or

8  denied that that was their name in the drug ledgers after --

9  you know, during our investigation.

10 Q.  And you were able to identify, as in your example, as you

11 indicated, Sergio, because of that cooperating defendant or

12 cooperating sources identifying them.

13 A.  That, and then we back-doored through looking at their

14 telephone numbers and, you know, looking at subscriber

15 information and telephone numbers, and then we go out and do

16 surveillance.  And then we, you know, take surveillance photos.

17 So there's a lot that goes into it.  Just that based off of his

18 word.  And then them corroborating as we're moving along, but

19 then you look at someone that has a phone for a long time, and

20 then we start talking to other DEA offices that also has

21 Mr. Olivarez as a target investigation in other parts of Texas

22 that is looking at him for drug trafficking methamphetamine.

23 So when you put that all together and it -- we're corroborating

24 our defendant.

25 Q.  What offices are those that are investigating

1   Mr. Olivarez?

2   A.   So as that information is coming in, of course, I'm doing

3   research and I'm looking at databases, and I see Mr. Olivarez

4   is popped up in different DEA investigations.  Once in Corpus

5   Christi where they actually put a tracker on his vehicle and

6   they were tracking his movements.  I don't know the details of

7   that tracking device yet, but they did track his vehicle.  And,

8   also, an agent out of San Antonio, Texas -- again they

9   identified Mr. Olivarez as the

10  methamphetamine distributor who was distributing Aryan Circle

11  members out in that area in the San Antonio area.  So we get

12  together.  We have telephone calls.  We start sharing

13  information with one another.  And, again, I get the photo, I

14  look at the photo, and it's Rocky Olivarez, the same photo that

15  I showed the defendant.

16  Q.   And you've put tracking devices on vehicles;

17  correct?

18  A.   That's correct.

19  Q.   You're familiar with the fact that it requires probable

20  cause for a judge to order or allow someone to put a tracking

21  device on a vehicle.

22  A.   That's true.

23  Q.   And you said that was accomplished in Corpus

24  Christi on this defendant's vehicle; is that correct?

25  A.   That's correct.

1   Q.   So some agent in Corpus Christi had to have gone to the

2   judge in order to get an order to put a tracker on his vehicle.

3   A.   That's true.

4   Q.   Now, you said that he was mentioned in regards to

5   firearms.  What specifically was mentioned in the ledgers in

6   regards to firearms and the defendant?

7   A.   It isn't so much that -- so the ledgers did have names,

8   but there were a lot of unidentified people in the ledgers that

9   were supplying firearms.  But according to the cooperating

10  defendant, that, during their relationship, or as Mr. Olivarez

11  was a customer of the drug trafficking organization, he

12  supplied two firearms, two handguns to the organization for --

13  for compensation as getting paid.  But those firearms were then

14  ultimately sent to Mexico to cartel members down there.

15  Q.   And what happens to the firearms that are sent to the

16  cartel members in Mexico?

17  A.   You know, they arm themselves.  Again, they use them to

18  fight law enforcement, to fight the military down there, to

19  protect themselves, and also to fight other cartel members.

20  Q.   And based on your investigation, can you estimate the

21  amount of time that the defendant was involved in receiving

22  drugs from the organization?

23  A.   Based on my investigation, it was back to the --

24  early 2018 and up to 2020 to present day, June 18th, I would

25  say.  I don't know what happened after June 18 is when we did

1   our takedown, and Mr. Olivarez had a trailer that was

2   registered to him that was -- again, as I testified to earlier,

3   the trailers that were going down to Mexico and back from

4   Mexico, some of those trailers were registered in

5   Mr. Olivarez's name with his address at Shay (phonetic) Street.

6   And so, again, we made -- his actual trailer we seized almost a

7   million dollars in cash in that trailer, and, also that trailer

8   was equipped with a very sophisticated track device that the

9   floor lowered to the ground, and it had 40 compartments that

10  were rectangular that you could put kilos in of cocaine and

11  heroin.  And that license plate was registered to Mr. Rocky

12  Olivarez.

13  Q.   How many trailers was this organization running at one

14  time?

15  A.   So this tra- -- this organization was running

16  approximately six trailers at one time, different license

17  plates.  A couple of them were registered

18  to Mr. Olivarez.  Interestingly enough, as we go to look for

19  Mr. Olivarez on September 25th, 2020, we look in his backyard

20  and he has, I think, three utility trailers lined up back

21  there, like newly purchased just sitting there.  I don't know

22  anything more than that.  But I could visually see that he had

23  trailers back there, and then the Chevy Tahoe that was

24  described to me that had the tracking device on it was in the

25  backyard too.

1  Q.  Tell us about the arrest.

2  A.  So the arrest of Mr. Olivarez was -- we needed to return

3  that trailer back to him because it was registered to him and

4  we were not seizing it.  We were able to destroy the track

5  device in there and remove it.  And so we went to his house.  I

6  believe it's 2154 Shay Road, in Dallas, Texas.  And when we

7  went up there, we weren't able to make any contact with him,

8  but we knew that he lived there.

9        So, again, we started asking neighbors.  We were able

10  to determine that his mom worked at a nearby laundrymat.  We

11  went to that laundrymat [sic] and he was not there.  Contacted

12  Ms. Olivarez, I believe, if that's the mom's name.  So as we

13  made contact with her, she calls Mr. Olivarez, Rocky Olivarez,

14  to come pick up the trailer.

15        And as we're sitting in the parking lot, we have our

16  vest on, police; we have marked units there.  Or actually the

17  vehicle that pulled the trailer was an unmarked patrol unit.

18  And he drove through the parking lot.  We waved at him, waved

19  him down.  He continued to drive, on and we had to contact Ms.

20  Olivarez to call him back to come back to meet with us.

21  Ultimately, he came back and we released the trailer to him,

22  and that's when we took him into custody.

23  Q.  He wasn't aware that you had an indictment and a warrant

24  for him; correct?

25  A.  Well, I don't know that.  He was surprised.  He did say,

1  "Hey, like, what's this about?" and stuff like that. But I

2  don't know if he knew that. Because, again, he was really

3  closely connected to Mr. Duolingo Gallegos, who was down in

4  Mexico. He was trusted by him. He did -- again, the trailer

5  was a deal that -- a deal that he struck up with that group

6  down in Mexico to get those trailers. And I do know through

7  defendants that Mr. Rocky Olivarez is close associates with

8  Duolingo Gallegos. There were outstanding drug debts owed by

9  Mr. Olivarez that were actually wiped clean by Mr. Duolingo

10  Gallegos because they were close friends.

11  Q.  Now, have you had an opportunity to examine his criminal

12  history?

13  A.  I have.

14  Q.  What do you know his criminal history to be?

15  A.  I know his criminal history to be for him to be a

16  convicted felon. I know that it dates back to, I want to say,

17  1993, I believe, where, you know, you have a couple of DWIs,

18  you do have a manufactured delivery of a controlled substance.

19  And I believe there was some time spent at the Texas Department

20  of Corrections. I do know through the DEA database that he was

21  or he did participate with an undercover. They did not file

22  charges on him back in 2003, I believe. The undercover

23  purchased an ounce of methamphetamine from Mr. Olivarez in

24  Dallas, Texas. But, again, the charges were never filed for

25  Mr. Olivarez because he ended up, I believe, going off or

1  getting sentenced and going to jail.

2  Q.  So you know he's got a history that dates back to the age

3  of 27; correct?

4  A.  Yeah.  I believe he was middle-aged then.  Yes.

5  Q.  And he was convicted at that time for manufacturing and

6  delivery of a controlled substance and was sentenced to six

7  years and five years on two different counts.

8  A.  Yes.  That's correct.

9  Q.  And, again, in 2002, he was again convicted for

10  manufacturing and delivering of a controlled substance.

11  A.  That's correct.

12  Q.  And received ten years on that sentence?

13  A.  Yes.  That is correct.

14  Q.  Are you familiar whether he was on any kind of supervision

15  at the time that he was committing this instant offense, this

16  trafficking activity that he's now charged with?

17  A.  I believe that he was on probation during -- or parole --

18  during this conspiracy that we were investigating -- so the

19  drug ledgers go back for Mr. Olivarez to 2019, 2018, a year and

20  a half back to 2019.  He is listed in the drug ledgers.  He's

21  listed in there doing transactions.  The total amount is

22  $58,000.  And so on that time that he was doing those

23  transactions, he was on probation.  Also, I don't know the

24  conditions of his probation at the time, but he was also

25  traveling and meeting with undercovers and those investigations

1    in Corpus Christi and also in -- I don't know if San Antonio,

2    but I know in Corpus Christi, though.

3    Q.    He was meeting with undercover officers for what purpose

4    in Corpus Christi?

5    A.    To negotiate methamphetamine transactions.

6    Q.    And that would have been during the time period that he

7    was on probation or some sort of supervision?

8    A.    That's correct.

9    Q.    Now, based on the totality of your investigation, the

10   context that you indicate that he has or the friendship that he

11   has with the individuals in Mexico, have you formed an opinion

12   as to whether this defendant would be a continuing risk of

13   flight or threat to the community?

14   A.    I have.

15   Q.    And what's your opinion?  And what do you base that on?

16   A.    I base that on his close relationship that he has with Mr.

17   Duolingo Gallegos.  Again, he was a trusted associate of this

18   organization to obtain those trailers that had the false

19   compartments in it to go to Mexico. I know that being -- that

20   having that close relationship to Mr. Duolingo Gallegos, I feel

21   that knowing that he has been arrested, that that would be

22   offered to him also like the other ones, the other people in

23   this organization to go down to Mexico.

24          Again, the people that have gone down there and

25   they're living down there right now avoiding arrest by DEA are

1     not the highest level people. They are people that are like

2     drivers. They are people that are distributors. They are just

3     people that are -- their roles in the organization are just

4     like Mr. Olivarez, you know, customers.

5          So -- so he does have safe passage to Mexico through

6     Mr. Duolingo Gallegos. And, also, the dangerous part is the

7     firearms that -- that the cooperating defendant told me about

8     him supplying. That is dangerous. That is dangerous for

9     agents down there in Mexico working on the U.S. side and also

10     for the military and the police officers and citizens of

11     Mexico, and also locally here. Some of those firearms could

12     have been used to use in offenses here in the United States.

13     And so that's my opinion about him being a danger and a flight

14     risk.

15   Q.   Thank you, Agent.

16          MR. GONZALEZ: No further questions.

17          THE COURT: Ms. Guadarrama.

18                   **CROSS-EXAMINATION**

19   **BY MS. GUADARRAMA:**

20   Q.   Yes. Agent West, I just have a few questions,

21   please.

22   A.   Yes, ma'am.

23   Q.   You say that Mr. Olivarez was on probation. Did you see

24   whether or not his probation was ever revoked or that he was

25   successfully discharged?

1  A.   I did not see that it was revoked.  I believe that he

2  completed it successfully, as it's noted.

3  Q.   And on September 25th when you arrested -- were you the

4  one that actually went to the house and arrested Olivarez?

5  A.   Actually, we arrested him at the laundrymat.  So I was

6  actually the one that actually put handcuffs on him, yes.

7  Q.   Were there other agents with you?

8  A.   Yes.

9  Q.   Who all was with you?

10  A.   It was Jim Wickham (phonetic), Eric Womas (phonetic), and

11  Brett Salsman (phonetic).

12  Q.   And you said you had an opportunity to look in the

13  backyard of Mr. Olivarez's home.  Did you see other trailers?

14  A.   Yes.

15  Q.   Okay.  And did you see Jet Skis back there or other type

16  of equipment?

17  A.   You know, now that you mention -- I do remember the Jet

18  Skis, and Jet Skis do come up in this investigation.  Yes, I

19  believe that that was back there.

20  Q.   So you're not telling the Court that it's illegal to buy

21  and sell trailers; correct?

22  A.   No.  I'm telling the Court that it's -- it's

23  illegal to install trailers with track devices and

24  then buy them for an organization to transport methamphetamine

25  and drugs and firearms and then bring dope into this country

1    and send drug proceeds.  That's what I'm telling the Court.

2    Q.   Okay.  But I'm just --

3    A.   For an organization -- for that head honcho or the boss of

4    the Sinaloa Cartel -- and not the Sinaloa, but a top member of

5    the Sinaloa Cartel.  That's what I'm saying.

6    Q.   Okay.  But you're not telling the Court that it's illegal

7    just to buy and sell trailers, just in general?

8    A.   In general, no.

9    Q.   Okay.  It's not illegal to buy Jet Skis?

10   A.   No.

11   Q.   Correct?

12   A.   No.

13   Q.   And is there any evidence that Mr. Olivarez was the person

14   that converted these trailers to have secretive compartments?

15   Is that your allegation or not?

16   A.   At this moment, I don't have any information that he was

17   building the track devices in them, but we're actively

18   investigating that part.

19   Q.   And it's not illegal to buy and sell guns; is that

20   correct?  There are gun shows everywhere.

21   A.   There are stipulations, you know, if you're

22   illegally in this country or if you are a felon, if you're a

23   drug user; there are parts of it that are illegal to it.  But,

24   yeah, a citizen that has no record like that -- yeah, you can

25   buy guns, but not to sell it to, you know, drug traffickers,

1  you know.  Or in Mr. Olivarez's case, he's a convicted felon;

2  so you can't do that.

3  Q.   Now, you said that there was a cooperating

4  defendant that kept identifying Mr. Olivarez.  And who is that

5  cooperating defendant?

6          MR. GONZALEZ:  Objection.  Irrelevant.

7          THE COURT:  I don't think it's relevant to the

8  detention decision here today.

9  Q.   (BY MS. GUADARRAMA)  Are there other defendants besides

10  this one cooperating defendant that has named Mr. Olivarez as a

11  -- as an involved participant?

12  A.   Yes.

13  Q.   So how many others?

14  A.   So all together, two cooperating defendants.

15  Q.   Okay.  With regard to Mr. Olivarez's risk of

16  flight or -- when you arrested him, would you say he was

17  compliant?

18  A.   Yes.

19  Q.   Did he resist arrest or anything like that?

20  A.   He did not.

21  Q.   He didn't try to evade or run?

22  A.   Well, so -- I believe that he saw us first in the parking

23  lot, and he continued to drive through.  We had

24  (indecipherable) on the call and tell him to come back, and we

25  waited for a while, but he saw us.  Again, we were marked.  We

1    had police gear on.  We had police cars with lights and sounds

2    on it in the parking lot.  We had his trailer hitched to the

3    back.  He drove through.  He saw the agents there.  We waved

4    him down and he continued to drive on.  We had to go to his mom

5    and start over there and talk to him about that.

6    Q.   Okay.  But he did come back?

7    A.   Yeah.  On the second try -- on the second one.  Yes.

8    Q.   Okay.  What exactly -- could you specify what

9    exactly ties Mr. Olivarez to Rafael Gallegos?

10   A.   Again, I'll go back.  It was cooperating defendant's

11   testimony that we started an investigation where his name,

12   Rocky, was listed in the drug ledger, you know, a few times,

13   and we asked him who this Rocky Olivarez was, and we started

14   our investigation by identifying Rocky Olivarez that's listed

15   in this drug ledger buying cocaine and methamphetamine.  And so

16   his connection is we'll continue to ask the defendant

17   questions, and we find out that Mr. Olivarez is a close friend

18   of Mr. Duolingo Gallegos, who is the main leader, organizer,

19   source of supply in this Sinaloa in Mexico; and that's the

20   relationship.  That's the connection to that.  And, also to his

21   son, Mr. Rafael Gallegos.  He has a close relationship with him

22   too.  Not like the dad, but there is connection; they do know

23   each other.

24   Q.   Have you ever seen surveillance video of Rocky Olivarez

25   with either Duolingo Gallegos or Rafael Gallegos?

A.    No.

Q.    You don't have any phone calls tying those two together;

is that correct?  Tying Mr. Olivarez to either of the Gallegos;

is that correct?

A.    Right now, no.

Q.    Do you have any evidence that Mr. Olivarez

benefited from or had any proceeds from any of these

transactions?

A.    What do you mean by that?

Q.    Did you find any large amounts of cash when you arrested

him?  Did you search his house to see what you might have

found?

A.    Okay.  So I can answer that.  Search the house, no.

Proceeds, I'm guessing he had over a thousand dollars.  I know

he's unemployed.  He's been unemployed for a while.  But as far

as proceeds, I mean, for a person being unemployed and living

with their mom, I mean over a thousand dollars, I would think,

is pretty good.

Q.    That's the extent of that?

A.    That's the extent, yeah.

          MS. GUADARRAMA:  Your Honor, could I have just a

second?

          We pass the witness, Your Honor.

          THE COURT:  Agent West, before I allow Mr. Gonzales

to ask any further questions, I just want to clarify that the

1  Court understands the quantities that you're alleging or are

2  specifically attributable to this defendant.  Am I correct that

3  your testimony is that there are $58,000 worth of transactions

4  that you can tie directly to this defendant of cocaine and/or

5  heroin?

6           THE WITNESS:  Yes.  Cocaine and methamphetamine.

7           THE COURT:  Okay.  Thank you for clarifying.

8           THE WITNESS:  Uh-huh.

9           THE COURT:  And then as it relates to the June 18th

10  seizure, the one that you're telling me had a million dollars

11  in the water heater, you're telling me the trailer that that

12  million dollars was found in was registered to this defendant?

13           THE WITNESS:  Yes.  And that trailer has been

14  observed multiple times going through Mexico -- to Mexico and

15  back from Mexico.  And cooperating defendants will tell you

16  each time it was either loaded with money or drugs.

17           THE COURT:  Thank you.

18           Mr. Gonzalez, any further questions of this witness?

19           MR. GONZALEZ:  No, Your Honor.

20           THE COURT:  Okay.

21           Ms. Guadarrama, in light of the fact that I asked

22  those two clarifying questions, do you have any further...

23           MS. GUADARRAMA:  No, Your Honor.

24           THE COURT:  Okay.  Agent West, you may step down.

25           THE WITNESS:  Thank you.

1    THE COURT:  Does the Government have any further

2  witnesses or evidence to present to this Court at this time?

3    MR. GONZALEZ:  No, Your Honor.  No further witnesses

4  or evidence.

5    THE COURT:  All right.

6    Ms. Guadarrama, you may call your witness.

7    MS. GUADARRAMA:  I call Erica Verdiguel, his

8  daughter.

9    THE COURT:  Ma'am, if you'll please come forward to

10  be sworn.

11    (Whereupon, the witness was sworn.)

12    THE WITNESS:  I do.

13    THE COURT:  Ma'am, once you're seated, could you

14  please state your full name for the record and then spell it,

15  please.

16    THE WITNESS:  My name's Erica Verdiguel.  It's

17  E-R-I-C-A and V, as in "Victor," -E-R-D-I-G-U-E-L.

18    THE COURT:  Ms. Guadarrama, you may proceed.

19                    **DIRECT EXAMINATION**

20  **BY MS. GUADARRAMA:**

21  Q.  Ms. Verdiguel, how are you related to Rocky

22  Olivarez, Jr.?

23  A.  I'm his eldest daughter.

24  Q.  Okay.  And how many other children does Rocky have?

25  A.  One other.

Q.   And is that -- who is that?

A.   Ashley -- Ashley Olivarez, my younger sister.

Q.   Is she here today present in the courtroom?

A.   She is.

Q.   Okay.  Who else is here present in the courtroom with you today?

A.   Augustina Olivarez, which is my grandmother, Rocky Olivarez's mother.

Q.   Okay.  Does Rocky live with his mother?

A.   Yes.

Q.   Can you give me the address on that?

A.   2154 Shay Road --

Q.   And --

A.   -- Dallas, Texas.

Q.   And how long have they lived there?

A.   He lived there for ten-plus years.  Maybe on and off with girlfriends, but generally since my grandpa passed away four years ago.

Q.   Okay.  And your grandpa passed away about two years ago?

A.   Four years ago.  2016.

Q.   Four years?  Okay.

     And how long has your grandmother lived there?

A.   Oh, 50-plus years.

Q.   Okay.  So let's just say, within the last year, what has

1  Rocky Olivarez done to help your mom?

2  A.   My grandma, she's elderly; so she has lots of

3  medical appointments.  Many times to go to the doctor for her

4  prescription as well.  My dad does the grocery shopping.

5  Especially with COVID he helps take care of her as well.  Takes

6  her wherever she needs to go.  My grandma also does not read or

7  write; so he helps in her regards to that.  As well as she has

8  diabetes; so -- pretty high, and so he takes care of her with

9  all of those.

10  Q.   Does he help monitor her medications every day?

11  A.   Yes, ma'am.

12  Q.   Okay.  And if he were not able to return home, you know,

13  in the foreseeable future, who would be able to take care of

14  your grandmother?

15  A.   Well, my sister and myself would have to step in, but we

16  do have our own homes and families as well.

17  Q.   So y'all don't have time to devote to your

18  grandmother like Mr. Olivarez does for his mother; is that

19  correct?

20  A.   That is correct.

21  Q.   Okay.  So would you consider that a hardship if

22  Mr. Olivarez was -- were to be detained on this case for a long

23  period of time?

24  A.   Yes, ma'am.

25  Q.   Is -- would you consider your dad close to his family?

1  A.  Yes, very close.

2  Q.  Okay.  And why do you say that?

3  A.  We are a close-knit family.  We do family dinners every

4  week.  My dad helps with his grandkids, my son and my niece,

5  along with the responsibilities of my grandmother.

6  Q.  And do you-all have any immediate family members in

7  Mexico?

8  A.  No, ma'am.

9  Q.  Okay.  So have you ever known that -- your dad to go to

10  Mexico?

11  A.  No.

12  Q.  When the officers were at the house for him to be

13  arrested, he basically turned himself in; is that correct?

14  A.  Yes.

15  Q.  Okay.  And in his past, he's been facing prison time.

16  Does he always still go to court as far as you know?

17  A.  Yes.  He's been very diligent with -- whenever -- in the

18  past, he's always been diligent and never been a flight risk.

19  Q.  Okay.  He's never had any type of assaultive type of

20  offenses in his history; is that correct?

21  A.  Not that I know of.

22  Q.  Okay.  And are you asking the judge to grant him a bond so

23  that he can be released during the pendency of this case?

24  A.  Yes, ma'am.

25  Q.  Okay.  And if it is appropriate to -- to give the Court

1  more assurance that he's not going to leave, to put either a

2  GPS monitor device or an electronic monitoring device on his

3  ankle to assure that he would come to court?

4  A.   Yes.  If there was need of assurance with tracking

5  bracelet or anything, I think he would definitely comply with

6  whatever the Court allows for him to be bonded out.

7  Q.   So if he were -- do you feel that he could do house arrest

8  and stay confined to his home during the pendency of this case?

9  A.   Yes, ma'am.

10  Q.   As a last resort, if the Court would require as a

11  condition of bond a certain amount of cash to ensure his

12  appearance, the family could work on doing that and coming up

13  with that?  Is that correct?

14  A.   Yes, ma'am.

15  Q.   The prosecutor has some questions for you.  Thank you.

16          MS. GUADARRAMA:  I'll pass the witness.

17          THE WITNESS:  Okay.

18                      **CROSS-EXAMINATION**

19  BY MR. GONZALEZ:

20  Q.      Ma'am, you're not saying that you would not pitch in

21  and take care of his mother or your grandmother; right?

22  A.   Correct.

23  Q.   You would do that, wouldn't you?

24  A.   Yes.

25  Q.   So if that were necessary, you and your sister would pitch

1  in and do some of the things that you're saying that the
2  defendant is now doing for her; correct?
3  A.   Correct.
4  Q.   Now, are you familiar with an individual by the name of
5  Rafael Gallegos?
6  A.   No.
7  Q.   Have you ever heard of him?
8  A.   No.
9  Q.   Do you know of the relationship of your father to that
10 individual?
11 A.   No.
12 Q.   Are they friends?
13 A.   I don't know.
14 Q.   Okay.  So you've never heard of him.  What about any
15 business transactions with Mr. Gallegos?
16 A.   I don't know any of.
17 Q.   Okay.  So you indicated that your father has been
18 compliant anytime that he's been to prison and come out;
19 correct?
20 A.   Correct.
21 Q.   So if the information the agent just gave that he was
22 involved in this conspiracy while he was on probation, you
23 would agree with me that he hasn't been compliant with his
24 probation.
25 A.   This is the first I've heard of it.

1  Q.  Okay.  How -- how often do you talk to him?  How often do

2  you see him?

3  A.  With him?

4  Q.  Yes.

5  A.  Weekly.

6  Q.  So --

7  A.  Daily sometimes.

8  Q.  -- okay.  So being that you see him weekly or

9  daily, you're not familiar with some of the individuals that he

10  associates with?

11  A.  No.

12  Q.  And you would agree with me that someone that gets off a

13  parole in 2017 and is alleged to have been involved again in

14  2018 and 2019 in the same type of activity, that would be

15  someone that could be a danger to society; correct?

16  A.  You're asking if he could be a danger to society?

17  Q.  Yes.

18  A.  Personally, no.

19  Q.  You don't think that a person that has been

20  convicted previously for drug trafficking and then comes out in

21  2017 and then goes right back to it in 2018, you don't see that

22  person as a danger to society?

23  A.  He's my father.  So, no, I do not.

24  Q.  Oh, because it's your father?

25  A.  Correct.

1 Q. If it was someone else -- well let me put it this way. If

2 it was someone else, would that person be a danger to society?

3 A. Well, he hasn't been tried. There's no evidence at this

4 time. So I would say no still.

5 Q. Okay.

6 MR. GONZALEZ: I have no further questions, Your

7 Honor.

8 THE COURT: Ms. Guadarrama, anything further for this

9 witness?

10 MS. GUADARRAMA: No, Your Honor.

11 THE COURT: Thank you, ma'am. You may step down.

12 THE WITNESS: Thank you.

13 THE COURT: Ms. Guadarrama, do you have any further

14 witnesses to present?

15 MS. GUADARRAMA: That's all we have, Your Honor.

16 THE COURT: All right. At this time, in light of the

17 fact that there is a dispute regarding this is a presumption

18 case, I'll hear from Mr. Gonzalez, first in argument.

19 MR. GONZALEZ: And the Government would argue that

20 this defendant is a continuing threat of flight as well as a

21 threat as to the community because of prior criminal history.

22 The defendant has indicated in the pretrial services report was

23 finished with his parole in 2017 but soon thereafter in 2018

24 and 2019, as testified by the agent who corroborated the

25 information from cooperating defendants and cooperating

1    sources, was right back involved in assisting a large drug

2    trafficking organization and the distribution of drugs as well

3    as purchasing of firearms for payment of drugs.

4           We would argue that the information provided by the

5    defendant's daughter has not rebutted the presumption.  As

6    indicated by her last few answers, she's not willing to accept

7    or even consider that someone with this prior criminal history

8    would be someone that would be a contributing threat to the

9    community.  And I would argue that that is an indication that

10    she would not turn her own father in if he was violating any

11    conditions of release.

12           We would agree that the presumption has not been

13    rebutted, that the information presented by the Government is

14    that this defendant was providing the trailers that were

15    trafficking in drugs as indicated by the agent.  There were two

16    trailers that were registered to him that were being used on a

17    weekly basis to import large quantity of drugs, cocaine, and

18    methamphetamine that were then distributed and that large

19    proceeds were then sent back to Mexico.  The agent also

20    testified that other members of this organization has already

21    fled and are hiding in Mexico and that the individuals in

22    Mexico have invited individuals here in the U.S. to flee to

23    Mexico to avoid prosecution and arrest.

24           So we would argue that the totality of the

25    information provided by the Government has not been rebutted

1    and that the defendant should remain detained.

2              THE COURT:  Thank you.

3              Ms. Guadarrama.

4              MS. GUADARRAMA:  Yes, Your Honor.

5              Mr. Olivarez has no criminal history of any type of

6    assaultive offenses where he would be a risk to the community.

7    There -- the only evidence according to the agent is that a

8    trailer was involved that his name -- that was registered to

9    his name.  There was not any -- he said there is not any

10   surveillance of Mr. Olivarez connected to Mr. Gallegos.  No

11   phone calls or anything like that that connects them.

12             So at this early stage in this case, we're asking

13   that -- the Court to grant his bond so that he can remain in

14   house -- in his home helping his mother, because it would be a

15   hardship otherwise.

16             Anytime -- as far as a flight risk matter goes,

17   anytime Mr. Olivarez has been facing prison time, you don't see

18   bond forfeitures on his felony cases.  He reported on his DWI

19   and got successfully discharged.  He complied with law

20   enforcement.  He didn't resist arrest in this particular case.

21   He complied with the officers. He's a compliant type of person,

22   and like I said, even when he was looking at prison time, he

23   didn't flee.  And he's not going to flee.  He has his family

24   here.  He's devoted to his mother.

25             And some of these -- these felonies are pretty remote

1  in time.  They were in 2003 to 2004.

2          So we're asking that, as a condition of bond, if the

3  Court sees fit, to either put up a cash amount as surety or use

4  GPS or electronic monitoring for house arrest.  That's what

5  we're asking for.  But he is not a flight risk, Your Honor, and

6  intends to always come to court as he has in the past.

7          THE COURT:  Thank you.  The Court will take the

8  matter under advisement, Ms. Guadarrama, to allow you an

9  opportunity to provide briefing on the issue of the

10  presumption.  If by noon tomorrow you will provide any briefing

11  with applicable authority supporting your assertion that this

12  is not a presumption case or otherwise file a notice to the

13  Court that you do, in fact, concur that this is a presumption

14  case.

15          Anything further, Mr. Gonzalez?

16          MR. GONZALEZ:  No, Your Honor.  Thank you.

17          THE COURT:  Anything further, Ms. Guadarrama?

18          MS. GUADARRAMA:  No, Your Honor.

19          THE COURT:  Then, Mr. Olivarez, at this time, I'm not

20  making a decision.  Your counsel is going to advise me as to

21  applicable authority supporting the presumption or not

22  presumption in this case.  So until I receive that, I am not

23  going to make a decision.  So today, you're going to go with

24  the Marshal service, and she'll inform you once I have made a

25  determination.  Thank you, sir.

1          (End of proceedings.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, court-approved transcriber, hereby certify on this

4    date, November 18, 2020, that the foregoing is a correct

5    transcript from the official electronic sound recording of

6    proceedings in the above-entitled matter.

7

8        _/s/ Shawna Gauntt-Hicks_____

9    SHAWNA GAUNTT-HICKS, CSR, CCR
     STATE OF TEXAS NO. 9353
10   EXPIRATION DATE: 12/31/2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25