1

1    UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF TEXAS
2              SHERMAN DIVISION

3

UNITED STATES OF AMERICA      :    DOCKET NO. 4:19CR277
4                             :
VS.                          :    SHERMAN, TEXAS
5                             :    SEPTEMBER 28, 2020
JULIO RAMOS (12)              :    9:45 A.M.
6  JONATHAN RAMOS (13)

7                   MOTION HEARING
      BEFORE THE HONORABLE AMOS L. MAZZANT, III,
8            UNITED STATES DISTRICT JUDGE

9

APPEARANCES:
10

FOR THE GOVERNMENT:          MR. ERNEST GONZALEZ
11                           U.S. ATTORNEY'S OFFICE
                             101 E. PARK, SUITE 500
12                           PLANO, TEXAS  75074

13

FOR JULIO RAMOS:             MR. NEAL ANDREW DAVIS
14                           ATTORNEY AT LAW
                             1545 HEIGHTS BOULEVARD
15                           HOUSTON, TEXAS  77008

16

FOR JONATHAN RAMOS:          MR. JED ROSS SILVERMAN
17                           ATTORNEY AT LAW
                             1221 STUDEWOOD
18                           HOUSTON, TEXAS  77008

19

COURT REPORTER:              MS. JAN MASON
20                           CERTIFIED SHORTHAND REPORTER
                             U.S. DISTRICT COURTHOUSE
21                           101 E. PECAN
                             SHERMAN, TEXAS  75090
22

23

24  PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

25  PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

2

1          THE COURT:  Good morning.  Please be seated.

2      Our first case this morning is 4:19CR277, United States

3   of America versus Jonathan Ramos.  And for the Government?

4          MR. GONZALEZ:  Your Honor, Ernest Gonzalez for the

5   Government.  The Government is ready to proceed.

6          THE COURT:  And for the Defendant?

7          MR. SILVERMAN:  Jed Silverman.  Good morning, Your

8   Honor.  Defense is ready to proceed.

9          THE COURT:  Okay.

10          MR. DAVIS:  Good morning, Your Honor.  Neal Davis

11   here for Julio Ramos, ready to proceed.

12          THE COURT:  Very good.  And I set this for hearing

13   because in reviewing the transcript -- well, two things.  In

14   the transcript the Government just did a proffer.  There was no

15   evidence in the record.  And so the Government, in their motion

16   to stay to the Court, had information that wasn't part of the

17   record before.  So that is the reason why.

18      Normally I just do a de novo review on the existing

19   hearing, but I could not do that based upon -- I could see

20   why the Magistrate Judge made the decision they did, but --

21   I can understand the Government's position, but that

22   evidence wasn't before the Court.

23      So my thought was the Government -- I assume you have

24   evidence you want to put on.

25          MR. GONZALEZ:  Yes, Your Honor.

3

1           THE COURT:  And we can go ahead and proceed.  Very

2   good.

3           MR. SILVERMAN:  Thank you, Your Honor.

4           THE COURT:  And then I assume -- we have our court

5   interpreter here.  Is your client --

6           MR. DAVIS:  Your Honor, Julio Ramos does not speak

7   English, but we have the translator.

8           THE COURT:  Okay.  And, Ms. Ailshire, have you

9   already been sworn in?

10          THE INTERPRETER:  Yes, Your Honor.  Good morning.

11          THE COURT:  Okay.  Thank you for your service.

12          THE INTERPRETER:  Thank you.

13          THE COURT:  Okay.  So if everyone will have a seat,

14  I'll have the Government call their first witness.

15          MR. GONZALEZ:  Your Honor, the Government calls

16  Special Agent Marcus West.

17          THE COURT:  Sir, if you'll raise your right hand and

18  be sworn in.

19                      (Witness was sworn.

20          THE COURT:  Go ahead, Mr. Gonzalez.

21          MARCUS WEST, GOVERNMENT'S WITNESS, SWORN,

22              D I R E C T   E X A M I N A T I O N

23  BY MR. GONZALEZ:

24  Q.  Sir, would you please state your full name for the Court

25  and the record?

4

1    A.   My name is Marcus West.   M-A-R-C-U-S, last name W-E-S-T.

2    Q.   How are you employed?

3    A.   A special agent with the Drug Enforcement

4    Administration.

5    Q.   And where are you presently stationed?

6    A.   Dallas, Texas.

7    Q.   Now, pursuant to your duties with DEA, are you familiar

8    with the following individuals:  First, an individual by the

9    name of Jonathan Ramos?

10   A.   I am.

11   Q.   Do you see that individual in the courtroom today?

12   A.   I do.

13   Q.   Would you point to where he's seated and indicate an

14   article of clothing that he's wearing?

15   A.   A light gray/dark gray pinstripe jumpsuit with the lime

16   green mask.

17          MR. GONZALEZ:  Your Honor, may the record reflect

18   that this witness has identified the Defendant?

19          THE COURT:  The record will so reflect.

20   BY MR. GONZALEZ:

21   Q.   And are you also familiar, based on your participation

22   with DEA, familiar with an individual by the name of Julio

23   Ramos?

24   A.   I am.

25   Q.   Do you see that individual in the courtroom today?

5

1    A.  I do.

2    Q.  Could you point to where he's seated and indicate an

3    article of clothing that he's wearing or some description of

4    him?

5    A.  Okay.  A dark gray/light gray jumpsuit with the baby

6    blue mask on at the table in front of me.

7            MR. GONZALEZ:  Your Honor, may the record reflect

8    that the witness has identified the Defendant Julio Ramos?

9            THE COURT:  The record will so reflect.

10   BY MR. GONZALEZ:

11   Q.  Now, sir, are you familiar with the facts that led to

12   the indictment as well as the arrest of both of these

13   Defendants?

14   A.  I am.

15   Q.  Have you prepared a PowerPoint presentation to assist in

16   your presentation and summary of the investigation and the

17   case?

18   A.  I have.

19   Q.  Would it be of assistance to you to present this to the

20   Court?

21   A.  Yes.

22   Q.  Now, tell us when or give us a brief summary of your

23   investigation, basically informing us when it began and how

24   it progressed.

25   A.  Okay.  As the PowerPoint states, in July of 2019 DEA,

6

1   myself as the case agent, started investigating a subject by

2   the name of Rafael Gallegos, Jr. as the leader/organizer of

3   a Sinaloa cartel based here in Dallas, Texas, also with

4   outreaching arms of supply all over the United States and

5   also including California.

6         So one of the main locations where Mr. Gallegos lived

7   was in Plano, Texas, and that's a picture of Mr. Gallegos

8   there.  He is a rap musician and that is his recording

9   label, and that's a picture of him from social media on the

10  couch there in front.  And that's one of the main targets of

11  our investigation was Rafael Gallegos.

12  Q.  And where is Mr. Gallegos, Jr. presently?

13  A.  So as part of this investigation, he fled to Mexico.

14  He's in Durango, Mexico right now with many other members of

15  this organization that are all known to be investigated.

16  They fled to Durango, Mexico to a ranch down there.

17  Q.  And is Mr. Gallegos, Jr. aware of the investigation and

18  is he aware of his indictment?

19  A.  He is aware of the investigation and his indictment.

20  Q.  Okay.  Please proceed.

21  A.  Is that the second slide?  I believe it is.

22        So -- okay.  So the next part of the investigation we

23  were able to cultivate a cooperating defendant.  I'm going

24  to label the cooperating defendant as CD No. 1, as you see

25  in this slide right here.

1          That cooperating defendant identified members of the

2     Gallegos drug trafficking organization and their specific

3     roles.  Specifically, CD-1 provided agents financial

4     documents, checkbooks, bank deposit receipts, deposit slips,

5     money wire receipts that identified Julio and Jonathan Ramos

6     as money launderers for the Gallegos DTO and said they were

7     based in California.

8          So as you can see there on the right-hand side of the

9     slip, those are actually Bank of America checkbooks that

10    were here in Dallas, Texas, used by the cooperating

11    defendant to write checks to deposit into what I call a

12    funnel account, a Bank of America account where they would

13    deposit drug proceeds into the account and that money would

14    be funneled to California and -- and withdrawn in California

15    to assure safe passage from Dallas, Texas to Los Angeles, to

16    avoid law enforcement detection.

17         So those checkbooks right there, as you can see, the

18    name Julio Ramos, Jonathan Ramos, and the address there in

19    Corona, California where they live.

20         And then the one below is the Ramos Rental Properties

21    checkbook.  They were using those bank accounts to funnel

22    money from Dallas to California.

23         Another example of some of the financial documents

24    seized from the cooperating defendant are these PLS

25    cashier's checks, and you can see they're in increments of

8

1    $2,500.  They're often made "pay to the order of" and they

2    were blank at the time when they purchased them from

3    MoneyGrams here in Dallas, Texas.

4         The common pattern that we saw was that they would buy

5    these in the thousands of dollars in $2,500 increments here

6    in the Dallas, Texas area, and then they would go to the

7    Bank of America and deposit the drug proceeds or these

8    cashier checks into Jonathan Ramos's and Julio Ramos's bank

9    accounts.

10        And here's a copy of one that you can see is for $2,500

11   purchased on June 18th of 2019.

12        Again, going with more examples, you can see here

13   actually stubs from the cashier's checks from June 19th,

14   2019, other examples.

15        But in this -- in this slide right here, you can see

16   the Bank of America deposit receipts there with the account

17   numbers 6691 and 3552.  I circled the two different accounts

18   that they would deposit thousands of dollars into.

19        Again, it was drug traffickers here in the Dallas,

20   Texas area that worked for Gallegos that were directed to

21   deposit money into these accounts, and the accounts were

22   6691 and 3552, and that money would be funneled then to

23   California.

24        Sorry.  There you go.

25        So the next step is I obtained federal grand jury

9

1   subpoenas for Bank of America and for account 3552 and 6991.

2   And the first account, 3552, was identified as a bank

3   account owned by Jonathan Ramos.  You'll see here that is

4   his -- this is called a signature card, and that's Jonathan

5   Ramos's signature as the bank -- they have some more

6   identifying information for Jonathan Ramos, Social Security

7   number, his address and whatnot.  But that's the signature

8   card there that identified Jonathan Ramos as the owner of

9   account 3552.

10       So, again, we proceeded with the grand jury subpoena,

11   and this is a signature card for 6691, and as you can see on

12   this screen, this shot right here on this slide, Julio

13   Ramos, sole proprietor, doing business as Julio Ramos Rental

14   Properties.

15       And as I testified to earlier, those checkbooks that

16   the cooperating defendant had, one of the checkbooks was in

17   the name of Julio Ramos Rental Properties and Julio Ramos.

18       Again, that's 6691 account information from Bank of

19   America.

20       That's just another slide with the signature on it for

21   Julio Ramos.

22       Again, we continued to do this investigation and

23   started analyzing accounts from probably about 2018 from

24   bank accounts for both Julio and Jonathan Ramos in Bank of

25   America, and I was able to estimate approximately a quarter

10

1    million at that time that has been funneled through bank

2    activity going through that account for Jonathan and Julio

3    Ramos.

4          You can see here a common pattern that they're doing is

5    they're doing these deposits of cashier's checks.  You can

6    see $8,550.  Those deposits, again, were made in Dallas,

7    Texas and the cash was withdrawn in California.

8          Another example of just the counter credits or the

9    deposits that were going into the Bank of America account,

10   and you can see this is Julio Ramos's, and I just want to

11   give another example.  Again, you see this throughout.  For

12   years they've been doing this.  But deposits made in Dallas,

13   Texas, and this one is $2,500, August of 2019.  As you move

14   down you see another one made on the 21st and 22nd of 2,200

15   and 5,700.

16         Again, this information comes from analysis of these

17   bank records but also supported by cooperating defendants in

18   this case, multiple cooperating defendants that told us this

19   is what they did, and they're orders directly from Rafael

20   Gallegos.

21         So as we move forward, you know, we corroborate the

22   cooperating defendants even more by looking at these PLS

23   cashier checks.  As you can see here, this is actually one

24   that was completed and filled out, but they made the "pay to

25   the order of" to Jonathan Ramos for $1,750.

11

1    Jose Ruiz at the bottom is identified as a subject in

2    this -- he's a drug trafficker that has been indicted in

3    this case and has been arrested in this case, and his name

4    is Jose Ruiz.  And his role was to collect drug proceeds,

5    purchase these PLS MoneyGram cashier's checks and deposit

6    them in Bank of America accounts for Julio and Jonathan

7    Ramos to ensure safe passage from Dallas to California so

8    they could be withdrawn and given to Rafael Gallegos.

9        Another example of a payment, a MoneyGram PLS cashier's

10   check to Jonathan Ramos.  "Pay to the order of" is Eduardo

11   Martinez.  He is a leader/organizer here in the Dallas,

12   Texas area.  We also know him as Lalo.  I'll testify about

13   him later on in this -- in my testimony.

14       But Eduardo Martinez, again, was a leader/organizer and

15   responsible for sending money to the Ramoses in California,

16   and that amount was 2000.

17       Again, I just put a few examples up here, but we have

18   multiple, multiple slides I could put up here of a lot of

19   these transactions with these cashiers checks going to the

20   Ramoses in California.

21       So my analysis, I did the Excel spreadsheet, as you can

22   see here, and I just want to give an example of some of the

23   deposits.  If you look to the left, it's October of 2018.

24   You can see the arrows are pointing to two deposits there,

25   but specifically, if you go right here, the Webb Chapel

12

1    address, again, cooperating defendants were making deposits

2    at this Bank of America off of Webb Chapel branch, and you

3    can see here there's another one up there.

4        Then as you go down below, the arrow pointing right

5    here, again, they would deposit those amounts in there,

6    which were 2000, 2000, 2000, 2000.  So you see this and they

7    do that to avoid law enforcement detection.  They want to

8    stay under -- they're structuring the payments to these Bank

9    of America accounts, again, to assure safe passage of this

10   money to California for Rafael Gallegos.

11       And I'll testify to it later.  They had a really

12   intricate pattern of -- of drug trafficking.  They had it

13   down pretty well of the patterns that they had, whether it

14   was money or actually the drug distribution being imported

15   in from Mexico.  So this is a method that they used putting

16   money into the Ramos's account.

17       So in the investigation we were able to identify three

18   subjects here.  The first one is going to be Juan Felipe

19   Valencia-Aristizabal.  We called him Columbo or he's known

20   as Columbo.

21       The second one is Eduardo Martinez-Gonzalez.  He's

22   known as Lalo.  And then Jose Alfredo Ramirez, known as

23   Fello.

24       Their names were also -- they were responsible for

25   obtaining those PLS cashiers checks and sending them to

13

1    California.

2         And on the left there, Valencia-Aristizabal is a

3    distributor of cocaine, marijuana, heroin, ice and

4    laundering money here in Dallas and collecting drug

5    proceeds.

6         In the middle there is that leader/organizer that I

7    testified to earlier, Mr. Martinez-Gonzalez.  He was running

8    the show here and responsible for the Chicago distributions,

9    of cocaine going to Chicago.

10        On the right was his right-hand man, Mr. Jose Alfredo

11   Ramirez, that was responsible for collecting drug proceeds

12   and also receiving loads of cocaine from Mexico and sending

13   large amounts of drug proceeds back to Mexico.

14        All three subjects were indicted and all three subjects

15   have been arrested, and they're in the judicial pending

16   status right now.

17        So in November of 2019 we cultivated another

18   cooperating defendant, and I'm going to call that

19   cooperating defendant CD No. 2.

20        We executed a search warrant at his residence in

21   Carrollton, Texas, and we seized multiple drug ledgers and

22   financial documents from his residence.  And you can see on

23   the right there's an example of a drug ledger, and I have

24   the amount of one drug ledger on May 17th they had a running

25   amount of $516,000, basically half a million dollars.

14

1      You can see the names listed in the drug ledger as

2  Rafa.  Rafa is going to be Rafael Gallegos, being the leader

3  of this organization, who is in Durango, Mexico right now,

4  who has fled prosecution.

5      You can see other people listed here, Flacco.  Flacco

6  is going to be Eduardo Martinez Gonzalez.  So it goes on.

7  You see muchachos.  That's cocaine.  You have heroin listed

8  in there.  Heroin is going to be Denalis.  So you kind of

9  get a feeling of the drug ledgers that we seized from CD No.

10  2.

11      We continued to analyze these drug ledgers, and this is

12  just another analysis that we seized from the cooperating

13  defendant in Carrollton, Texas.  But for a year and a half,

14  a 1.5 year period, we estimated that this drug trafficking

15  organization distributed $5.7 million, or collected

16  $5.7 million in drug proceeds.  I'm sorry.  That's a two

17  year period.

18      And -- and the cooperating defendant number two said

19  that that's just a snapshot of what they did, because we

20  were only able at that search warrant to seize 16 drug

21  ledgers.  He said they had volumes and volumes of drug

22  ledgers that he would usually shred or burn to get rid of.

23  But we were able to get 16 of his and add up 5.6 million in

24  drug proceeds over a two year period that were sent either

25  to Mexico or to the Ramoses in California.

15

1        A picture of this with the search warrant was a

2   vehicle.   This vehicle was Mr. Julio Ramos's Mercedes that

3   was parked in the driveway in Carrollton, Texas.   Took a

4   picture of that there, the California license plate there

5   for Mr. Ramos.   So his vehicle was here.

6        We also identified that Mr. Ramos in this investigation

7   assisted Mr. Gallegos for purchasing high priced vehicles,

8   such as Cadillac Escalades and Mercedes and whatnot, and

9   also residences in California.

10       So they owned a lot of properties in California, and

11  when I say "they", mostly the Gallegoses, that were managed

12  by Mr. Julio Ramos and Jonathan Ramos.

13       So as you move along in the search warrant, we were

14  able to look into the CD No. 2's phone and we were able to

15  extract a lot of drug ledgers, a lot of conversations, text

16  messages and photos.   But specifically, on June 19th we --

17  we knew that Mr. Gallegos was in California, and he was

18  there specifically to arrange a 30-kilo methamphetamine

19  transaction to get to -- to purchase 30 kilos of

20  methamphetamine and deliver that from California to Dallas,

21  Texas.

22       And in that we were able to see a conversation that Mr.

23  Gallegos was having with CD No. 2, and in this conversation

24  here was an audio, and I was going to play that audio

25  conversation for the Court and -- of him directing the

16

1   cooperating defendant to put money in Mr. Julios's account.

2                   (Audio recording was played in Spanish.

3        THE WITNESS:  Okay.  So basically in that

4   conversation that is Rafael Gallegos sending an audio voice

5   message to the cooperating defendant, directing the cooperating

6   defendant to put -- basically he has $15,000 in drug proceeds.

7   He wants him to break it up.  He wants him to put $5,000 in Don

8   Julio's account but break it up into $5,000 increments.

9        And he confuses Mr. Don Julio with a subject we know as

10  Abuelo.  Abuelo was also indicted in this investigation.

11  But they're both old men, and they refer to both of them as

12  Abuelos also.

13       But in this situation he specifically says Don Julio,

14  and speaking to a cooperating defendant, he did deposit that

15  money into the Bank of America account for Don Julio but

16  also sent more money to other people in California waiting

17  to receive it to purchase the 30 kilos of methamphetamine

18  that was out there.

19       So after that seizure in November of 2019, DEA starts

20  investigating the group here in Dallas, Texas.  We

21  identified places in Plano, Texas, McKinney, Texas, Lucas,

22  Texas, Carrollton, Texas and Dallas, Texas and the

23  surrounding areas, and we identified the group, as I

24  testified to earlier.

25       This is Rafael Gallegos' drug trafficking numbers here,

17

1    and the common way that they would bring the drugs into the

2    United States is in that black trailer, but they had not

3    only one black trailer, they had five black trailers like

4    that that would cross over the United States and go to a

5    house in Richardson, Texas.  In that trailer right there it

6    would be loaded with approximately 40 kilos of cocaine and

7    sometimes a mixture of heroin, and they would do that on a

8    weekly basis.

9        Not only would they bring it here to Dallas, Texas,

10   they had another trailer that would go directly to Chicago,

11   so this operation involved probably a week, I would say,

12   approximately 80 to 100 kilos of cocaine and heroin going to

13   Dallas and also Chicago.

14       We were on surveillance here and we were able to take

15   photos of this -- of Gallegos's group here bringing in the

16   drugs.  And, again, I'll testify later, after they sold the

17   drugs, where the money would go.

18       So here's -- a surveillance of Mr. Martinez was

19   included in my slide earlier.  He's a leader/organizer.  As

20   you can see, that weighted backpack there and the weighted

21   bag to the right there, they would collect drug proceeds at

22   that house in Richardson, Texas.

23       They would also bring cover load material.  As you can

24   see in the slide on the right, that's Mr. Ramirez bringing

25   in a washer and dryer.  So they would bring in washers and

1    dryers and they would take the washers and dryers apart and

2    put drug proceeds in them for concealment and send it to

3    Mexico in those trailers.

4         Again, more pictures in Richardson, Texas at a stash

5    house.  You can see Mr. Martinez there with Alan and

6    Cynthia.  Both of them have been indicted and arrested in

7    this investigation.  That's where they would count the

8    money, package the money, and also pick up the drugs when

9    the trailer was offloaded.

10        There to the right you can see them taking the washer

11   away to put on the trailer, and that washer is loaded with

12   drug proceeds.

13        Here's more surveillance photos of us following the

14   leader/organizer Mr. Martinez into a Home Depot.  In that

15   Home Depot, again they would -- all week, that's all they

16   would do is buy packaging material, cover load material, and

17   we followed them back to the Richardson house.

18        As you can see in the back hatch of the vehicle and

19   they're unloading items to put on the trailer to put money

20   on the trailer and take money off and take drugs off.

21        So on June 11th we indicted several members of this

22   drug trafficking organization here in the Eastern District

23   of Texas.

24        On June 18th we decided, because of COVID, that we were

25   going to focus in on a smaller group of people because of

19

1    manpower issues.  So on June 18th we arrested approximately
2    I would say 15 to 18 Defendants in this case, and including
3    Mr.-- Mr. Julio Ramos and Jonathan Ramos.

4         And on that particular day for that operation we seized
5    40 kilograms of cocaine and heroin, 23 firearms,
6    approximately 3.5 million in currency, and 4 million in real
7    property.  Some of the property is located in California.

8         I testified earlier to Mr. Martinez.  Here's a picture
9    of him up close, Eduardo Martinez-Gonzalez.  He has a bunch
10   of aliases that he uses, as you can see there in the slide.
11   He's a DTO leader/organizer and he resided at 3850 West
12   Northwest Highway 1414 in Dallas, Texas.  We executed a
13   search warrant at his residence on June 18th of 2020.

14        You can see here in this slide the aliases.  We
15   recovered or seized two driver's license.  The female on the
16   left is Gabriela Robles, who is his girlfriend that resided
17   with him.  She was also indicted in this case for money
18   laundering.

19        But these are the IDs that were found there, and
20   they're fictitious Texas driver's licenses that they would
21   use for financial documents.

22        Specifically, and most importantly, we seized a Bank of
23   America receipt inside Mr. Martinez-Gonzalez's residence or
24   apartment, the stash house.  You can see that I put a
25   rectangular box around it and it's for account 3552 that

20

1  belongs to Jonathan Ramos.  That was located inside the

2  apartment for $3,250.  So they were still wiring money and

3  drug proceeds to the Ramoses on June 1st of 2020.

4      To further support that, we seized a drug ledger inside

5  the apartment, and you can see 1 Junio, June 1st, Monday,

6  and then a deposit to 3250.  That supports that -- that Bank

7  of America receipt that I showed you earlier.

8      And you can see off to the right there that he had

9  collected basically three quarters of a million dollars on

10 June 2nd.  And, again, that money is being sent in those

11 trailers and also wired back to the Ramoses in California

12 for the drug trafficking organization.

13     Here's another example of their methods and means of

14 getting money to the Ramoses and into Mexico.  Here's just a

15 small snapshot of Mr. Martinez's -- this is his alias of him

16 sending these increment amounts of money back to Mexico and

17 also to California.  And you can see they do it in amounts

18 under a thousand dollars to avoid law enforcement detection

19 again.

20     But we're able to see and add up hundreds of thousands

21 of dollars that Mr. Martinez sent to either California or to

22 Mexico for the drug trafficking organization.  And I think

23 up above I typed in $300,000 approximately.

24     As you continue in the search warrant, we seized large

25 sums of cash, approximately 125,000 U.S. currency seized

21

1   from Mr. Martinez's apartment, with the drug ledger and also

2   that Bank of America receipt from Jonathan Ramos's account.

3       This is a stash house, the Gallegos stash house that we

4   hit on that particular date, and we seized approximately

5   half a million from the stash house.  You can see all the

6   cocaine lined up there.

7       Again, all those drugs and all that money was processed

8   and counted, and for example, the money was delivered either

9   to the trailer or to the Ramoses in California.

10      Seized from that drug stash house was a drug ledger,

11  and you can see the running amount there I have.  We're in

12  the millions of dollars that they collected.  That is a one

13  week period that they're collecting approximately

14  1.5 million in cash, and it's ongoing weekly that they're

15  moving approximately 5 million to 6 million a month in cash.

16  And there is a drug ledger that we seized from the residence

17  of the stash house for Gallegos.

18      I showed you earlier the black trailer.  Here's the

19  black trailer, and on that particular day we were able to

20  seize that black trailer before it went down to Mexico, and

21  in the black trailer is a water heater.  You can see the

22  square cut in the water heater.  Inside that water heater

23  was approximately a million dollars in currency that was

24  being smuggled down to Mexico.

25      So it just shows you kind of the volume of cash that

22

1    they're doing in this drug trafficking organization, that on

2    that particular day, again, we seized 3.5 million in cash

3    from them.

4        Just the processing, here's the money and the -- and

5    the blocks and bricks inside the water heater.

6        As we continue the investigation, I find out that Julio

7    Ramos has a warrant for removal or deportation from the

8    United States.  I believe that he is a citizen of Peru.  So

9    I contacted ICE and confirmed that, and that's a copy of his

10   warrant of removal or deportation.

11       Then, again, I get an immigration detainer for

12   Mr. Julio Ramos, an ICE detainer, because he is not here

13   legally in the United States.

14       And that's pretty much the slide slow.  Well, let me --

15   we've got one more, I believe.

16       Okay.  So right after the arrest, this is Rafael

17   Gallegos sending social media posts to DEA.  Of course, you

18   can see what he's saying right there.  But what's

19   interesting is a lot of people in this organization he had

20   contacted, and some people that told us, informants and

21   cooperators, that he was trying to get people to go down to

22   Mexico to live on his ranch to avoid law enforcement, to

23   have safe passage.  They could stay with him down there,

24   and -- and some people took him up on that.  So a lot of

25   people are down on his ranch in Durango, Mexico.  They have

23

1    fled down there.

2        And he has hired a lot of people up here, for a lot of

3    people up here, as far as paying financial money for

4    families and stuff to take care of them.

5        So the method and means are there.  I mean, he is

6    recruiting people to go down to Mexico.  And this is a

7    social media post that he posted during -- right after the

8    arrests.

9        And I believe that's it.

10   Q.  Now, you talked about millions of dollars being

11   transacted by this organization, and you focused in on the

12   two Defendants here, their quantity of money that was sent

13   to them being hundreds of thousands of dollars as well or

14   millions of dollars?

15   A.  Millions.

16   Q.  Okay.  And in order for a cartel such as this or an

17   organization such as this to allow individuals to have

18   access to that quantity of money, would they have to be a

19   trusted member of that organization?

20   A.  A very trusted member of the organization, to the point

21   that, I mean, that -- that money can disappear, and for

22   years it's been working like I testified to earlier.  The

23   different type of methods that they had, they had it down to

24   a science, and part of that was funneling money and wiring

25   money to the Ramoses there.  And they were very trusted to

24

1   receive that money and disburse that money and get it back

2   down to Mexico.

3   Q.  And along with being a trusted member, and as you said,

4   involving large quantities of money, if money goes missing,

5   if money is lost, is there repercussions to that?

6   A.  Yes, there is.

7   Q.  Does that place those individuals as well as any other

8   individuals around them in jeopardy or in some sort of

9   danger?

10  A.  They are.

11  Q.  Now, you also talked about encouragement by the

12  individuals in Mexico for other co-conspirators or

13  co-defendants to flee so that they wouldn't be arrested and

14  they wouldn't give up their knowledge of the organization,

15  is that correct?

16  A.  That is correct.

17  Q.  Have you seen multiple instances of that where

18  individuals in Mexico, the leader/organizers in Mexico are

19  encouraging the individuals here in the United States that

20  they feel are going to be arrested to flee?

21  A.  Yes, and this case is a great example of that.  I

22  believe that most of them were U.S. citizens that have fled

23  to Mexico.  I believe that we have eight or nine that are

24  down there in Mexico right now, and we just caught one

25  crossing over recently, I believe last week, so he fled also

25

1    to Mexico to avoid prosecution.  But asked to go down there

2    because of Mr. Gallegos.

3    Q.  And you talked about also co-defendants, plural,

4    identifying these Defendants as money launderers for the

5    organization.  Are there multiple individuals that have

6    identified these two Defendants as money launderers?

7    A.  Yes, there are multiple Defendants, yes.

8    Q.  And you indicated that there have been multiple seizures

9    of drug ledgers during this investigation, is that correct?

10   A.  Yes.

11   Q.  And have those drug ledgers been -- have those drug

12   ledgers been consistent and do they corroborate the

13   information that these cooperators are giving you in regards

14   to these two Defendants?

15   A.  Yes.

16   Q.  And you talked about over $5.7 million during a two year

17   period.  Was that consistent with the information in your

18   investigation, as well as your seizure of $3.1 million?

19   A.  So, the 5.7 million was from on or about 2018 to 2019,

20   and then there was a gap there and we were only able to

21   seize recent drug ledgers for a four month period, so we're

22   talking close to $10 million in approximately a two year

23   period.

24   Q.  And this is just a snapshot of their activity, correct?

25   A.  Just a snapshot.  We didn't get all the drug ledgers.

26

1    Q.   The photographs that you showed, you showed the trailers

2    that were coming on a weekly basis with over 40 kilos and

3    taking back millions of dollars in bulk as well, correct?

4    A.   That's correct.

5    Q.   So it's safe to say that this organization is well

6    resourced and could encourage individuals to go to Mexico

7    and could supply them with the resources or the wherewithal

8    to stay in Mexico for a long, long period of time?

9    A.   Yes.

10   Q.   And what cartel is this particular organization

11   associated with or working with or is a part of?

12   A.   So this cartel is a part of a confirmed Sinaloa Cartel.

13   Q.   Sinaloa Cartel, that's the same cartel Chapo Guzman was

14   operating prior to his arrest?

15   A.   That's correct.

16   Q.   And who's operating that cartel now in Mexico?

17   A.   Mayo, and also the Chapitos, which are Chapo's two sons.

18   Q.   Mayo Zambada and Chapo Guzman's sons are now at the head

19   of the Sinaloa Cartel, correct?

20   A.   Yes, and the Gallegoses are right next to them.

21   Q.   Okay.  And those are the leaders that are giving

22   directions to the two individuals here for the delivery of

23   money?

24   A.   So the Gallegoses are right next to Chapo's sons and

25   also El Mayo Zambada, so Gallegoses are directly -- are

27

1    providing direction to both the Ramoses and Rafael Gallegos,

2    Jr.

3    Q.   Okay.  Now, is the Sinaloa Cartel a violent

4    organization?

5    A.   It is a very violent organization.

6    Q.   And do they kill indiscriminately?  Have they killed

7    indiscriminately in Mexico as well as the United States?

8    A.   So they -- they will kill law enforcement, U.S. law

9    enforcement, Mexican law enforcement, military, rival gang

10   members, and intimidation to family members.  But

11   specifically in this case, they have reached out and made

12   threats to the DEA regarding informants that are

13   cooperating.

14   Q.   Now, is there any information that they are involved in

15   any kind of arms smuggling?

16   A.   That is correct, they are.

17   Q.   What types of arms and where are they getting the

18   resources to purchase arms?

19   A.   So initially with this investigation we made a large

20   cache seizure of firearms that were going back to Mexico.

21   And we were able to find out through a cooperating defendant

22   that the other part of their money making scheme is to

23   supply the Sinaloa Cartel with large volumes of firearms and

24   ammunition and training gear, such as Barrett 50 caliber

25   sniper rifles and AK47s and handguns such as Glocks and

28

1    Berettas.

2         So we did find a drug ledger that confirmed the

3    cooperating defendant's statements and we saw that they had

4    smuggled approximately 150 firearms from the United States

5    to Durango, Mexico, and those firearms were handed over to

6    the Sinaloa Cartel to continue this ongoing drug war and

7    fight law enforcement and rival cartel members.

8    Q.  And that's the same organization that these two

9    Defendants are working with and assisting with their drug

10   smuggling activities?

11   A.  Well, even better than that, I mean, if you -- to help

12   you understand, some of the weapons -- the money that is

13   made from the weapons that are in the drug ledgers were sent

14   to Mr. Ramos, Jonathan and Julio Ramos, in California.  So

15   two ways of smuggling the money to get down to Mexico, but

16   they're making money off of that.

17   Q.  And I think you touched on it briefly.  You talked about

18   there being assets here in the Dallas area as well as in

19   California, and you talked about real properties.

20   A.  That's correct.

21   Q.  Has your investigation shown that the Defendants here

22   were involved in purchasing or being used as straw

23   purchasers for real property?

24   A.  The information came from cooperating defendants.  We

25   researched the information and we saw that they were making

29

1    multiple real property purchases in the California area.  So

2    we saw a lot of properties purchased and a lot of properties

3    sold by the Ramoses, yes.

4    Q.  And I think one of the businesses that you identified

5    for the Defendants was involving real property?

6    A.  That's correct.

7    Q.  So using -- basically using that business associated

8    with them to purchase properties for the drug trafficking

9    organization?

10   A.  According to the sources, that they purchased or

11   concealed drug proceeds in properties in California through

12   the assistance of the Ramoses.

13   Q.  And I know you've been investigating for quite some

14   time.  Have you been able to find all the properties and

15   seize all the properties?

16   A.  I have not.  I believe we have just one property so far.

17   By the time we got there, the properties had already sold

18   and exchanged.  Like we had an unwitting party that

19   purchased the property, and it was like maybe three months

20   too late that the transaction occurred.  But I believe there

21   was one property we were able to look at.

22   Q.  And based on that, based on the fact that you haven't

23   identified all the properties, would there be any concern in

24   your mind that they could use the resources of selling those

25   properties to flee, and speaking specifically of these two

30

1    Defendants?

2    A.  Yes, I believe that.

3    Q.  Now, looking at this investigation in its totality,

4    based on what you know of this organization, the violence of

5    this organization as well as the individuals that have fled,

6    have you formed an opinion as to whether these Defendants

7    would be a flight risk and a risk to the community?

8    A.  I have.

9    Q.  And what's your opinion and how do you come to that

10   opinion?

11   A.  Well, for example, with Mr. Julio Ramos, I feel that, A,

12   he's got a warrant, an ICE detainer, and he has methods and

13   means to flee to South America.  And also, he still has

14   contact with family members down there.  I've seen through

15   money wire transfers that he does wire money to family

16   members in South America, but he's also a citizen down there

17   and not a citizen of the United States.

18       He's looking at some pretty serious charges up here for

19   money laundering.  So, yes, I think he is a flight risk.

20       Also, being a danger too, in connection to this cartel,

21   being directed by the main leader/organizers in Durango,

22   Mexico that are Sinaloa Cartel members that are right below

23   the main leaders of the organization, I believe that that is

24   very dangerous, and dangerous for the community.

25       Also, with Mr. Jonathan Ramos, I feel that his access

31

1    to large sums of currency -- we didn't get all the currency.

2    I don't know if there's still some out there.  We seized

3    some bank accounts, but I just think -- also his access,

4    having these leader/organizers in Dallas, Texas sending him

5    money directly, not to Julio Ramos but more to Jonathan

6    Ramos, that he was collecting those cashier's checks and

7    having a direct relationship with the right-hand man of the

8    Sinaloa Cartel.  Yes, I do think he's a danger to the

9    community, and that's the basis of my opinion.

10            MR. GONZALEZ:  Your Honor, that's all I have.  I'll

11   pass the witness.

12            THE COURT:  Cross examination?

13            MR. DAVIS:  Thank you, Your Honor.

14               C R O S S   E X A M I N A T I O N

15   BY MR. DAVIS:

16   Q.  Good morning, Agent West.  Can you hear me okay?

17   A.  Yes, sir, I can.

18   Q.  Can you tell me what your involvement was in this case?

19   A.  I was case agent.

20   Q.  So you're familiar with the reports that have been

21   written in the case, is that right?

22   A.  Yes.

23   Q.  And you're also familiar, obviously, from the bank

24   records, financial records that have been reviewed, correct?

25   A.  Yes.

32

1  Q.  And are you aware that Mr. Ramos was arrested in

2  California June 18th, 2020?

3  A.  Yes.

4  Q.  He was arrested at -- at his residence, correct?

5  A.  Yes.

6  Q.  And there was no evidence during that arrest that he

7  tried to run, correct?

8  A.  That's correct.

9  Q.  There was no evidence that he tried to hide?

10  A.  That's correct.

11  Q.  We saw a lot of photos of large amounts of currency,

12  drugs, stash house, vehicles.  All those photos are from

13  Dallas and the surrounding area, correct?

14  A.  Those photos are, yes.

15  Q.  None of those photos are from California, correct?

16  A.  No.

17  Q.  All right.  And so when Mr. Ramos was arrested at his

18  residence, did anyone recover large amounts of currency?

19  A.  No.

20  Q.  What about jewelry?

21  A.  No.

22  Q.  Handguns?

23  A.  No.

24  Q.  Assault rifles?

25  A.  No.

33

1    Q.   Cocaine?

2    A.   No.

3    Q.   Marijuana?

4    A.   No.

5    Q.   Drug ledgers?

6    A.   No.

7    Q.   All right.  And so basically he was taken into custody

8    without incident at his residence in California, correct?

9    A.   That's correct.

10   Q.   All right.  As far as the indictment goes, there are

11   nine counts in the indictment, right?

12   A.   I believe so.

13   Q.   And how many Defendants are there?  Approximately 40?

14   A.   Superseding, now 74.

15   Q.   Seventy-four?

16   A.   Approximately.

17   Q.   Seventy-four.  And some of those are in custody and some

18   of those are not, right?

19   A.   Correct.

20   Q.   All right.  Let me talk to you about what he's actually

21   charged with.  The first count is a conspiracy charge to

22   possess with intent to manufacture, distribute

23   methamphetamine.  He is not charged in that count, correct?

24   A.   I do not believe so.

25   Q.   All right.  Count two charges conspiracy to possess with

34

1   intent to distribute cocaine, correct?

2   A.  Correct.

3   Q.  Okay.  He is charged there.  What is the evidence that

4   he himself manufactured cocaine?

5   A.  He participated as a money launderer in the conspiracy

6   for the cocaine drug proceeds, to receive them in his Bank

7   of America accounts and to distribute -- to assist with the

8   distribution of cocaine for this drug trafficking

9   organization.

10  Q.  Right.  But my question is, what is the evidence that he

11  himself actually was involved in any kind of manufacturing

12  of cocaine?

13  A.  Um, well, are you saying actually -- when you say

14  manufacturing, do you mean like bricking it up and --

15  Q.  Sure, yes, sir.

16  A.  Well, he was involved in the funneling of the drug

17  proceeds through his bank account.

18  Q.  Right, but that wasn't my question.  I'm talking about

19  manufacturing, bricking up, packaging cocaine, himself.

20  What evidence is there in this case of that?

21  A.  The money laundering.

22  Q.  Okay.  Do you have any evidence that he himself

23  transported cocaine?

24  A.  At this time, no, but I just played a phone call with

25  the purchase of the methamphetamine in California that he

1    was participating in that -- that operation there of getting

2    it from California to Dallas, Texas.

3    Q.  Do you have any evidence that he himself transported

4    cocaine?

5    A.  At this time, no.

6    Q.  All right.  How about possessing cocaine, do you have

7    any evidence that he actually possessed any cocaine?

8    A.  At this time, no.

9    Q.  All right.  Charge three, manufacturing and distribution

10   of methamphetamine, cocaine or heroin.  The same questions

11   would apply there but we have some other drugs,

12   methamphetamine and heroin.  Do you have any evidence that

13   he actually transported any methamphetamine or heroin?

14   A.  When you say transport, like driving it?  What do you

15   mean?

16   Q.  Yes.  Well, what's your definition of transport?

17   A.  I mean, working as a person that maybe smuggles it

18   across the border.

19   Q.  Sure.  Driving one of those trucks that you showed a

20   photo of where there's trailers attached.  Do you have any

21   evidence of him doing any of that?

22   A.  No.

23   Q.  All right.  Do you have any evidence of him possessing

24   any of that, heroin or methamphetamine?

25   A.  So, according to our cooperating individuals in this

36

1   case, that he rented the houses that were basically in his

2   name in California and that they used those houses as stash

3   houses for methamphetamine, on that particular audio call

4   that I played, coming from our cooperating sources.

5   Q.  There was -- there was a conversation that you played

6   for the Court.  There wasn't anything in that conversation

7   about him going to houses, stash houses and seeing drugs,

8   was there?

9   A.  Well, what I testified to earlier is I said it came from

10  a confidential source, a cooperating defendant that told us

11  that information.

12  Q.  What did the cooperating source tell you?

13  A.  That Mr. Julio Ramos rented the house or purchased the

14  house, the stash house, for the organization for Mr.

15  Gallegos to store drugs in that house.

16  Q.  Okay.  My question is, do you have any evidence that he

17  actually possessed any of those drugs himself?

18  A.  Well, that was his house.  It was a stash house.

19  Q.  But he would have to know the drugs were there, right?

20  A.  Well, I don't have that right now, but, I mean, he

21  purchased the house.  It was his house.  He allowed Mr.

22  Gallegos to keep drugs at that house.

23  Q.  Right, but that doesn't mean he possessed the drugs,

24  correct?

25  A.  Well, I mean, it is his house, you know.  I mean, he's

37

1    keeping -- there's drugs there at the house.

2    Q.  If someone rents a house to somebody else, are they

3    responsible for knowing everything that goes on in the

4    house?

5    A.  But when you add the totality of the circumstances of

6    him being a money launderer.  I mean, let's put it together,

7    money launderer, money going through his account, and then

8    you add in, he has a house there in California that Gallegos

9    is using as a stash house.  You put it all together, yeah, I

10   can see that.  It's not a landlord type of situation there.

11   Q.  Right.  Well, let's talk about that and we'll talk about

12   the laundering in a little bit.

13       There is -- charge five is that conspiracy to possess

14   with intent to distribute heroin.  He's not charged in that

15   count, right?

16   A.  If you say so.  I can't -- I can't recall right now.

17   Q.  Well, you're the case agent, right?

18   A.  That's correct.

19   Q.  Okay.

20   A.  Can I see a copy of the indictment?

21   Q.  Sure.

22   A.  There's 74 people indicted.

23   Q.  I understand.  But have you reviewed the superseding

24   indictment before you testified today?

25   A.  Approximately a week ago.

38

1   Q.   Okay.  Well, I'll represent to you he is not charged in

2   that.

3   A.   Okay.  Thank you.

4   Q.   And you know that there are several firearm counts in

5   the indictment, possession of a firearm in furtherance of a

6   drug trafficking crime, a continuing criminal enterprise

7   count, conspiracy to possess a firearm in furtherance of a

8   crime of violence or drug trafficking.  He's not charged in

9   any of those counts?

10  A.   That's correct.

11  Q.   Okay.  Now, let me talk a little bit about the accounts

12  and things that you testified about.  Basically in this

13  case, as pertains to Julio Ramos, there are two bank

14  accounts, correct, that you reviewed?

15  A.   Yes.

16  Q.   Okay.  There's one account that's in the name of Julio

17  and Jonathan Ramos, right?

18  A.   No, there's one bank account in Jonathan Ramos.

19  Q.   Okay.  There's an account for Julio Ramos Rental

20  Properties, right?

21  A.   Well, I -- I viewed it as -- I believe the slide had

22  Julio Ramos doing business as Julio Ramos Rental Properties.

23  Q.   Correct.  And then there's another account that's in the

24  name of both Julio Ramos and Jonathan Ramos, and then

25  there's another account that's just in the name of Jonathan

39

1    Ramos.  Do you recall that?

2    A.   Yes, I do recall that.

3    Q.   And I just wanted to refresh your memory on that.  Okay.

4    And those were all at the Bank of America, right?

5    A.   Yes.

6    Q.   And you can see that there in those bank records that

7    you reviewed that Mr. Ramos apparently is -- there were

8    payments that were being made to Mr. Ramos for rent.  Is

9    that accurate?

10   A.   That's correct.

11   Q.   And you know that Mr. Ramos has several properties in

12   California, correct?

13   A.   Um, I'm aware that he has bought and sold several

14   properties.  I don't know if he actually is the owner of any

15   properties at this moment.

16   Q.   Okay.  Are you also aware that he was renting properties

17   and subleasing them to other individuals?

18   A.   Based on the checks, that's what I -- that's the

19   conclusion I came to.

20   Q.   Okay.

21   A.   Yeah.

22   Q.   All right.  And so some of those individuals that he

23   rented property to were apparently relatives of these

24   individuals in Dallas that you discussed, right?

25   A.   No.

40

1    Q.  Or some of them were.  For instance, Joseph Lopez,

2    do you know if he rented an apartment from Mr. Ramos?

3    A.  So if you're talking about an alias for Joseph Borromeo

4    Lora, Jody, yes, he is an indicted member of this conspiracy

5    and I believe rented the property out there in California

6    from Mr. Ramos.

7    Q.  And what about Leonor Lopez and Rafael Gallegos, Sr.,

8    are you aware that they rented a house from Mr. Ramos in

9    California?

10   A.  I -- I do believe I recall that, yes.

11   Q.  Okay.  And are you also aware that a house was rented to

12   Rafael Gallegos, Jr.?

13   A.  Yes.  All those people you mentioned are members of this

14   conspiracy.  According to source information, those

15   properties were actually owned by the Gallegoses and only

16   managed by Mr. Ramos.

17   Q.  Have you -- as part of your investigation, have you

18   checked the title on those properties to see if, in fact,

19   Gallegos owned those properties?

20   A.  Some of the properties I did, but you have to understand

21   the scheme that's involved here, that they would provide the

22   money to Mr. Ramos and Mr. Ramos would buy it and his name

23   would be on the title.  That's according to our source

24   information.

25   Q.  Okay.  So did you find any properties in the names of

41

1   Gallegos or any of the other individuals that you testified

2   about besides Mr. Ramos?

3   A.   I did not see the names on any of the titles.

4   Q.   The amount of money that was sent from Dallas bank

5   accounts to the Bank of America accounts, they were sent to

6   two different accounts.  One was the rental property

7   account, among others, and also Julio Ramos's personal

8   account, is that right?

9   A.   That's correct.

10  Q.   Do you recall that the informant said that those were

11  payments for rent and to purchase vehicles in California?

12  A.   No.

13  Q.   Okay.

14  A.   It was not for rent.

15  Q.   Excuse me?

16  A.   It was not for rent.

17  Q.   Do you recall that in the December 7, 2019 DEA report

18  that's what your informant said?

19  A.   I don't recall that.

20  Q.   Okay.  Would you like to see the report?

21  A.   Sure.

22        MR. DAVIS:  Judge, this is where I hit a roadblock

23  because I'm not really sure how to approach, with the virus.

24        THE COURT:  You can approach.  Just put your mask

25  back on.

42

1    MR. DAVIS:  Just put my mask on?

2    THE COURT:  Yes.

3    BY MR. DAVIS:

4    Q.  Okay.  Let me show you a report that's dated December 7,

5    2019.  It's a DEA-6.  Right there, this line right here

6    where it says Gallegos used Ramos to pay rent and purchase

7    vehicles in California.

8    A.  Okay.

9    Q.  Okay.  So would you agree with me that the report says

10   the CD, cooperating defendant, said Ramos would withdraw the

11   drug proceeds in California for Gallegos.  Gallegos used

12   Ramos to pay rent and purchase vehicles for him in

13   California?

14   A.  So that rent is basically to pay for the homes out there

15   in California that he owned.

16   Q.  Is that what --  is that what the informant -- is that

17   what the report says?  Does it say for mortgage payments or

18   does it say it's for rent?

19   A.  Rent payments.

20   Q.  Okay.  Now, you would agree with me that when you look

21   at the monthly amounts that are sent from Dallas to

22   California, that those amounts vary month to month, is that

23   right?

24   A.  That's correct.

25   Q.  And they could be anywhere from maybe over a thousand

43

1   dollars sometimes up to $10,000, is that right?

2   A.  That's correct.

3   Q.  All right.  Now, according to the DEA report on

4   January 22nd, it said between May '18 and June 2019, there

5   were -- so we're talking about a little over a year -- into

6   the Ramos accounts there were 105 deposits, totaling

7   $220,000, is that correct?

8   A.  That's correct.

9   Q.  All right.  So from January -- May of '18 to a little

10  over '19, we're talking a little over $220,000 in deposits

11  into the account, right?

12  A.  Correct.

13  Q.  Now, only part of those deposits actually came from

14  Dallas, right?

15  A.  I'm not understanding what you're saying.

16  Q.  Have you added up the money that came from Texas of that

17  $220,000 over that relevant time period?

18  A.  I don't recall.  I just recall looking at the bank

19  account.  I think the majority of it did come from the --

20  from the State of Texas.

21  Q.  Well, there is a portion of your report that actually

22  lists out the payments from Dallas to that account.  Do you

23  recall that, those accounts?

24  A.  Yes.

25  Q.  All right.  By my math, it's somewhere around $120,000.

44

1   Of course, math is not my expertise.  But does that sound

2   about right, $120,000 from Dallas to those accounts?

3   A.  I can't -- I can't recall.

4   Q.  Okay.  You -- are you aware that he also was an

5   assistant to a real estate broker, Mr. Ramos, in California?

6   A.  I'm -- I'm not aware of that, no.

7   Q.  Did you seize some checks from someone named Michael

8   Habad to Mr. Ramos?

9   A.  Yes, I did.

10  Q.  All right.  Are you familiar with Michael Habad?

11  A.  No, I'm not.

12  Q.  Have you bothered looking at Mr. Ramos's 1099s to see if

13  he declared income as an employee of a real estate or

14  mortgage company?

15  A.  I -- I have not.

16  Q.  Were there any -- did you look at -- okay.  Let me go to

17  the cars for a second here.  You mentioned that there was a

18  Mercedes parked in the Carrollton driveway, is that right?

19  A.  That's correct.

20  Q.  All right.  You know that, based on all the information

21  that you have, there is zero evidence that Mr. Ramos ever

22  went to Carrollton, Dallas or Texas, correct?

23  A.  I don't know that.

24  Q.  You don't have any evidence of that, do you?

25  A.  What do you mean?

45

1    Q.  You don't have any informants or any other evidence that

2    Mr. Ramos went to Dallas or Texas?

3    A.  I -- I don't know if he's ever been here before.  I

4    don't know that.  He could have been here.

5    Q.  You don't have any evidence of that so far in your

6    investigation, correct?  You haven't developed that?

7    A.  I have not, no.

8    Q.  All right.  Now, we saw a photograph of a Mercedes-Benz

9    that was in a driveway, right?

10   A.  Right.

11   Q.  You learned from your informant that Valencia was the

12   owner of the Mercedes-Benz, right?

13   A.  That's correct.

14   Q.  So when you put that photo up and you said it was

15   registered to Mr. Ramos, you're not suggesting to the Court

16   that you have evidence that Mr. Ramos was actually there

17   that day, correct?

18   A.  Not that day.  I don't know if he was ever there at the

19   house.  I mean, I don't know.

20   Q.  Right.

21   A.  But the car was there.

22   Q.  Are you aware that he had sold that car because of some

23   mechanical issues to Mr. Valencia?

24   A.  I'm not aware of that.

25   Q.  You're not aware of that?

46

1   A.   I don't recall.  I know that Mr. Valencia drove and

2   operated the car.

3   Q.   Right.

4   A.   But you have a car with Mr. Ramos' license plate on it.

5   Q.   You actually seized that car as part of your

6   investigation, right?

7   A.   Yes, we did.

8   Q.   All right.  Let's talk about the evidence in the case

9   outside of the informants.  Do you have any visual

10  surveillance of Mr. Ramos?

11  A.   Limited.

12  Q.   Okay.  What -- when you say limited, what kind of

13  surveillance are you referring to?

14  A.   Just DEA out there doing checks for us on the Ramos

15  family at the Early Crimson house, I believe.

16  Q.   Okay.  And what did that show?  That he resided there?

17  A.   That's correct.

18  Q.   All right.  Do you have any surveillance of him going to

19  these so-called stash houses when there were drugs there?

20  A.   Which stash houses?

21  Q.   The ones that you said were in California.

22  A.   There's several stash houses.  I mean, Dallas?

23  Q.   Any of them, any of them.

24  A.   Well, based on source information that he did visit the

25  one that had the -- the one that Leonor Lopez owned, that he

47

1    would go by that stash house.  That was a stash house.

2    Q.  Right.  I'm talking about visual surveillance.  Do you

3    have any?

4    A.  No.

5    Q.  How about telephone intercepts of Mr. Ramos?

6    A.  We do have some WhatsApp, and I haven't gone through

7    them yet, audio messages with Rafael Gallegos.

8    Q.  Okay.  And those were regarding rent payments?

9    A.  I don't recall.  I didn't listen to them.

10   Q.  Okay.  And that's fair because I think the discovery is

11   still being produced.

12   A.  Yes.

13   Q.  Is that right?  Okay.  What about any kind of undercover

14   recordings with informants or anything else?

15   A.  No.

16   Q.  Did you guys obtain his digital devices when he was

17   arrested?

18   A.  We do have them.

19   Q.  Okay.  Have those been dumped yet and evaluated?

20   A.  No, they -- he refused consent to enter his phone.

21   Q.  Well, you can get a search warrant.  You had a search

22   warrant to get those, didn't you?

23   A.  Yeah, but it's an Apple iPhone.  It's pretty difficult

24   to dump those.

25   Q.  Okay.  So you're saying that you cannot dump an Apple

48

1    iPhone without --

2    A.  I have one that's been sitting at the FBI for two years

3    now.

4    Q.  Okay.  So your testimony is the resources of the FBI and

5    the Federal Government, you can't dump an iPhone without a

6    password?

7    A.  Not right now, yeah.

8    Q.  Okay.  And then you obtained a cell phone from Juan

9    Felipe Valencia, right?

10   A.  Yes.

11   Q.  You guys analyzed that?

12   A.  Yes.

13   Q.  And there are no conversations between Valencia and Mr.

14   Ramos, correct?

15   A.  There are conversations.  There were outgoing in the

16   call logs there were conversations.  I think he was saved as

17   Don Julio in Mr. Valencia's phone.

18   Q.  Okay.  So you're saying that there are conversations

19   between Mr. Valencia and Mr. Ramos?

20   A.  I believe so.  The cell phone that we had had his number

21   in it, Mr. Valencia's.

22   Q.  Okay.  Do you know whether or not they actually spoke or

23   are you just going by that phone number being in --

24   A.  No, there was call logs.  They -- it looks like they

25   spoke to one another in the call logs.

49

1  Q.  Okay.  You don't know what they discussed at all,

2  correct?

3  A.  No.

4  Q.  All right.  And the text messages, were there any text

5  messages or anything like that to Mr. Valencia?

6  A.  I don't recall.

7  Q.  All right.  Let me ask you some questions about the

8  Government's reply in this case for detention.  There's an

9  assertion that Mr. Ramos, for some time, has been entrusted

10 by the Sinaloa Drug Cartel with safeguarding and

11 transferring large amounts of U.S. currency from the U.S. to

12 Mexico.

13      What evidence is there that he transported money from

14 the United States to Mexico?

15 A.  Just sources indicating that, that money was sent up to

16 funnel accounts and wires, that they were responsible for

17 getting that money from California to Gallegos in Mexico.

18 Q.  Okay.  So you're saying that you have some informants or

19 sources that have told you that he, Mr. Ramos, has been

20 responsible for sending money to Mexico?

21 A.  Yes.

22 Q.  All right.  There's an assertion that DEA began

23 intercepting a series of related telephone lines in the U.S.

24 to Mexico.  During the course of the interception, the DEA

25 intercepted a conversation in which Defendants spoke about

50

1    their drug trafficking activities.

2        There's nothing specifying that Ramos was part of these

3    conversations.

4    A.  You know, at this time I don't know that.  A lot of

5    times they speak in coded language, so I don't know if Ramos

6    was in there, a lot of just very short brief conversations.

7    But I didn't hear Julio Ramos on there, but I don't know

8    that.

9    Q.  Okay.  But to your knowledge, you haven't heard him on

10   any of those calls?

11   A.  At this moment, no.

12   Q.  All right.  Now, in August '19 a reliable and credible

13   DEA source said he deposited over $500,000 in multiple Bank

14   of America accounts owned by Ramos.  And then it says -- and

15   this was -- so apparently, this was the CS who said he sent

16   approximately $500,000 to Ramos.

17   A.  Approximately.

18   Q.  Do you recall that?

19   A.  I do.

20   Q.  And he also said he sent this from Dallas, right?

21   A.  That's correct.

22   Q.  But -- and this was presumably -- when you say a CS, is

23   this someone who is potentially facing criminal charges?

24   A.  True.

25   Q.  And what was he getting out of working for you guys?

51

1   A.  No promises were made.

2   Q.  What's that?

3   A.  No promises were made to him.

4   Q.  Okay.  So he was just doing -- what about an expectation

5   of a benefit, is that why he was cooperating?

6   A.  No promises were made.  There's no expectations,

7   nothing.

8   Q.  Could he have been charged?

9   A.  Say that again.

10  Q.  Could he have been charged criminally?

11  A.  Yes.

12  Q.  Was he charged criminally up to this point?

13  A.  At this point, no.

14  Q.  All right.  Now, you obtained the bank records.  How is

15  it that he said he sent $500,000, when the bank records show

16  around, give or take, $120,000 being sent from Dallas?

17  A.  He said over a course of a period of time.  It wasn't

18  all at one time.

19  Q.  I understand.  And you've got --

20  A.  We're talking probably about 2017 to 2019.

21  Q.  Okay.  Have you gotten those records from 2017?

22  A.  I did not get those records from 2017, no.

23  Q.  Okay.  Based on the records we have now, what they show

24  is a fraction of $500,000 was sent from Dallas?

25  A.  But there's other methods of sending money.  They wired

52

1   money also.  As I testified to earlier, they wired money

2   through MoneyGram and Western Union.  They wired money.

3   They sent money through bank funnel accounts.  There were

4   different methods and means of getting money to the

5   Gallegoses.

6   Q.  I understand that.  But when you look at the money that

7   is sent from Dallas, whether it's wired or it's sent from a

8   money order or you look at the deposits on your spreadsheets

9   from Dallas, they total about $120,000, don't they?

10  A.  The wires of the money?

11  Q.  Yeah.  Everything coming from Dallas totals about

12  $120,000.

13  A.  Are you talking about -- they wired money and it was in

14  the hundreds of thousands of dollars too, wiring it.  I'm

15  not talking the funnel account.  The funnel account is what

16  you're talking about.

17  Q.  Okay.

18  A.  There's other ways to get money to California, through

19  Western Union, for example.

20  Q.  But what he said was that he -- the words he used was he

21  sent money, and he said he sent it from Dallas and he

22  said -- and then there's a description of the process of

23  buying these PLS cashier's checks.  Because you actually

24  talked to two informants.  One said that he sent 500,000.

25  Then there's another one who says he sent 650,000.  Do you

53

1    recall that?

2    A.  I do.

3    Q.  All right.  The one that -- for instance, the one who

4    said 650,000, he said he went as Valencia and Rodriguez,

5    used PLS check cashiers to convert proceeds to 150 cashier's

6    checks in approximately $2500 amounts and then deposited

7    them in June '18 to June '19 via Bank of America funnel

8    account.

9        That's what he said.  Do you recall that?

10   A.  I do.

11   Q.  Okay.  Do you have any evidence thus far in the records

12   that you have obtained that support it's that amount of

13   money, $650,000 or $500,000?

14   A.  Talking about the accounts or talking about a total of

15   Western Union, MoneyGram?

16   Q.  The total amount.

17   A.  It's up there, yes.  I don't know the exact amount, but

18   it's high.

19   Q.  Do you have records of that?

20   A.  Um, so I showed an Excel spreadsheet earlier with Lalo

21   that was sending money and it had a red rectangle about the

22   increments of a thousand dollars, $900, $850.

23   Q.  Right.

24   A.  Yeah.  So that money was sent to California at times and

25   also to Mexico.

54

1    Q.   Okay.  But what these guys are saying is we sent this to

2    Ramos.  This isn't we sent it to Mexico or other people.

3    This is what we sent to Ramos.  One says $500,000 and one

4    says $650,000.

5    A.   Yeah.  So, I mean, we don't have every check stub.  It

6    was an approximate amount.  I used approximate in there,

7    didn't I?

8    Q.   Well, I mean --

9    A.   I mean --

10   Q.   Here's what I'm trying to get at.  According to one DEA

11   report it says deposits from May '18 to June '19 were

12   $220,000.  When you look at which of those deposits came

13   from Dallas, by my math, and it could be off, but it looks

14   like it's about $120,000, when you look at the transfers

15   from Dallas to California.  And that's based on your DEA

16   report, 220 deposit, 120 or so from Dallas.

17        And then you've got two informants saying, hey, I know

18   that 500,000 was sent.  You've got another informant saying

19   I know 650,000 was sent.

20        The numbers don't really add up, so I'm trying to

21   figure out, are they lying?

22   A.   Well, the way we corroborated them, they brought in the

23   PLS, as you saw on the slide, the PLS cashier's checks.

24   Q.   Right.

25   A.   And they showed us copies of those, and the bank

55

1    receipts and showed us copies of those.  The drug ledgers,

2    we looked at the drug ledgers.

3         So, you know, it's an approximate amount.  They didn't

4    keep an ongoing running tab of what they were sending.  They

5    just gave us an approximate amount of what they sent and

6    that's what I reported.

7    Q.  But that's not even close, is it, $120,000, 500,000 and

8    650,000?

9    A.  When you say $120,000, where are you getting that from?

10   Q.  The money -- it's from your DEA report where you list

11   the amount of money that was deposited in --

12   A.  But that's for one account, right?

13   Q.  It's for the Ramos accounts.  I don't know.

14   A.  All the accounts?

15   Q.  There are only two accounts that he has.

16   A.  There's a third account in there too.  I believe it's

17   owned by Carla, I believe.

18   Q.  That's Carla and Jonathan Ramos.

19   A.  Okay.

20   Q.  Yeah.  But they're referring to the two accounts that

21   you showed with the bank numbers.  That's Julio Ramos and

22   Jonathan Ramos' account and Julio Ramos Rental Properties.

23   And that -- the implication when you read the report, you

24   say I'm sending this to these Ramos accounts.

25   A.  Okay.

56

1   Q.  So presumably it's those two, but I'm trying to figure

2   out, have you seen any evidence that they sent 500, $650,000

3   to those accounts, to support what they're saying?

4   A.  Um, I'm -- we've seen the funneling actions inside that

5   bank account.  I don't have the amounts in front of me right

6   now.

7   Q.  Okay.  Fair enough.

8       Well, let me -- I'll just -- this is from the

9   Government's reply.  Agents corroborated information through

10  subpoenas to Bank of America showing that over 397 days,

11  from May 18, 2018 to June 18, 2019, there were 105 cash

12  deposits totaling $220,000.

13  A.  Okay.

14  Q.  And most of those -- by the way, that's what the

15  Government's reply says, but 60 percent of that, those 105

16  deposits, were checks, weren't they?

17  A.  I mean, does it say that?

18  Q.  It says it in your DEA-6 dated January 22nd, 2020.

19  A.  What kind of checks?  Personal checks?  Cashier's

20  checks?

21  Q.  It's your report.  I don't know.  It says checks.

22  A.  Okay.

23  Q.  I don't know.  Do you consider cashier's checks separate

24  from cash?

25  A.  Um, it's a cash payment.  Cashier's checks are cash.

57

1    Q.   Okay.  Then that may be why in the Government's reply it

2    says $220,000 in cash.  That's what I was curious about.

3    A.   Okay.

4    Q.   All right.  Do you have any evidence of Mr. Ramos going

5    to Durango or having communications with anyone in Durango?

6    A.   Communications with Durango?  Yes, through Rafael

7    Gallegos, Jr.

8    Q.   Do you have any evidence that Mr. Ramos contacted anyone

9    down in Durango or had contact with people in Durango?

10   A.   Mr. Gallegos.

11   Q.   Okay.  What's the evidence that he had contact with Mr.

12   Gallegos in Durango?

13   A.   Um, through source information, that he maintained

14   contact with them for the rental properties out in

15   California, even after the June 18th date.

16   Q.   And is this from confidential informants or Defendants?

17   A.   Yes.

18   Q.   All right.  And you're not here to represent everything

19   these guys told you is true or you believe it beyond a

20   reasonable doubt, are you?

21   A.   I believe that they're reliable and credible, yes.

22   Q.   In light of the disparity between the amount of money

23   they said they sent?

24   A.   But that was an approximate amount in there.  You know,

25   they didn't have a running ledger what they were sending to

58

1    him.

2    Q.  Well, there were ledgers that you recovered, right?

3    A.  Yes.

4    Q.  By the way, let me ask you about that.  One says that he

5    sent 500,000.  Another informant said 650.  Doesn't that --

6    does that mean that they're saying together they sent

7    $1.1 million to California?

8    A.  Um, I don't know.  I mean, they said approximate.

9    Q.  Okay.  Well, let's just say approximate means kind of

10   close, right?

11   A.  Approximately.  You could be off.

12   Q.  Okay.  By --

13   A.  It's not a definite amount.

14   Q.  Be off by like 90 percent, 80 percent?  Is that still

15   approximate to you?

16   A.  Um, I mean, it's an approximate amount.

17   Q.  All right.  Let's go to the observation that Mr. Ramos

18   was some sort of high level member of the Sinaloa DTO.

19   Apparently that's something that was said.

20   A.  Who said that?

21   Q.  Well, that's in the Government's reply, Defendant is a

22   high level --

23   A.  He's a trusted member to be at that level, yes, to

24   handle that type of money, yes.

25   Q.  Okay.  So do you agree with that, that he's a high level

59

1    member?

2    A.   Yeah, to be trusted like that, yes.

3    Q.   Okay.  So how much money do you think was involved,

4    just -- do you have any idea how much money was involved in

5    this drug operation in terms of the number of millions of

6    dollars?

7    A.   What do you mean?  I don't understand that.

8    Q.   Well, we saw a ledger --

9    A.   During what time span?

10   Q.   Well, let's look at the ledger that you saw.  The ledger

11   had about $5 million of payments that were owed, right?

12   A.   Right.

13   Q.   The informant told you that was, quote, a snapshot,

14   okay?

15   A.   Okay.

16   Q.   During the course of Mr. Ramos's alleged money

17   laundering in this case, how much money do you think the DTO

18   was moving in drugs?  Just an estimate.  Do you think it's

19   under a hundred million dollars or more?

20   A.   What time span are we talking about?

21   Q.   Okay.  Let's say 2018, 2019.

22   A.   Okay.

23   Q.   Right.  Those are the times of these deposits.  How much

24   do you think, just estimate, the cartel in this Dallas area

25   was responsible for?

60

1    A.   I would say approximately 10 to 12 million.

2    Q.   Ten to what?

3    A.   Ten to 12 million.

4    Q.   Ten to 12 million.  All right.  So a 10 to

5    12 million-dollar drug operation.  Mr. Ramos is supposed to

6    be some high level, trusted member of the Sinaloa Cartel.

7    You have an informant that says that Gallegos is paying him

8    for rent.  You know that he's got several properties out

9    there that he's renting.  And according to the records,

10   maybe $120,000 was put through his account from Dallas, or

11   $200,000.  I mean, even if that's true, that's -- that's

12   pretty minor, isn't it?

13   A.   Well, Mr. Ramos wasn't the main money launderer.

14   Q.   Okay.

15   A.   As you saw, the trailer had over a million dollars in it

16   that was going directly to Mexico.

17   Q.   Okay.

18   A.   So bulk cash smuggling was a big part of it.

19   Q.   Okay.  That's what I was trying to figure out.  I didn't

20   know if the allegation was that he was the main money

21   launderer or not.

22        Okay.  Did the vast majority of the money go down to

23   Mexico or some other place, as opposed to being put in bank

24   accounts?

25   A.   So a large portion of it did go to Mexico, but then

61

1   another part of it went to Mr. Ramos, the Ramoses out in

2   California, for those properties out there, those investment

3   properties for the Gallegoses.

4   Q.   Okay.  And do you have any evidence, aside from an

5   informant, that Mr. Ramos gave any -- any money to Mr.

6   Gallegos for those properties or there were any arrangements

7   or anything like that, that they were involved together?

8   A.   Are you saying -- are you saying that physically handing

9   money, do we have evidence of them exchanging money?

10  Q.   Or agreements or texts or, hey, I'm buying this house

11  for you, give me the money, or emails?

12  A.   In this case, nothing was put in Mr. Gallegos's name, as

13  you can see.

14  Q.   Right.

15  A.   Like the vehicle, the Cadillac Escalade that was bought

16  in Las Vegas, Nevada was not put in his name.  It's always

17  put in somebody else's name, including properties, and

18  that's where the Ramoses come in.  They're in their names.

19  The vehicles are in their names.  Also people out here in

20  Dallas, it's in -- Gallegos never had any vehicles in his

21  name, or properties in his name.

22  Q.   Do you know if Gallegos had a driver's license?

23  A.   He did, or I believe it was maybe an ID card.

24  Q.   Right.  So are you familiar that sometimes if someone

25  doesn't have a driver's license, they get someone else to

62

1   buy a car for them?

2   A.  I'm not aware of that, no.

3   Q.  Okay.  But my question is, do you have any evidence that

4   Mr. Gallegos and Mr. Ramos themselves, any evidence other

5   than what an informant is saying that they had some kind of

6   agreement where Mr. Ramos was buying properties for Mr.

7   Gallegos?

8   A.  I don't have anything else.

9           MR. DAVIS:  All right.  No further questions, Your

10  Honor.

11          THE COURT:  Thank you.  Cross examination?

12          MR. SILVERMAN:  Thank you, Your Honor.

13      Sorry.  This microphone doesn't stay.

14              C R O S S   E X A M I N A T I O N

15  BY MR. SILVERMAN:

16  Q.  Good morning, Special Agent.  How are you?

17  A.  Good.  Thank you.

18  Q.  In the course of investigating this case, you had

19  received background information on my client, Jonathan

20  Ramos, is that correct?

21  A.  Yes.

22  Q.  And you and I can agree that Jonathan -- that Jonathan

23  Ramos doesn't fit the profile of a person involved in the

24  Sinaloa Drug Cartel.  Is that fair to say?

25  A.  No.

63

1   Q.  It's not fair to say that?

2   A.  They use anybody.  I mean, it doesn't -- I mean, it

3   depends on what role you're talking about.

4   Q.  Let's talk a little bit about Jonathan Ramos.  Jonathan

5   Ramos was born in the United States.  He's a U.S. citizen,

6   right?

7   A.  Yes.

8   Q.  And you're aware that he graduated from -- in 2007 he

9   graduated from Bravo High School in East Los Angeles, right?

10  A.  I don't know that.

11  Q.  Were you aware that he had graduated from California

12  State University in San Bernadino, California and he

13  received a degree in health science?  Were you aware of

14  that?

15  A.  No.

16  Q.  Were you aware that he has absolutely no criminal

17  history?

18  A.  I'm aware of that.

19  Q.  Were you aware that he's married and that he has three

20  children?

21  A.  Married, yes.  Children, unknown.

22  Q.  Okay.  And as part of your investigation, you also

23  looked into whether Jonathan had -- had a lot of

24  international travel, right?

25  A.  True.

64

1   Q.  And there's absolutely no international travel that you

2   uncovered in the course of your investigation?

3   A.  I did not see that.

4   Q.  When he was 12 years old he had traveled to Peru once.

5   Were you aware of that?

6   A.  I am aware of that.

7   Q.  And were you aware that when he was 10 or 11 years old

8   that he had traveled to Mexico one time?

9   A.  I believe that's true.

10  Q.  And other than those -- other than those incidents of

11  travel, there's no other international travel?

12  A.  That's correct.

13  Q.  And that's one of the things that you considered when

14  you had told the Court a little bit earlier about whether or

15  not you felt like he was a flight risk, right?

16  A.  As far as --

17  Q.  The things that you and I just discussed, did you take

18  those into consideration before you told the Judge that

19  Jonathan Ramos was a flight risk, right?

20  A.  I told the Judge that I thought he was a flight risk due

21  to his connection to Mr. Gallegos in Mexico and his ranch,

22  that a lot of people were going down there to kind of hide

23  out.

24  Q.  And you're aware that Jonathan Ramos has filed tax

25  returns each and every single year, right?

65

1   A.   I'm not aware of that.

2   Q.   Are you aware of what his job currently is right now?

3   A.   Um, no.

4   Q.   Okay.  Were you aware that Jonathan Ramos, from

5   January 2020 to May 2020, has been employed at the San

6   Bernadino Community College District?  Were you aware of

7   that?

8   A.   No.

9   Q.   Were you aware that his employer has, if the Court

10  releases him on pretrial release, has told him that he can

11  contact him and he's going to do everything he can to

12  provide him his employment back?  Were you aware of that?

13  A.   No.

14  Q.   Were you aware that prior to Jonathan Ramos working at

15  the San Bernadino Community College that he was an employee

16  at Staples Office Supply from 2018 to 2019?  Did you know

17  that?

18  A.   No.

19  Q.   Were you aware that prior to Jonathan working at Staples

20  Office Supply that he had worked at the Best Buy Electronics

21  store?  Were you aware of that?

22  A.   No.

23  Q.   Were you aware that when Jonathan Ramos had attended

24  California State University at San Bernadino, he was a part

25  time tutor for other students?  Were you aware of that?

66

1    A.   No.

2    Q.   Okay.  And these are all things that you would want to

3    consider when you're telling the Court that he's a flight

4    risk, right?

5    A.   Well, there's that one thing that I testified to earlier

6    about his connection to Mr. Gallegos.  These charges are

7    pretty -- pretty serious.

8    Q.   And I understand that, sir.  That wasn't my question.

9    I'm talking to you -- right now I'm just talking to you

10   about his background, his employment history and his

11   educational background.  Do you understand that, Agent?

12   A.   Yes, I do.

13   Q.   Okay.  And so with respect to those things that you and

14   I just discussed, you would agree that those things would

15   indicate that he's a stable person that has connections to

16   the community, right?

17   A.   Not if you're looking at some serious charges though.

18   Q.   I'm not talking about the charges.  I'm talking about

19   his background, his lack of criminal history, his employment

20   history, his family.  Those things indicate he's a stable

21   person, right?

22   A.   Yeah, but when --

23   Q.   Thank you.

24   A.   When you have those charges --

25   Q.   I --

67

1   A.   -- you become unstable and --

2   Q.   Special Agent --

3   A.   Yes.

4   Q.   If there's a follow-up question that I need to ask you,

5   I'll ask you the follow-up question, okay?

6   A.   Yes, sir.

7   Q.   I appreciate --

8   A.   But I'm not going to answer a question if I don't agree

9   with you.

10  Q.   I want to talk to you a little bit about the

11  circumstances around Jonathan's arrest, when he was

12  arrested.  Do you know when that took place?

13  A.   June 18th, 2020.

14  Q.   And where was -- where was Jonathan arrested on

15  June 18th?

16  A.   I believe at a residence.  I don't recall the numerics

17  of the residence, but it's Early Crimson Court, I believe,

18  in Corona, California.

19  Q.   And when he was arrested, was -- did he attempt to flee?

20  A.   No, no.

21  Q.   Was he completely cooperative?

22  A.   Yes.

23  Q.   Were there any firearms that were recovered in his

24  residence?

25  A.   No.

68

1    Q.  Were there any drugs that were recovered in his

2    residence?

3    A.  No.

4    Q.  Was there anything that indicated, based on your

5    investigation in this case, that at the time of his arrest

6    that he would attempt to flee or evade officers executing

7    this arrest warrant?

8    A.  No.

9    Q.  Okay.  And you're aware of what Jonathan is accused of

10   in this case, right?

11   A.  I believe so, but I -- I mean, you know, there's a lot

12   of Defendants in the case.  Specifically, I know money

13   laundering, but there might be some other counts in there

14   too.

15   Q.  Okay.  And so just speaking broadly, with respect to

16   possession of drugs or distributing drugs, do you have any

17   evidence that Jonathan participated in the distribution of

18   drugs?  Not the money, but drugs?

19   A.  No.

20   Q.  Do you have any evidence that Jonathan manufactured any

21   drugs?

22   A.  No.

23   Q.  The connection that Jonathan has to this case comes down

24   to the bank accounts.  Is that fair?

25   A.  The drug proceeds that were funneled through the

69

1    accounts.

2    Q.  Bank accounts.  Okay.  And you had shown the Court two

3    different checks from two different Bank of America

4    accounts, right?

5    A.  Yes.

6    Q.  And there was one check that we had seen that was a blue

7    check, and then there was another one in there.  The two

8    ending account numbers were Bank of America 1075 and Bank of

9    America 6691, is that correct?

10   A.  No, I believe it's 3552 and 6991 that are PLS cashier's

11   checks.

12   Q.  And one of those accounts was in Jonathan's individual

13   name and the other one was in his name and his father's

14   name, is that correct?

15   A.  Yes.

16   Q.  And with respect to the deposits that were made into

17   these accounts, in the course of your investigation, did you

18   recover any surveillance video from the banks showing who

19   was making deposits into those accounts?

20   A.  No.  I tried, but --

21   Q.  It's a yes or no question.

22   A.  I tried.  I tried.

23   Q.  It's a yes or no question.

24   A.  No, I didn't.

25   Q.  Okay.  Do you have -- with respect -- you had shown the

70

1    Court copies of different -- was it cashier's checks or

2    money orders that were deposited into these accounts?

3    A.   Say that again.

4    Q.   Cashier's checks or money orders or both that were

5    deposited into these accounts?

6    A.   Um, there was cash, like cash cash, right?  And --

7    Q.   You --

8    A.   I'm answering your question.

9    Q.   Yes, sir, let me -- let's talk about that for a second.

10   Cash cash?

11   A.   Okay.

12   Q.   Do you have any evidence for the Court that Jonathan

13   Ramos had deposited any of that cash into the account?

14   A.   Jonathan Ramos?

15   Q.   Yes.

16   A.   So what you would see is like one account that he would

17   take the money out and --

18   Q.   It's a yes or no question.

19   A.   Well, I -- that's not a yes or no question.

20   Q.   Do you have any evidence that Jonathan --

21   A.   Yes.

22   Q.   -- deposited --

23   A.   Yes.

24   Q.   What evidence is that, sir?

25   A.   So what I was saying was he would take it out of one

71

1  account and move it to another account, so withdrawing -- it

2  may be an electronic transfer of the funds, but you would

3  see it going from one account, right, $2,500, into 3552 and

4  then you would see a transfer from 3552 to 6991 through Mr.

5  Ramos, Jonathan Ramos.

6  Q.  Okay.  And that's an electronic transfer that was made

7  on-line, right?

8  A.  Well, there's electronic and then like a withdrawal and

9  then maybe a deposit into an ATM.  You would see some of

10  that activity also.

11  Q.  Do you -- can you tell the Court whether or not Jonathan

12  Ramos made that transfer or his father, Julio Ramos, had

13  made the transfer?

14  A.  Well, I mean, there's two accounts, like you said.

15  There's a Julio Ramos and there's a Jonathan Ramos and Julio

16  Ramos.  We didn't have the video, but one of those two made

17  the withdrawal from the account.

18  Q.  So one of the two people sitting here at counsel table

19  had made the withdrawal, but you can't tell the Court which

20  one, right?

21  A.  At this time, no.

22  Q.  Okay.  And I don't want you to speculate about anything.

23     Now, with respect -- you had shown the Court some money

24  orders that had been deposited into these accounts, right?

25  A.  Yes.

72

```
 1   Q.  And you would agree with me that a money order is like a

 2   check in that the rear of the instrument has got to be

 3   endorsed, right?

 4   A.  Yes, I agree.

 5   Q.  Okay.  Did you show the Court the -- the back of those

 6   money orders?

 7   A.  Um, I did not.

 8   Q.  Were you aware that Jonathan Ramos didn't endorse those

 9   money orders?

10   A.  I'm not aware of that.

11   Q.  Okay.  Well, you looked at the endorsement on the rear

12   of the money order, right?

13   A.  Um, so those --

14   Q.  It's a yes or no question.  In the course of your

15   investigation, did you look at the rear of the money order

16   at the endorsement?

17   A.  No.

18   Q.  So you can't tell this Court who had endorsed the money

19   order?

20   A.  If you let me explain, I can tell you.

21   Q.  Can you tell the -- can you listen to my question first,

22   sir?  Okay?  Are you ready?

23   A.  I'm ready.

24   Q.  Okay.

25   A.  Go ahead.
```

73

1    Q.   Did you look at the rear of the money order at the

2    endorsement?

3    A.   No.

4    Q.   So can you tell the Court who endorsed the money order

5    that -- the money orders that had gone into the Bank of

6    America account?

7    A.   I don't know.

8    Q.   Okay.  So once again, the big connection to this case

9    for Jonathan Ramos are these bank accounts, right?

10   A.   Yes.

11   Q.   Okay.  Now, you had told the Court about these different

12   drug ledgers that were recovered in this case, is that

13   correct?

14   A.   Yes.

15   Q.   And were there people's nicknames in these drug ledgers?

16   A.   Yes.

17   Q.   What's -- what's Jonathan Ramos's nickname in the

18   Sinaloa Cartel?

19   A.   Jonathan?

20   Q.   Yeah, Jonathan, my client, what's Jonathan Ramos's

21   nickname in the Sinaloa Cartel?

22   A.   Um, I -- I don't know.

23   Q.   He doesn't have a nickname because he's not part of the

24   Sinaloa Cartel, right?

25   A.   You don't have to have a nickname to be a part of the --

74

1   Q.  All these other people that you described to the Court

2   have these nicknames, these other people that didn't

3   graduate from high school, didn't graduate from college and

4   didn't work at the community college, they all have these

5   street names, right?

6   A.  Well, Alan didn't have a street name.

7   Q.  Let's just be candid with each other.  Jonathan --

8   A.  You asked me if they had a nickname.  Not everybody had

9   nicknames in this group.  There's 75 of them.

10  Q.  You and I can agree Jonathan Ramos has no name in the

11  gang, right?

12  A.  I don't know.  I don't know if he has a nickname.  I

13  know it was Jonathan Ramos.

14  Q.  Is Jonathan Ramos's name listed in any of these drug

15  ledgers?

16  A.  At this time, no.

17  Q.  And if you testify to something beyond this time, you

18  would be speculating.

19  A.  Well, I'm going to say --

20  Q.  So my question is --

21  A.  His nickname is Deposito.  I mean, when they made that

22  deposit, they put it on the drug ledger, it says Deposito.

23  It was $3,250, I believe.

24  Q.  Do you -- are you telling this Judge that his name is

25  Deposito, that Jonathan Ramos's name is Deposito?  Is that

75

1    what you're telling this judge?

2    A.  Well, that's what Lalo referred to him as.  When he

3    deposited the money in his account, he put down Deposito.

4    Q.  You're telling this Court --

5    A.  Can I look at the slide and show you?

6    Q.  -- that Lalo said that Jonathan Ramos --

7    A.  I didn't say that Lalo said that.  I didn't say that.  I

8    said in the drug ledger Mr. Ramos's name was Deposito,

9    because the amount --

10   Q.  Are you talking about Jonathan Ramos or are you talking

11   about Julio Ramos?

12   A.  It was in Jonathan Ramos's account.

13   Q.  Okay.  My question -- well, they have -- his father's

14   name was on his account, right?

15   A.  That's true.

16   Q.  And his name was on his account, right?

17   A.  That's true.

18   Q.  Okay.  So his father may have been using his account,

19   right?

20   A.  That's possible.

21   Q.  Okay.  Do you have anything about Jonathan Ramos's

22   lifestyle that indicates to you that he's leading some fancy

23   lifestyle?

24   A.  I don't have that information, no.

25   Q.  Does he have any fancy cars?

76

1    A.  I don't know.

2    Q.  Does he live in a fancy house?

3    A.  I -- I don't -- well, in California, I mean, it's pretty

4    pricy out there.

5    Q.  Any -- any safety deposit boxes connected to him with a

6    bunch of cash in them?

7    A.  No.

8    Q.  Okay.  Now, so other than Deposito, you -- just so the

9    record is clear, you and I can agree that Jonathan Ramos's

10   name is not on any of those drug ledgers, right?

11   A.  That's correct.

12   Q.  Okay.  Now, you had talked about -- at some time in the

13   testimony, I think, that the last name Ramos was just used,

14   without really distinguishing Jonathan from his father

15   Julio, and so I just wanted to be clear about my client with

16   respect to these straw purchases of houses.  Can you explain

17   to the Court, what is a straw purchase of a house?

18   A.  Like a -- a substitute person that comes in that really

19   doesn't have the money but they step in to take the

20   responsibility of purchasing the property for a person that

21   is the original financier.

22   Q.  Okay.  And what's the purpose of having a straw

23   transaction with a straw purchaser of real property?

24   A.  To avoid law enforcement detection.

25   Q.  Okay.  How many straw purchases of real estate property

77

1    did Jonathan Ramos participate in?

2    A.   I'm not aware of any.

3    Q.   So the answer to the question, based on your

4    investigation, is zero, is that correct, Special Agent?

5    A.   At this time.

6    Q.   And -- well, the Court is making its decision based on

7    the evidence that we have at this time, right?

8    A.   Correct.

9    Q.   Okay.  So no purchases of straw property that Jonathan

10   Ramos participated in, right?

11   A.   At this time, no.

12   Q.   You had talked to the Court about straw purchases of

13   vehicles, right, where you buy a vehicle for somebody else,

14   right?

15   A.   Yes.

16   Q.   How many straw purchases of vehicles did Jonathan Ramos

17   participate in?

18   A.   Um, I'm not aware of any, no.

19   Q.   Zero?

20   A.   I'm not aware of any.

21   Q.   All right.  Now, you had talked to the Court about the

22   transportation of these drugs in these black trailers,

23   right?

24   A.   Yes.

25   Q.   And with respect to the transportation of drugs in these

78

1   black trailers, how many of those trips did Jonathan Ramos

2   participate in?

3   A.   None.

4   Q.   Okay.   You had told the Court on the Government's direct

5   examination that multiple cooperating individuals had IDed

6   Jonathan Ramos, is that correct?

7   A.   Julio Ramos.

8   Q.   Okay.   So fair to say none of these cooperating sources

9   specifically identified my client, Jonathan Ramos, right?

10  A.   That's correct.

11  Q.   Okay.   Now, you had talked about people that are

12  involved in this Sinaloa Cartel organization encouraging

13  U.S. citizens to flee to Durango, Mexico.   Do you remember

14  testifying to that?

15  A.   Yes.

16  Q.   And do you have any information that anybody had

17  encouraged my client, Jonathan Ramos, to flee to Mexico?

18  A.   No.

19  Q.   Do you have any information that my client, Jonathan

20  Ramos, had been encouraged by anybody to flee to Mexico?

21  A.   I don't.

22  Q.   You had told the Court that as part of this drug

23  conspiracy that there was money being sent back to Mexico,

24  is that right?

25  A.   Yes.

79

1   Q.  How many times did Jonathan Ramos send money back to

2   Mexico?

3   A.  Part of that scheme out in California was collecting

4   part of the drug proceeds to send to Mexico, so --

5   Q.  I'm talking about Jonathan Ramos.  How many times do you

6   have specific information that Jonathan Ramos sent money

7   back to Mexico?

8   A.  As far as like coming from a source, like a cooperating

9   source?

10  Q.  Yes, sir, from a cooperating source, a co-defendant,

11  anybody, how many times?

12  A.  Zero.

13  Q.  Okay.  So his name on both bank accounts is really your

14  strongest piece of evidence.  Would that be fair to say,

15  sir?

16  A.  His name on both bank accounts?  No.  I mean, I think

17  you see the structuring activity.

18  Q.  Structuring?  Okay.  Let's talk about that for a minute.

19  A.  Can I finish my answer?

20  Q.  Yes, sir.  Go right ahead.  Sorry for interrupting you.

21  A.  Thank you.  The structuring activity, the money coming

22  into the funnel bank account, him moving it from one account

23  to another, him receiving the PLS cashier's checks from

24  unknown people in Dallas, Texas, and cashing those checks

25  into those bank accounts.

80

1   Q.   Okay.  So back to the last thing you had mentioned,

2   those PLS checks that were deposited into the bank accounts,

3   did you look at any of those endorsements on the back of

4   those checks?

5   A.   So those were sent from Bank of America, so they didn't

6   have the back side of them Xerox copied or copied or

7   scanned, so no.  No, I didn't see the back of them.

8   Q.   Do you know if Jonathan Ramos participated in those

9   transactions at all?

10  A.   Well, his name was on the check.

11  Q.   His name was on the check and it was deposited in the

12  account, but his father also had his name on the account,

13  right?

14  A.   That's true.

15  Q.   So his father had the ability to access those accounts

16  and negotiate everything that was going on in those

17  accounts, right?

18  A.   It's possible, yes.

19  Q.   Is it fair to say that you're not able to distinguish,

20  based on the investigation and the records in this case,

21  whether his father was doing that or whether he was doing

22  that, right?

23  A.   That's correct.

24  Q.   Okay.  And just with respect to, once again, his

25  background, his background really wouldn't support or

81

1   wouldn't support the idea that he's part of the Sinaloa Drug

2   Cartel, would it?

3   A.   If you go based off my training and experience, anybody

4   can participate in this deal, anybody.

5   Q.   How many --

6   A.   We've had teachers.  We have had --

7           THE COURT:  This is all repetitive.  You started this

8   examination on this questioning.  Let's move on.

9           MR. SILVERMAN:  Yes, sir, I'm getting ready to tie it

10  up, Judge.

11          THE COURT:  Well, I'm not talking about that.  I'm

12  just saying you've already asked this question and he gave his

13  opinion on this.

14  BY MR. SILVERMAN:

15  Q.   You and I had discussed structuring a couple of minutes

16  ago.  Can you tell the Court, what is structuring?

17  A.   Structuring is when you use a pattern of depositing

18  money into a bank account on maybe different days, under the

19  $10,000 reporting requirement, to avoid law enforcement

20  detection.  So you see it going into bank accounts and ATMs

21  maybe.  You'll see it deposited at one bank branch and then

22  maybe another bank branch, so that's an example of

23  structuring.

24  Q.   And are there any ATM videos in this case with Jonathan

25  Ramos depositing amounts under $10,000 into the bank?

82

1    A.   No.

2    Q.   Are there deposit slips that Jonathan Ramos filled out

3    in amounts, over a period of days, in an attempt to avoid

4    the reporting requirement?

5    A.   Um, could you repeat that question again?

6    Q.   Yes, sir.  Do you have any -- did you look at any

7    deposit slips that Jonathan Ramos filled out with amounts

8    less than $10,000 to avoid the reporting requirement?

9    A.   I didn't see any.

10   Q.   Okay.  So there's none?

11   A.   Well, I mean, I have to -- I believe there's one that's

12   like 8,850 that was broken up into two separate PLS checks

13   that came in to him that he deposited.

14   Q.   And just so we don't confuse the issue, talking about

15   these PLS checks, these are electronic deposits, right?

16   A.   I believe so, yes.

17   Q.   You don't have any evidence that Jonathan Ramos made

18   those deposits, do you?

19   A.   No, I don't.

20   Q.   Mr. Davis had talked to you a little bit about

21   surveillance in this case.  Is there any surveillance in

22   this case with Jonathan Ramos committing any crime on the

23   surveillance?

24   A.   Actual physical surveillance?

25   Q.   Yes, physical surveillance.

83

1    A.  No.

2    Q.  Are there any recorded phone calls that implicate

3    Jonathan Ramos by name as part of this conspiracy?

4    A.  No.

5               MR. SILVERMAN:  Could I have just a second?

6               THE COURT:  Yes.

7               MR. SILVERMAN:  I have no further questions of this

8    witness, Your Honor.

9               THE COURT:  Thank you.  Mr. Gonzalez, anything

10   additional?

11              MR. GONZALEZ:  Just a few questions, Your Honor.

12              R E D I R E C T  E X A M I N A T I O N

13   BY MR. GONZALEZ:

14   Q.  Agent West, based on your training and experience and

15   investigating these types of cases, does everyone that's

16   involved in a conspiracy of this nature touch the drugs?

17   A.  That's correct, not everybody touches the drugs.

18   Q.  Does everybody involved transport the money?

19   A.  No.  Separate roles.

20   Q.  Do individuals serve a specific role in the drug

21   trafficking organization?

22   A.  That's correct.

23   Q.  And the role that these two Defendants had was what?

24   A.  Laundering drug proceeds for the organization.

25   Q.  And that's what your investigation showed and your

84

1   cooperators told you, correct?

2   A.   That's correct.

3   Q.   Now, did you find real estate that was associated to

4   these Defendants?

5   A.   Yes.

6   Q.   And would it surprise you -- well, your confidential

7   informants indicated that they were sending payments --

8   defense counsel asked you if it was rent payments for

9   property, correct?

10   A.   Yes.

11   Q.   Would it surprise you that when Mr. Julio Ramos said or

12   he reported to Pretrial Services that he simply received --

13   he earns $5,000 a month and that's the only money he earned

14   is through his place of employment?  Did you see larger

15   quantities being deposited into his bank account?

16   A.   Yes.

17   Q.   More than $5,000 a month?

18   A.   I believe there was multiple payments.  One was, I

19   believe -- I can't recall off the top of my head.  8,550 is

20   what I recall.

21   Q.   And that's not including taking out the 2,500 in

22   expenses that he indicated to Pretrial Services.  So,

23   really, it's only $2,500.  Did you see more than $2,500 a

24   month being deposited into his bank account?

25   A.   Yes.

85

1    Q.  Did you see any rent payments?

2    A.  I didn't see any rent payments.

3    Q.  In fact, Mr. Julio Ramos doesn't report that he owns any

4    residences and that he's receiving rental income?

5    A.  That's -- that's correct.  I believe that there were

6    checks written as far as -- as I testified to earlier,

7    Mr. Hamad, there were some checks coming like that.  But

8    other than -- coming from Dallas, Texas and the amounts

9    that -- they were always even amounts, like 2,500, 3,000,

10   250, amounts like that that were coming in, 1,000, coming

11   from Dallas to California to the Ramoses.

12   Q.  But your information was that that was for them to

13   launder, not to pay for any rent on a property?

14   A.  That's correct.

15   Q.  In regards to Jonathan Ramos, similarly there, he has

16   been unemployed -- has been employed at Staples, has been

17   employed at Best Buy, has been employed at the University of

18   California or California State University at San Bernadino.

19   He doesn't really report an income.

20       Did you show any constant income that would be

21   indicative of employment?

22   A.  I didn't see any.

23   Q.  Then he reported that there was $30,000 in that joint

24   bank account but that most of it belonged to his father.

25   And was that the bank account that was being used by both

86

1    Defendants?

2    A.   Yes.

3    Q.   And when you indicated that there was properties being

4    purchased in California, were those properties being

5    purchased for Gallegos?

6    A.   Yes, he used the Ramoses to purchase those properties

7    out there for his -- for Jody to stay in, Joseph Borromeo

8    Lora, Leonor Lopez and Rafael Galindo Gallegos, Sr.

9    Q.   And those properties were expensive properties, correct?

10   A.   I think they're appraised over a million.

11   Q.   Were those properties, based on your investigation,

12   purchased with drug proceeds?

13   A.   According to the sources, yes.

14            MR. GONZALEZ:  That's all I have, Your Honor.

15            MR. SILVERMAN:  Can I briefly?

16            THE COURT:  Yes, go ahead.

17             R E C R O S S   E X A M I N A T I O N

18   BY MR. SILVERMAN:

19   Q.   Just the two Bank of America accounts, 3930 and I

20   believe the other one was 3552.

21   A.   Okay.

22   Q.   3930 was the account that Jonathan Ramos and his wife

23   used.  Were you aware of that?

24   A.   Is Carla the wife?

25   Q.   Yes.

87

1    A.   Yes, I saw that.

2    Q.   And that the money that he got paid from the community

3    college, the family's money was in that bank account.   Were

4    you aware of that?

5    A.   I was not.

6    Q.   Okay.   Did you look at his tax returns for last year?

7    A.   I did not.

8              MR. SILVERMAN:   Okay.   Nothing further, Your Honor.

9              THE COURT:   Okay.   You may step down.

10        What says the Government?

11             MR. GONZALEZ:   No further witnesses, Your Honor.

12             THE COURT:   Any evidence from the defense?

13             MR. SILVERMAN:   Yes, Judge, the --

14             THE COURT:   Well, let me first call on --

15             MR. DAVIS:   Yes, Your Honor.   Mr. Silverman has a

16   couple of witnesses that are his main witnesses, and I just

17   have a couple of questions.   They're very brief.

18             THE COURT:   Okay.   That's fine.

19             MR. DAVIS:   Relatives.

20             MR. SILVERMAN:   Jonathan Ramos calls Elizabeth Marin.

21             THE COURT:   While we wipe that down, if you want to

22   raise your right hand.

23                       (Witness was sworn.

24             THE COURT:   Okay.   Just wait one second.

25        If you'll state your name and spell your last name for

88

1   the record.

2           THE WITNESS:  Good morning, Your Honor.  My name is

3   Elizabeth Marin.

4           THE COURT:  And would you spell your last name?

5           THE WITNESS:  M-A-R-I-N.

6           THE COURT:  Thank you.  Go ahead.

7           MR. SILVERMAN:  May I proceed?

8           THE COURT:  Yes.

9         ELIZABETH MARIN, DEFENDANTS' WITNESS, SWORN,

10              D I R E C T   E X A M I N A T I O N

11  BY MR. SILVERMAN:

12  Q.  Can you please introduce yourself to the Court?

13  A.  Good morning.  My name is Elizabeth Marin.

14  Q.  And spell your last name, please.

15  A.  M as in Mary, A as in apple, R as in Ray, I as in igloo,

16  N as in Nancy.

17  Q.  And, Ms. Marin, where are you from?

18  A.  Originally I was born in Lima, Peru.

19  Q.  Are you a United States citizen?

20  A.  Yes, sir.

21  Q.  How long have you been a United States citizen?

22  A.  Since I was eight years old.

23  Q.  Do you have any prior criminal history?

24  A.  No, sir.

25  Q.  Do you know this person sitting on my right side of the

89

1    counsel table wearing glasses?

2    A.   Yes.

3    Q.   And who is that person?

4    A.   He's my cousin.

5    Q.   And which -- and prior to being arrested for this

6    offense, where did your cousin -- what's your cousin's name?

7    A.   Jonathan Ramos.

8    Q.   And where did Jonathan Ramos live?

9    A.   Corona, California.

10   Q.   And did he live in a home or an apartment?

11   A.   Home.

12   Q.   And who did he live with?

13   A.   His dad, Julio Ramos, his mother, Sandra Ramos, his

14   sister, Susana Ramos, his wife and three kids, and also

15   Susana Ramos's family, husband and three kids, and their

16   grandpa.

17   Q.   And how long has Jonathan Ramos been married?

18   A.   I'm not sure, to be honest.  I want to say maybe five

19   years, I want to say, or a little longer than that probably.

20   Q.   And how many children does he have?

21   A.   Three.

22   Q.   And how old are the children?

23   A.   Mateo, he's about maybe six, seven years old, I believe,

24   and the twins are almost three.

25   Q.   Okay.  And what kind of work do you do in California?

90

1   A.   Right now I'm a business banker for Wells Fargo Bank.

2   Q.   And how long have you done that job?

3   A.   About almost five years.

4   Q.   And do you have a college degree?

5   A.   I'm going to college currently.

6   Q.   And do you own a home, rent a home in California?

7   A.   Rent an apartment in California.

8   Q.   And who do you live with?

9   A.   With my domestic partnership and my two kids.

10  Q.   Who is that person?

11  A.   Saul Rodriguez.

12  Q.   And do you and Saul have any children together?

13  A.   Yes, sir.

14  Q.   And how many children do you have?

15  A.   Two.

16  Q.   In the event that the Court grants Jonathan pretrial

17  release, would you be willing to sign on a surety bond to

18  guarantee his court appearance here in Texas?

19  A.   Yes, sir.

20  Q.   And do you know Jonathan to be a person that travels

21  internationally?

22  A.   No.

23  Q.   Is -- what kind of person do you think Jonathan is?

24  A.   Humble, family oriented, goal oriented.  He's a home

25  body.  He's always at home, other than going out to get food

91

1   for his family, work, school, that's it.

2   Q.  Do you know, prior to being arrested, what Jonathan's

3   employment status was?

4   A.  I was aware of Best Buy and the latest company,

5   community college.

6   Q.  And do you know anything about the community college

7   wanting to take him back if the Court releases him on

8   pretrial release?

9   A.  I was not aware.

10           MR. SILVERMAN:  Okay.  Nothing further, Your Honor.

11           THE COURT:  Well, let me ask the other defense

12   counsel.

13           MR. DAVIS:  If it's okay, Judge, just a couple of

14   questions.

15           THE COURT:  Yes, go ahead, and then we'll go to Mr.

16   Gonzalez.

17               C R O S S   E X A M I N A T I O N

18   BY MR. DAVIS:

19   Q.  Good morning.

20   A.  Good morning.

21   Q.  We met yesterday, right?

22   A.  Yes.

23   Q.  Okay.  Mr. Silverman has covered, in large part, your

24   background and your relationship, but I just wanted to ask

25   you a couple of questions.  How long have you known Julio

1    Ramos?

2    A.  Since I came to this country, since I was eight.

3    Q.  All right.  And are you familiar with his immigration

4    status here in the United States?

5    A.  Yes, I am.

6    Q.  Okay.  And what is that status?

7    A.  That he's not legal.

8    Q.  And because of that, has he traveled before outside the

9    United States?

10   A.  Never.

11   Q.  Okay.  If the Court were to grant him pretrial release,

12   would you help ensure that he would follow those conditions?

13   A.  Of course.

14   Q.  Do you have concerns about him being a flight risk?

15   A.  Not at all.

16   Q.  What about a danger to the community?

17   A.  Not at all.

18           MR. DAVIS:  Okay.  No further questions, Your Honor.

19           THE COURT:  Mr. Gonzalez.

20               C R O S S   E X A M I N A T I O N

21   BY MR. GONZALEZ:

22   Q.  You would agree with me, ma'am, that someone who's here

23   in this country illegally is already violating the laws of

24   this country by being here?

25   A.  Yes.

93

1    Q.  And Mr. Julio Ramos didn't have a problem with that, did

2    he?

3    A.  No.

4    Q.  Ma'am, you talked about being possibly a third party

5    custodian for Jonathan Ramos, and you indicated that there

6    was children there at your house.  What are their ages?

7    A.  I'm sorry.  My house or his house?

8    Q.  At your house.

9    A.  My house, ten years old and a five year old.

10   Q.  And you've sat here and listened to the testimony of the

11   DEA agent, an experienced agent, and he talked about the

12   violence perpetrated by the cartel that they're linked to.

13   Do you have any concern for your children living there at

14   your house, having someone associated with that cartel

15   living there?

16   A.  Of course.

17   Q.  You do?

18   A.  Of course.

19   Q.  And you're still willing to put that concern of someone

20   associated with the Sinaloa Cartel living there at your

21   house?

22   A.  Yes.

23   Q.  Now, you talked about his employment, that he was

24   employed at the college or the university, sorry, and that

25   he was employed at Staples.  You know about that employment,

94

1    correct?

2    A.   Yes.

3    Q.   And that -- and you know that after that he was

4    unemployed, or did you not know that?

5    A.   I wasn't aware.

6    Q.   Okay.  So he was unemployed after Staples.  Do you know

7    how much money he was making?

8    A.   No.

9    Q.   Do you know how much money they were bringing into their

10   household?

11   A.   No.

12   Q.   Do you know how much money he pays for his house?

13   A.   No.

14   Q.   Do you know how he hired his attorney?

15   A.   No, not -- not necessarily, not in detail.

16   Q.   Well, what do you know?  How did he pay for his

17   attorney?

18   A.   I know that I helped out at some point as a family

19   member.

20   Q.   How much money?

21   A.   I put in about a thousand dollars.

22   Q.   And how much money did the Defendant put in?

23   A.   I'm not sure.  I'm not familiar with the whole amount.

24   Q.   What was the total amount that needed to be paid?

25   A.   I believe -- just for him?

95

1    Q.  Just for him.

2    A.  I believe about 60,000 maybe or -- I'm not sure.  I'm

3    not so sure.

4    Q.  What is it that you thought it was?

5    A.  Well, I know for both total was probably about a hundred

6    thousand.

7           MR. DAVIS:  Excuse me, Judge.  I object to what fee

8    arrangements were as being privileged in a criminal case.  I

9    don't think it's relevant.

10          MR. GONZALEZ:  Your Honor, part of the issue here is

11   the wealth of --

12          THE COURT:  Well, I'll overrule the objection.  I

13   mean, whatever she knows, I don't see how that's privileged if

14   she's been told.  Why is that protected?

15          MR. DAVIS:  Because --

16          THE COURT:  It would be different if your client was

17   testifying maybe, but --

18          MR. DAVIS:  Right.  Well, I understand the Rules of

19   Evidence don't apply, but it would have been a privileged

20   communication with my client.  I don't know how exactly she

21   would know this stuff.  I mean, it would be hearsay and things

22   like that.

23          MR. SILVERMAN:  And I would argue the same objection

24   on behalf of Jonathan.

25          THE COURT:  Okay.  Well, I'm going to overrule the

96

1    objection.  Go ahead.

2    BY MR. GONZALEZ:

3    Q.  So how much money needed to be collected by the family

4    to pay for these attorneys?

5    A.  I'm not sure.

6    Q.  You mentioned an amount just awhile ago.  What did you

7    believe it to be?

8    A.  I'm sorry?

9    Q.  You mentioned an amount just awhile ago.  What was that

10   amount?

11   A.  I said an approximate of about a hundred thousand, but

12   it's not in concrete.  I'm not sure exactly the exact

13   amount.

14           MR. SILVERMAN:  And I object at this point to

15   speculation, Judge.  She said she doesn't really know.

16           THE COURT:  Well, overrule the objection.  She can

17   answer, whatever she believes.

18   BY MR. GONZALEZ:

19   Q.  You believed it was a hundred thousand dollars, and you

20   pitched in $1,000, right?

21   A.  Right.

22   Q.  Do you know where the other $99,000 came from?

23   A.  Most likely, the rest of my family members.

24   Q.  How much money came from their bank accounts?

25   A.  I'm not sure.

97

1   Q.   How many assets did they sell?

2   A.   I'm not sure.

3   Q.   Do you know whether they own real estate?

4   A.   Whether what?  I'm sorry.

5   Q.   Whether they own real estate?

6   A.   I know my uncle does.

7   Q.   And how much did he pay for that?

8   A.   I don't know.

9   Q.   How many properties does he own?

10  A.   I'm not sure.

11  Q.   How many properties did he sell to hire the attorneys?

12  A.   I'm not sure.

13          MR. GONZALEZ:  That's all I have, Your Honor.

14  Thank you.

15          MR. SILVERMAN:  Briefly?

16          THE COURT:  Yes, go ahead.

17           R E D I R E C T   E X A M I N A T I O N

18  BY MR. SILVERMAN:

19  Q.   The Government had talked to you about a person that was

20  part of the Sinaloa Cartel being around your children.  Do

21  you remember hearing that question?

22  A.   Yes.

23  Q.   How long have you known Jonathan Ramos?

24  A.   My whole life.

25  Q.   Would you consider him to be a hard person or a softer

98

1    type of person?

2    A.   A softer type of person.

3    Q.   Is he the type of person that would run around with gang

4    members?

5    A.   Not at all.

6    Q.   Is he -- does he have any gang tattoos?

7    A.   No.

8    Q.   Was he a more studious person or somebody that just kind

9    of skipped school and didn't finish their studies?

10   A.   No.  He doesn't even go to the street alone or the

11   market alone.

12   Q.   Is he a big person that hangs out with his buddies at a

13   club or anything like that?

14   A.   I don't think he's ever been to a bar or a club.

15   Q.   Okay.  Family man, right?

16   A.   Yes.

17   Q.   Not a gang member, right?

18   A.   Not at all.

19   Q.   And when you told me that you would be comfortable as a

20   third party custodian, was it based on what you know about

21   Jonathan Ramos?

22   A.   Correct.

23   Q.   With respect to the fee that was paid for the lawyers,

24   do you know specifically what the fee was?

25   A.   No.

99

1    Q.   Okay.   Do you know the amount that's owed still?

2    A.   No.

3              MR. SILVERMAN:   Okay.   Nothing further.

4              THE COURT:   You may step down.

5         Anything else?

6              MR. SILVERMAN:   I have one more quick witness, Your

7    Honor.

8              THE COURT:   Go ahead.

9              MR. SILVERMAN:   The defense calls Saul Rodriguez.

10             THE COURT:   Sir, if you'll raise your right hand and

11   be sworn in.

12                       (Witness was sworn.

13             THE COURT:   Go ahead.

14         SAUL RODRIGUEZ, DEFENDANTS' WITNESS, SWORN,

15             D I R E C T   E X A M I N A T I O N

16   BY MR. SILVERMAN:

17   Q.   Can you please introduce yourself to the Court?

18   A.   Yes.   My name is Saul Rodriguez, S-A-U-L

19   R-O-D-R-I-G-U-E-Z.

20   Q.   Mr. Rodriguez, where are you from?

21   A.   Los Angeles, California.

22   Q.   And did you attend high school there?

23   A.   Yes.

24   Q.   What high school did you graduate from?

25   A.   John Marshall High School.

100

1   Q.  And what did you do after you graduated from John

2   Marshall High School?

3   A.  I enlisted in the Marine Corps.

4   Q.  And we appreciate your service.  How long were you in

5   the United States Marine Corps?

6   A.  Eight years.

7   Q.  Did you, sir, have any active combat duty?

8   A.  Yes, in 2008 I went to Iraq.

9   Q.  And how long did you serve in Iraq?

10  A.  Seven months.

11  Q.  And when did you come back -- when did you leave the

12  Marine Corps?

13  A.  I got out in February 2012.

14          THE COURT:  Mr. Silverman, if you would turn your mic

15  on.

16          MR. SILVERMAN:  It's not coming on.

17          THE COURT:  We just finished a two week trial where

18  they were being used all day by a whole bunch of lawyers.

19          MR. DAVIS:  So in the hearing, if it runs out, you're

20  done?

21          THE COURT:  No, no.

22  BY MR. SILVERMAN:

23  Q.  And, Mr. Rodriguez, where we left off is when you came

24  back from active combat duty.  What did you do when you came

25  back?

101

1    A.  I had minor jobs here and there, working at different

2    places.  In 2013 I decided to go back to school, and I've

3    been going to school since.

4    Q.  And what do you do today, sir?

5    A.  I work at a community college in Pasadena.  I do

6    outreach coordination for Veteran Services.

7    Q.  And are you currently in school right now?

8    A.  Yes, I am.  I'm at California State at A in the Master's

9    Program in counseling.

10   Q.  Okay.  Do you know this person sitting at counsel table

11   to my right wearing glasses?

12   A.  Yes.

13   Q.  And who is that person?

14   A.  Jonathan Ramos.

15   Q.  And how do you know Jonathan Ramos?

16   A.  Through my partner.

17   Q.  And are you -- prior to him being arrested, would you be

18   around him often?

19   A.  Yes.

20   Q.  And would you be willing to do everything you could to

21   make sure that he shows up to his court appearances in

22   Texas?

23   A.  Yes.

24   Q.  Would you be willing to sign as a third party custodian

25   on a bond if the Court determines it's appropriate to

102

1    release him on pretrial release?

2    A.   Yes.

3    Q.   Is Jonathan Ramos the type of person that travels

4    internationally?

5    A.   No.

6    Q.   Is Jonathan Ramos -- have you ever seen him possess

7    firearms?

8    A.   No.

9    Q.   Have you ever seen him use drugs?

10   A.   No.

11   Q.   What kind of person can you tell the Court that Jonathan

12   Ramos is?

13   A.   Very quiet, keeps to himself.  I mean, he's usually

14   upstairs with his wife and kids.  Whenever I go over, he'll

15   come down and we'll watch some Dodger games, talk about

16   baseball.  That's it.

17              MR. SILVERMAN:  Okay.  Nothing further, Your Honor.

18              THE COURT:  Anything?

19                  C R O S S   E X A M I N A T I O N

20   BY MR. DAVIS:

21   Q.   I'll just ask you similar questions but shorter since

22   Mr. Silverman has covered quite a bit of the territory with

23   you.  But do you know Julio Ramos?

24   A.   Yes.

25   Q.   And if the Judge was to grant him pretrial release,

103

1   would you help ensure that he follows conditions of that?

2   A.  Yes.

3   Q.  And do you have concerns about him being a flight risk?

4   A.  No.

5   Q.  Or a danger to the community?

6   A.  No.

7   Q.  And you've heard the agent's testimony here today,

8   correct?

9   A.  Yes.

10           MR. DAVIS:  Okay.  No further questions.

11           THE COURT:  Mr. Gonzalez, any questions?

12           MR. GONZALEZ:  No, Your Honor.

13           THE COURT:  Okay.  You may step down.

14           THE WITNESS:  Thank you.

15           THE COURT:  Does that conclude the evidence, Mr.

16   Silverman, that you would like to offer?

17           MR. DAVIS:  What I would do, Judge, if we could just

18   introduce as Defense Exhibit 1 for Julio Ramos the Pretrial

19   Services Report.  I think it provides a lot of background to

20   the Court.

21           THE COURT:  Well, typically the Court doesn't admit

22   that as an exhibit.  It's something the Court has as part of

23   its record.

24           MR. DAVIS:  That's all from Mr. Ramos.

25           MR. SILVERMAN:  On behalf of Jonathan Ramos, if the

104

1    Court would just take judicial notice of the Pretrial Services

2    Report.

3              THE COURT:  Yes, I will certainly do that.  I mean,

4    we consider it automatically anyways, although it was prepared

5    by California.  I don't know that our probation officer here

6    has actually done a report.  But that's fine.

7              MR. DAVIS:  Thank you, Your Honor.

8              MR. SILVERMAN:  Thank you, Your Honor.

9              MR. DAVIS:  Nothing further.

10             MR. SILVERMAN:  Nothing further.

11             THE COURT:  Okay.  And since this is a presumption

12    case, the only question I have, Mr. Gonzalez, is as to Jonathan

13    Ramos.  I know he's also charged in one of the counts that

14    would lead to a presumption, correct?

15             MR. GONZALEZ:  Yes, Your Honor.

16             THE COURT:  Okay.  But based on the testimony, I

17    don't know of any -- separating him from Julio, but it doesn't

18    sound like there's any evidence tying him to the drug

19    conspiracy.  And I know you're not bound by that at this

20    detention hearing, but I'm just trying to figure out how I

21    evaluate that.  Because if it's just the money laundering count

22    as to him, that's not a presumption case by that, correct?

23             MR. GONZALEZ:  Well, I -- the presumption case is any

24    case that involves a potential sentence of more than ten years.

25             THE COURT:  No, I always thought the presumption --

105

1    putting my Magistrate hat back on.  It's been years since I did

2    a detention hearing, but I always thought the presumption only

3    comes into play if there's a ten year minimum that's in play

4    and certain offenses.  I didn't think it -- the money

5    laundering count is usually up to 20 years.

6              MR. GONZALEZ:  Correct.

7              THE COURT:  So I wasn't sure if the presumption

8    applies if it's just the money laundering count.  I know he's

9    been indicted for the others so the presumption is in play in

10   that sense, but I have to evaluate it, so I'm asking for help

11   here to see --

12             MR. GONZALEZ:  Well, Your Honor, the testimony is

13   that there were money orders, bank deposits.  His bank account

14   was being used.  There's testimony that the confidential

15   informants or cooperating defendants have indicated that the

16   money that was being deposited into those specific bank

17   accounts, which are owned by either one of these two

18   Defendants, was the proceeds and that it was being sent back so

19   that it could then be sent to Mexico.  But it was drug

20   proceeds.

21        So they're not only involved in the money laundering

22   aspect.  The money is coming from the drug distribution.

23   Whether they distributed the drugs or manufactured the drugs

24   is not the issue.  Whether -- it's are they involved in the

25   conspiracy, and do they have an agreement to launder the

1    money that's derived from the drugs, which is then sent to

2    them.  They send it to Mexico.  They use that money to

3    produce more drugs, and so on, so forth.

4           THE COURT:  So let me ask, so your view is if -- and,

5    again, there's some evidence Julio is different, but as to

6    Jonathan, if his only involvement is money laundering and

7    that's it, do you believe that's enough to convict him for the

8    conspiracy on the drug charge?

9           MR. GONZALEZ:  Sure.  There's witnesses that are

10   going to say that --

11          THE COURT:  The only reason is we've tried a number

12   of cases, and in similar kind of cases where there's a mixture

13   of the money laundering side, the drug distribution side, most

14   of the Defendants have gotten acquitted on -- when there really

15   wasn't any evidence of them doing anything other than money

16   laundering.  They got convicted of the money laundering side,

17   but --

18          MR. GONZALEZ:  Well, I --

19          THE COURT:  We're not in trial today.  I just thought

20   we should --

21          MR. GONZALEZ:  I would beg to differ.  I've gotten

22   convictions from both, both the drug conspiracy and the money

23   laundering, based on these exact same facts where their part or

24   their role in the conspiracy is just to launder the money or to

25   transport the money.  Because of the fact that it's coming from

1    the distribution of drugs, they're squarely in the conspiracy

2    to distribute drugs.

3         That quantity of money can then be converted to

4    kilogram quantities of whatever drug it was that was

5    generating those proceeds.

6              THE COURT:  Okay.  So now the presumption is in play,

7    irrespective of the Court's comments, because the indictment

8    triggers that presumption.  So I'll let the Defendants go first

9    to argue why you feel like you rebutted the presumption and I

10   should allow for a bond.  Who would like to go first?

11             MR. DAVIS:  Your Honor --

12             THE COURT:  You need to use a mic.

13             MR. DAVIS:  Sorry.  Would you like me to address you

14   back there?

15             THE COURT:  It doesn't matter.  That's fine too.

16             MR. DAVIS:  So, as the Court noted, this is not a

17   trial.  It's -- it's a summary of the evidence in the case.

18        I believe the Court has the Pretrial Services Report.

19   I think the Court is well aware of Mr. Ramos's background,

20   that he doesn't have a criminal history.  He's somewhat of

21   an elderly gentleman who has got a lot of health problems.

22        He is not here legally.  He's from Peru.

23             THE COURT:  That's the other question, and let me ask

24   that.  I mean, typically when I was a Magistrate Judge, we

25   never had a hearing when someone had an ICE hold.

108

1          MR. DAVIS:  I just learned of that today.

2          THE COURT:  Okay.  Because you only get one -- I say

3   that because normally what I would say to the attorneys is that

4   you only get one detention hearing, and I'll never let somebody

5   out when there's an ICE hold.

6          MR. DAVIS:  Right.

7          THE COURT:  But I understand we went through a whole

8   hearing and I'll make whatever findings, independent of that.

9          MR. DAVIS:  And that's the deal.  I noticed the date

10  was August 20th.  When I called before that date, I was told

11  there was no ICE hold, so today was the time I learned of that.

12         THE COURT:  Sure.

13         MR. DAVIS:  And the Government apparently recently

14  learned of it too, and they have been good about communicating

15  with me.

16      So I understand there's an ICE hold, so obviously we're

17  in a little bit of a different position.  So I would just

18  ask the Court to consider the weight of the testimony.  I

19  think there's a question of whether Mr. Ramos really knew

20  that these were drug proceeds, which obviously is kind of

21  the gravamen of the offense, or whether he believed he was

22  getting good faith rental payments.

23      Also, you know, there's a lot of inconsistencies with

24  the Government's theory, I mean, from how much money was

25  deposited to, wait a minute, was he buying property or was

109

1    he sending money back to Mexico?

2         It just seems like it could be put together a little

3    better and it's really murky, and it's murky as far as bank

4    records go, endorsements and everything else, and it has

5    been a challenge for me to even figure out these numbers.

6    And I'm not sure mine are even accurate or they're complete

7    because of the way the records are.

8         So -- but I do understand it's a presumption case in

9    this situation.  That's what I would say.

10        Thank you, Your Honor.

11             THE COURT:  Okay.  Mr. Silverman.

12             MR. SILVERMAN:  Yes, Your Honor.  Jonathan Ramos is a

13   United States citizen.  He has significant ties to his

14   community.  He graduated from high school.  He has a history of

15   steady employment.  He attended a four year college.  He

16   received his undergraduate degree.  He's married.  He has three

17   children.

18        He has no criminal history.  He -- there's no

19   extraneous information about him possessing firearms, about

20   him being a drug abuser, about him abusing alcohol.

21        Additionally, there's at least some evidence in this

22   record that in the event the Court releases him, that he's

23   going to be able to seek employment back at the community

24   college.

25             THE COURT:  Well, the witness didn't know that so

110

1   do we -- have you been able to verify whether or not he has a

2   job he can go back to?

3           MR. SILVERMAN:  Only through him, that I have talked

4   to him and that his supervisor has told him as soon as he gets

5   out to call him.  And so the record is what it is with respect

6   to the employment.

7       With respect to the evidence in this case, the

8   Government has a bank account that he had his name on the

9   bank account with his father.  There's no evidence that he

10  endorsed -- in this hearing there's no evidence that he

11  endorsed any of these money orders that were deposited into

12  the account.

13      There is no evidence that he was the one that

14  electronically transferred any of those funds.  There is no

15  evidence, according to the agent, that he participated in

16  the straw purchases of any of these houses.  There's no

17  evidence that he participated in the straw purchases of any

18  cars.

19      When he was arrested, he didn't attempt to flee.  There

20  were no firearms that were recovered at the house.  There

21  were no drugs recovered at the house.

22      If the Court looks at this as a presumption case, if

23  there ever was a case that a person should be released,

24  Jonathan Ramos is that person, and I would ask the Court to

25  release him.

111

1          THE COURT:  Thank you.  Mr. Gonzalez.

2          MR. GONZALEZ:  Well, first of all, Your Honor, we

3    would rely on the presumption.  And I think the evidence that

4    you heard -- let me start by their witnesses.  I don't believe

5    that their witnesses have rebutted the presumption either.

6          I believe that the one witness, Ms. Marin, who

7    testified said she was concerned for her own kids having

8    someone like that, that -- with what she has heard here

9    today, coming into her house.  I don't think she rebuts the

10   presumption to continuing threat to the community, when she

11   herself is in fear that something may happen to her children

12   having the Defendant in her residence.

13         And the reason I was asking the questions about who

14   hired the attorneys is because there appears to be excessive

15   wealth here when you look at what's in the Pretrial Services

16   Report to what's in the testimony of the bank statements.

17         Defense counsel wants to say, well, there's no proof

18   that Jonathan Ramos cashed those checks.  It could have been

19   Julio Ramos.  Well, maybe it could have been, but I don't

20   think that that causes this Court any less concern.

21         The cashier's checks are in his name.  He's living with

22   his father.  Those cashier's checks are winding up in their

23   bank account.

24         He can't be deliberately ignorant to the fact that

25   there's large sums of money coming into his bank account and

112

1   he's not questioning that.  If anything, it's indicative of

2   them working together, having a mutual bank account,

3   receiving large sums of money from Dallas, Texas, receiving

4   money orders in his name, which defense counsel wants to

5   insinuate that his father has deposited into their account.

6        I think they're working together.  I think the evidence

7   shows, as the agent testified, that this was a large

8   conspiracy that was moving large quantities of drugs, and

9   they were doing their role, their part of it, either to

10  receive the money and pay for purchases of property in

11  California that the main actors in this conspiracy have

12  purchased, or they were sending the money back to Mexico so

13  that more drugs could be processed and sent back to Dallas

14  so that there could be a continuing flow of drugs into the

15  United States and a continuing flow of money to these

16  Defendants, who are in communication with the main actors.

17  Let's not lose sight of that.  They're in communication with

18  the main actors in Mexico.

19       You also heard the recording where the individuals --

20            MR. SILVERMAN:  I just have to object to that last

21  statement of the prosecutor.  There is no evidence that

22  Jonathan Ramos was in communication with anybody in Mexico.  So

23  just with respect to Jonathan Ramos, I would object to that.

24            MR. GONZALEZ:  There's the testimony from the agent

25  and that's what I would rely on, Your Honor.

113

1          So there's communication -- there's also communication

2     that was played for the Court where a leader/organizer in

3     the organization is specifically orchestrating or saying

4     that certain amounts of money need to be sent to the

5     individuals in California.  Whether it's Julio Ramos or

6     Jonathan Ramos, it's one and the same, from the Government's

7     perspective.  They're working together to launder the money

8     for this organization.

9          It's not by accident that there's $30,000 in Jonathan

10    Ramos's account and he says, well, the bulk of that money

11    belongs to my father.  Again, indicative that they're

12    working together in this process.

13         He is unemployed for substantial amounts of time.  His

14    employment at the university or at Staples cannot possibly

15    generate the amounts of money being depicted in this bank

16    account.

17         And the same thing for Mr. Julio Ramos.  He either

18    forgot to tell this Court he has rental property, as defense

19    counsel wants the Court to believe those payments were for,

20    because he doesn't mention it in the Pretrial Services

21    Report.  He said his sole income was $5,000 that he gets

22    from working at this real estate company, and 2500 of that

23    is monthly expenses.

24         So the bank accounts do not match up to what they're

25    reporting to this Court.  So they're underreporting their

114

1    income so that the Court doesn't believe what the testimony

2    of the agent was, that their role is to launder money for

3    this large organization.

4            THE COURT:  Thank you, Mr. Gonzalez.

5        Okay.  So as to Julio Ramos, first of all, he has an

6    ICE detainer, so the Court has to detain him anyways.  But I

7    don't believe the presumption has been rebutted, and the

8    evidence to him is very different than Jonathan.  So absent

9    that ICE detainer, I would detain him, and I'll enter an

10   order by the end of the week.

11       As to Jonathan, I want to ponder that.  I don't -- I'll

12   enter a decision by the end of the week.  I'm troubled by

13   some of the facts in the case in terms of what has been

14   alleged and -- but I think that one is a closer call, so

15   I will take that matter under advisement as to Jonathan and

16   I'll make a decision by the end of the week.  I have to

17   because I resume another trial next week.

18           MR. SILVERMAN:  May I say something, Your Honor?  Is

19   there anything else I can provide the Court with respect to

20   like the employment issue?  If I could get a letter from his

21   employer, would the Court consider that?  I would like to keep

22   the record open and tender a copy to the Government.

23           MR. GONZALEZ:  I would object to that, Your Honor.

24   If they knew this was going to be a representation they were

25   going to make to the Court, they should have brought that

115

1    employer or brought that letter.

2         THE COURT:  Well, the issue for me is -- I think as

3    to that fact, I can probably say he may have the ability to go

4    back to his job is where I'm leaving it, because it's unknown

5    for sure.  But even if he could, whether that -- I don't think

6    that would turn it for me.

7         So my problem is we have a large drug operation.  A

8    number of people have fled.  As the agent said, some of

9    those are U.S. citizens who have fled.

10        So I'll be very candid.  I'm not inclined to let him

11   out.  So that fact wouldn't turn it, but I do want to go

12   through and look at everything again.

13        MR. SILVERMAN:  Thank you, Your Honor.

14        THE COURT:  And then we'll proceed.

15   Okay.  Anything further from the Government on this

16   case?

17        MR. GONZALEZ:  No, Your Honor.  Thank you.

18        THE COURT:  Anything else from defense?

19        MR. SILVERMAN:  No, Your Honor.

20        THE COURT:  Both of you will go back into custody

21   now, and I'll decide the issue by the end of the week as to

22   Jonathan.

23        MR. SILVERMAN:  Thank you, Your Honor.

24        THE COURT:  I'm staying on the bench because I have

25   one more hearing that was supposed to be at 10:30.

116

1    I certify that the foregoing is a correct transcript from

2    the record of proceedings in the above-entitled matter.

3

4    _____          _____

5    Jan Mason                        Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

117

1                         CHRONOLOGICAL INDEX

2    WITNESS:                                        PAGE:

3    Government's Evidence

4    MARCUS WEST

5              Direct Examination.........................3

6              Cross Examination by Mr. Davis............31

7              Cross Examination by Mr. Silverman........62

8              Redirect Examination......................83

9              Recross Examination by Mr. Silverman......86

10   Defendant Jonathan Ramos Evidence

11   ELIZABETH MARIN

12             Direct Examination.........................88

13             Cross Examination by Mr. Davis............91

14             Cross Examination by Mr. Gonzalez.........92

15             Redirect Examination by Mr. Silverman......97

16   SAUL RODRIGUEZ

17             Direct Examination.........................99

18             Cross Examination by Mr. Davis...........102

19

20

21

22

23

24

25